WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
ANDERS PEDERSEN, Bar No. 11626
anders.pedersen@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: 208.389.9000
Facsimile: 208.389.9040

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE ASSOCIATED PRESS; THE MCCLATCHY COMPANY, LLC, dba The Idaho Statesman; and EAST-IDAHO-NEWS.COM, LLC, dba East Idaho News,<br><br>          Plaintiffs,<br><br>  v.<br><br>JOSH TEWALT, in his official capacity as the Director of the Idaho Department of Correction,<br><br>          Defendant. | Case No. 1:24-cv-00587-DKG<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

    I.    Idaho's Current Execution Procedures ...................................................... 4

    II.   The AP's Attempts to Gain Access to the Medical Team Room .............................. 6

ARGUMENT ......................................................................................................... 6

    I.    The Media Groups Are Likely to Succeed on the Merits of Their First Amendment Claim ................................................................................. 7

        A.    Legal Standard ............................................................................ 8

        B.    The Press Has a First Amendment Right of Access to the Medical Team Room ................................................................. 9

            1.    The Press Has a Right of Access to the Medical Team Room Under Ninth Circuit Precedent ................................. 9

            2.    The Public Has a First Amendment Right to Access the Medical Team Room Under the *Press-Enterprise* Test. ................. 13

        C.    The State Cannot Present a Sufficient Penological Interest That Is Likely to Justify Restricting Access to the Medical Team Room ........................................................................................ 15

    II.   Absent Injunctive Relief, the Media Groups Will Suffer Irreparable Injury ......................................................................................... 18

    III.  The Balance of Equities and the Public Interest Favor Granting a Preliminary Injunction ........................................................................ 19

CONCLUSION ...................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) ............................................................. 7

*Armstrong v. Davis*,
 275 F.3d 849 (9th Cir. 2001), *abrogated on other grounds by Johnson v.
 California*, 543 U.S. 499 (2005) ......................................................... 16

*Associated Press v. Otter*,
 682 F.3d 821 (9th Cir. 2012) ...................................................... passim

*Cal. First Amend. Coal. v. Woodford*,
 299 F.3d 868 (9th Cir. 2002) ...................................................... passim

*Coffman v. Queen of Valley Med. Ctr.*,
 895 F.3d 717 (9th Cir. 2018) ............................................................. 6

*CTIA - The Wireless Ass'n* v. *City of Berkeley*,
 928 F.3d 832 (9th Cir. 2019) ............................................................. 7

*Drakes Bay Oyster Co. v. Jewell*,
 747 F.3d 1073 (9th Cir. 2014) ........................................................... 7

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
 82 F.4th 664 (9th Cir. 2023) ...................................................... 7, 19

*First Amend. Coal. of Ariz., Inc. v. Ryan*,
 938 F.3d 1069 (9th Cir. 2019) .................................................... passim

*Guardian News & Media LLC v. Ryan*,
 225 F. Supp. 3d 859 (D. Ariz. 2016) ............................................. 8, 12

*Idaho v. Coeur d'Alene Tribe*,
 49 F. Supp. 3d 751 (D. Idaho 2014) .................................................. 6

*L.A. Times Commc'ns LLC v. Kernan*,
 No. 18-CV-02146-RS, 2018 WL 10419787 (N.D. Cal. Aug. 17, 2018) .............. 11, 12, 13, 15

*Leigh v. Salazar*,
 677 F.3d 892 (9th Cir. 2012) ...................................................... 2, 15

*N. D. v. Reykdal*,
 102 F.4th 982 (9th Cir. 2024) ........................................................... 7

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION - ii

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................................................ 19

*Pizzuto v. Tewalt,*
No. 1:21-CV-00359-BLW, 2024 WL 3089291 (D. Idaho June 21, 2024) .............................. 2

*Pizzuto v. Tewalt,*
No. 1:23-CV-00081-BLW, 2023 WL 4901992 (D. Idaho Aug. 1, 2023) ................................ 2

*Press-Enterprise Co. v. Superior Ct.,*
478 U.S. 1 (1986) ........................................................................................... passim

*Recycle for Change v. City of Oakland,*
856 F.3d 666 (9th Cir. 2017) ...................................................................................... 7

*Richmond Newspapers, Inc. v. Virginia,*
448 U.S. 555 (1980) ................................................................................................. 1

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020) (per curiam) .............................................................................. 19

*Schad v. Brewer,*
No. CV-13-2001-PHX-ROS, 2013 WL 5551668 (D. Ariz. Oct. 7, 2013) ........................... 14

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
240 F.3d 832 (9th Cir. 2001) ...................................................................................... 6

*Trop v. Dulles,*
356 U.S. 86 (1958) .................................................................................................. 1

*Turner v. Safley,*
482 U.S. 78 (1987) .................................................................................................. 8

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) .................................................................................................... 6

**Statutes**

I.C. 19-2716 ........................................................................................................... 2

**Constitutional Provisions**

U.S. Const., amend. I ....................................................................................... passim

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION - iii

# TABLE OF AUTHORITIES
(continued)

**Other Authorities**

IDOC, Execution Chemicals Preparation and Administration (ECPA) (Oct. 11, 2024) .. 3, 4, 5, 11

# INTRODUCTION

At its core, this case involves the press's ability to fulfill its "significant role in the proper functioning of capital punishment" by providing independent public scrutiny of the State of Idaho's execution process. *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 876 (9th Cir. 2002) (*CFAC*). The Ninth Circuit has not minced words: An informed discussion by the public "is critical in determining whether execution by lethal injection comports with 'the evolving standards of decency which mark the progress of a maturing society.'" *Id*. (quoting *Trop v. Dulles,* 356 U.S. 86, 101 (1958)). Only through the press, functioning as "surrogates for the public," can this critical debate take place in an informed manner. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980).

The Associated Press ("AP"), the McClatchy Company, LLC, dba the Idaho Statesman, and East-Idaho-News.Com, LLC, dba East Idaho News (collectively, "the Media Groups") are challenging the Idaho Department of Correction's (IDOC) recently updated Standard Operating Procedures for Executions (SOP), and its unlawful attempt to restrict their access to integral aspects of the execution process under their First Amendment right of access. Under the current SOP, witnesses—which include four members of the press—will be able to view the Execution Preparation Room, where the medical team places intravenous (IV) lines, and the Execution Chamber, where a condemned individual is placed as the lethal injection drugs are administered and remains until pronounced dead. The witnesses will not, however, be allowed access to the Medical Team Room despite the fact that the medical team will undertake some of the most, if not the most, critical aspects of the execution process in this room. And absent access to the activity occurring in the Medical Team room, the public will remain uninformed about the entirety of the execution.

Significantly, it is not the IDOC's first attempt at unconstitutionally limiting the public's access to critical aspects of the execution process. *See, e.g., Associated Press v. Otter*, 682 F.3d 821,

824 (9th Cir. 2012) (enjoining Idaho from restricting access to the initial stages of an execution on First Amendment grounds). It remains that, "[t]he free press is the guardian of the public interest," and "[i]f a government agency restricts public access, the media's only recourse is the court system." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012). Accordingly, the Media Groups request that this Court enter either a preliminary injunction or a temporary restraining order (TRO) enjoining the IDOC from restricting witnesses from viewing the tasks integrally intertwined with the execution of a condemned individual taking place in the Medical Team Room. Specifically, the Media Groups seek general visual and audio access to the Medical Team Room similar to that already provided in the Execution Preparation Room or the Execution Chamber.

## STATEMENT OF FACTS

Idaho is one of 27 states that use capital punishment. *See* I.C. 19-2716; Death Penalty Information Center, State by State (2024). Idaho has carried out 29 executions since 1864. Death Penalty Information Center, Idaho, History of the Death Penalty (2024). Although Idaho has not executed an inmate in over a decade, it has continued to issue writs of execution and demonstrated that it fully intends to carry out executions of condemned individuals, including Thomas Creech.[1]

Idaho first attempted to execute Mr. Creech on February 13, 2024. *See* Boone Decl. ¶ 7. During that attempt, execution team members tried eight times to place a viable IV line in Mr. Creech's arms and legs over multiple hours. *Id.* ¶ 32. Eventually, Mr. Creech's execution was halted once the execution team finally determined they could not successfully set an IV line. *Id.*

---

[1] The State also presently intends to execute another inmate, Gerald Pizzuto. *See Pizzuto v. Tewalt*, No. 1:23-CV-00081-BLW, 2023 WL 4901992, at *2 (D. Idaho Aug. 1, 2023) (Idaho has issued three death warrants since May 2021). Mr. Pizzuto's execution is stayed until the Ninth Circuit resolves an appeal involving a discovery dispute. *See Pizzuto v. Tewalt*, No. 1:21-CV-00359-BLW, 2024 WL 3089291, at *4 (D. Idaho June 21, 2024). While Mr. Creech's execution appears most imminent, the Media Groups' request applies to all executions under the current protocols.

Following Mr. Creech's failed execution, the IDOC decided to renovate F Block of the Idaho Maximum Security Institution (IMSI), which houses Idaho's Execution Chamber. The renovated "Execution Unit" now includes two witness areas—one for the State's witnesses and one for the condemned prisoner's witnesses—an Execution Chamber, an Execution Preparation Room, and a Medical Team Room. *See* IDOC SOP, Execution Procedures, at 13 (Oct. 11, 2024).

On October 15, 2024, the IDOC published its revised SOP, which applies to all staff members involved in the administration of capital punishment. *See id.* at 1. The revisions were made to reflect the physical changes to F Block, revise the qualifications for the medical team, clarify the execution process, and update the IV placement, syringe, and chemical preparation procedures. *Id.* At the same time, the IDOC released an Execution Chemicals Preparation and Administration document that provided a more detailed set of procedures for the actual execution of a condemned individual. *See* IDOC, Execution Chemicals Preparation and Administration (ECPA), at 4 (Oct. 11, 2024).

The day after IDOC released its updated SOP, the State of Idaho issued a second death warrant for Mr. Creech, scheduling his execution for November 13, 2024. Boone Decl. ¶ 8. An AP representative was approved as one of the media representatives and was intending to be in attendance as the IDOC executed Mr. Creech. *See id.* However, one week before the IDOC was scheduled to execute Mr. Creech, the U.S. District Court for the District of Idaho stayed his execution. Briefing in that case was due November 29, 2024, and that matter remains pending. In the event the stay is lifted, the State has made it clear that it intends to try to execute Mr. Creech, or another condemned prisoner, again. When that occurs, the updated SOP will control the process and the AP, as it has for the last three executions, intends on attending as one of the media representatives. *Id.* ¶¶ 7-8. Similarly, the Idaho Statesman and East Idaho News intend to cover any further executions through either requesting to have a media representative present as a designated witness or through the accounts of other media representatives. Cripe Decl. ¶ 5; Sunderland Decl. ¶ 6. The updated SOP

unconstitutionally limits the Media Groups' access, however, as it does not allow any witness to observe procedures in the Medical Team Room. *See* Boone Decl. *Id.* ¶ 48.

## I. Idaho's Current Execution Procedures

Under IDOC's updated protocols, the execution of a condemned individual begins by securing the individual to a medical gurney. IDOC ECPA, at 4. The inmate is then escorted to the Execution Preparation Room, where the medical team will determine if peripheral IV access can be established. *Id*. If the medical team leader determines peripheral IV access is not attainable, a medical team member will establish a central line and affix electrocardiograph (EKG) leads on the inmate. *Id*. The IDOC has stated that "[a] live, closed-circuit video and audio feed will be available to state and condemned witnesses for the entirety of the time the condemned person is in the execution preparation room." IDOC updates Execution SOP, Protocols (Oct. 15, 2024); *see also* Boone Decl. ¶ 34.

Once the medical team has established IV access and connected EKG leads, the condemned individual is then escorted on a medical gurney to the Execution Chamber. *See IDOC ECPA,* at 5. From there, the medical team leader will attach the EKG leads to the monitor and confirm that the EKG monitor is functioning properly. The team leader will also attach the IV lines to established IV access and ensure they are flowing appropriately. *Id.* Surprisingly, no lethal injection drugs are administered in the Execution Chamber. *Id.* Rather, there is a small opening in the wall where the IV lines pass into the Medical Team Room. *See* Boone Decl. ¶¶ 21-22.

Once all the necessary lines are attached, the medical team leader will leave the Execution Chamber and join the rest of the medical team in the Medical Team Room. *See IDOC ECPA,* at 5. From that point forward, it appears that only the IMSI Warden will remain in the Execution Chamber, and the medical team will monitor the condemned individual from a closed-circuit audio and video feed inside the Medical Team Room. *Id.* at 5-6.

Members of the medical team conduct several tasks inside the Medical Team Room that are fundamental to the process of executing a condemned person. Those tasks include preparing and labeling syringes that will be used to contain the lethal injection drugs; drawing the lethal injection drugs into the prepared syringes; tracking the syringes to ensure they are not damaged or mixed up; monitoring the condemned person through a closed-circuit feed; and monitoring the condemned person's vital signs through an EKG monitor. *See IDOC ECPA,* at 5-6; *see also* Boone Decl. ¶ 49. Perhaps most importantly, team members inside the Medical Team Room are responsible for administering the lethal injection drugs from the prepared syringes into the IV lines attached to the condemned person. *See IDOC ECPA,* at 6-9; *see also* Boone Decl. ¶ 50.

The medical team will remain in the Medical Team Room throughout the administration of the legal injection drugs. *See IDOC ECPA,* at 8; *see also* Boone Decl. ¶ 52. Once all the lethal injection drugs are administered and all electrical activity of the condemned individual's heart ceases, the medical team leader is responsible for advising the Ada County Coroner that the execution has been completed. At that point, the coroner will examine and pronounce the death of the condemned person. *IDOC ECPA,* at 8. At that point, all the witnesses will be escorted out of the witness areas and the execution will be considered completed. *Id.*

Despite providing witnesses audio and visual access to the Execution Preparation Room and the Execution Chamber for the duration of the execution, the IDOC has refused to provide any access to the Medical Team Room. Boone Decl. ¶¶ 35-47. As it stands, anything that happens in the Medical Team Room during an execution will be done in complete secrecy and free from any public scrutiny. Rather, the witnesses, including the media witnesses, will only be able to see the results of the activity in the Medical Team Room, without being able to see what precipitated those results.

## II.    The AP's Attempts to Gain Access to the Medical Team Room

Among the Media Groups, this is not the AP's first attempt to gain access to what is now called the Medical Team Room. The AP's concerns with its access to the Medical Team Room—previously called the "medical room" or "chemical room"—began in 2012, with the execution of Richard Leavitt. Boone Decl. ¶ 31. For several years after Mr. Leavitt was executed, the AP made multiple informal requests for access to the Medical Team Room. *See id.* ¶¶ 35-36. In 2021, when the IDOC was preparing to execute Mr. Pizzuto, the AP's legal counsel made a formal request for access. *Id.* ¶¶ 38-40. In response, the IDOC informed the AP that it had no intention of providing access to the chemical room claiming that it had penological interest in physically keeping individuals out of the room, and that it did not have a closed-circuit television in place. *Id.* ¶ 41.

Following that response, the AP suggested that a window or closed-circuit cameras could be installed in the chemical room (as it was called then) to provide visual and audio to the media witnesses. *Id.* ¶ 43. The IDOC did not respond to the suggestion, and it appears no window or closed-circuit feed was added during the recent renovation. *Id.* ¶ 47. Currently, the IDOC has no intention of providing access to the Medical Team Room for any future executions. *Id.* ¶ 48.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction or a TRO, both of which are governed by the same standard. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). For either, a moving party must show "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest." *Idaho v. Coeur d'Alene Tribe*, 49 F. Supp. 3d 751, 762 (D. Idaho 2014) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Coffman v. Queen of Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018)). The court may apply a sliding scale test, balancing the elements of the preliminary

injunction standard "such 'that a stronger showing of one element may offset a weaker showing of another.'" *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

The first factor is "the most important" in the court's analysis. *N. D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024). In the First Amendment context, the first factor overlaps substantially with the second because irreparable harm "is relatively easy to establish . . . 'by demonstrating the existence of a colorable First Amendment claim.'" *CTIA - The Wireless Ass'n* v. *City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) (citation omitted) ("'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (citation omitted)). Further, where, as here, "the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

All four factors weigh heavily in favor of granting preliminary injunctive relief. First, the Media Groups are likely to succeed on its First Amendment claim under binding Ninth Circuit precedent holding that "the public has a First Amendment right to view executions in their *entirety.*" *First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069, 1075 (9th Cir. 2019) (emphasis added) (citing *CFAC*, 299 F.3d at 877). Second, Ninth Circuit precedent similarly demonstrates that infringing on the public's First Amendment rights for even one execution will result in irreparable harm. *See Associated Press*, 682 F.3d at 826. Third, the last two factors tip sharply in the Media Groups' favor because serious First Amendment questions exist. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023).

## I.     The Media Groups Are Likely to Succeed on the Merits of Their First Amendment Claim

The dispute here is narrow. The single question before the Court is whether it is likely that the IDOC's execution protocol restricting witnesses from viewing the Medical Team Room leading up

to, during, and immediately after an execution violates the public's First Amendment's right to access government proceedings. The answer to that question is yes.

## A. Legal Standard

The First Amendment guarantees a qualified right of access to governmental proceedings. *CFAC*, 299 F.3d at 873. That right extends not only to the general public, but also to the press. *Id*. at 873 n.2. To determine if a public proceeding is subject to a right of access, courts weigh two considerations: (1) whether the place and process have historically been open to the press and general public, and (2) whether public access plays a significant role in the functioning of the process in question. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986). Where this test is satisfied, a "qualified First Amendment right of public access" exists. *Id.* at 9.

Where a right of access exists, the government may not restrict it without sufficient justification. *Id.* "The burden the government must meet to justify closure depends on the type of proceeding." *Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d 859, 866 (D. Ariz. 2016) (citations omitted). Where, as here, a right of access attaches to prison proceedings, access to the proceedings may only be limited if doing so is "reasonably related to legitimate penological objectives" and does not represent "an exaggerated response to those concerns." *CFAC*, 299 F.3d at 878 (quoting *Turner v. Safley*, 482 U.S. 78, 87 (1987)) (internal quotation marks omitted). To determine whether a restriction is reasonable or an exaggerated response to a penological interest, a court considers four factors:

> (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally, and (4) whether there exist ready alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.

*Turner*, 482 U.S. at 87 (cleaned up).

### B.    The Press Has a First Amendment Right of Access to the Medical Team Room

In this case, both clear Ninth Circuit precedent and the *Press-Enterprise* test support the public's First Amendment right to witness the tasks performed in the Medical Team Room.[2]

#### 1.    The Press Has a Right of Access to the Medical Team Room Under Ninth Circuit Precedent

The Ninth Circuit has constantly "determined that public viewing of executions *in their entirety* is rooted in historical tradition and that public observation plays a significant role in the functioning of capital punishment." *Ryan,* 938 F.3d at 1075 (citing *CFAC,* 299 F.3d at 875-77).

*California First Amendment Coalition v. Woodford* is the seminal Ninth Circuit case on the public's First Amendment right to view executions in their entirety. *See* 299 F.3d 868. In *CFAC*, the court considered whether a California regulation preventing witnesses from observing the initial steps of the execution process, during which the prisoner was brought into the execution chamber, was secured to the gurney, and had IV lines inserted violated the public's First Amendment right to access government proceedings. *Id.* at 871. The court used the two-prong *Press-Enterprise* test, determining that public viewing of executions in their entirety is rooted in historical tradition and that it plays a significant role in the functioning of capital punishment. *Id.* at 875-76. Finding that the *Press-Enterprise* test was satisfied, the Ninth Circuit held "that that the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." 299 F.3d at 877.

Nearly a decade after *CFAC*, the Ninth Circuit again addressed the public's right to view all

---

[2] The Media Groups are not claiming a right of access to specific information regarding the lethal injection drugs, their manufacturer, or other confidential information. Rather, the Media Groups seeks only to enforce its right of access to generally view inside of the Medical Team Room during the execution process because the tasks completed in there are integrally intertwined with an execution.

aspects of an execution. *See Associated Press*, 682 F.3d at 824. In *Associated Press v. Otter*, media organizations challenged Idaho's then execution procedures, which only allowed witnesses to view the final portion of an execution. *Id.* at 823. The media organizations asserted that, as surrogates for the public, they had a right to witness all stages of an execution, rather than just the final portion.

Agreeing with the media organizations, the court found that the plaintiffs were "likely to succeed on the merits of their First Amendment claim … simply by pointing to [the court's] prior opinion in [*CFAC.*]" *Id.* at 824. The court explained that it already held "in the clearest possible terms" that "the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Id.* at 822 (quoting *CFAC, 299 F.3d at 877*). Applying this clear holding, the Ninth Circuit clarified that the "First Amendment protects the public's right to witness *all phases* of [the condemned prisoner's] execution," including those initial portions Idaho sought to restrict. *Id.* (emphasis added).

The Ninth Circuit once again addressed the public's right to witness executions in *First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069 (9th Cir. 2019). There, the plaintiffs claimed that Arizona was unconstitutionally restricting witnesses' ability to hear the sounds of the entire execution process. *Id.* at 1073. Under Arizona's procedures, witnesses were able to view the final stages of an execution through a window, however, the audio feed that was used during the initial procedures was turned off except for during limited updates from prison staff. *Id.*

Explaining that its decision followed "directly from the holding and reasoning of [*CFAC,*]" the court held that the "First Amendment right of access to governmental proceedings encompasses a right to hear the sounds of executions in their entirety." *Id.* at 1075. The court reasoned that the historical public access described in *CFAC* included the ability to hear executions, and that access to the sounds of an execution plays a significant role in the proper functioning of capital punishment

because "execution witnesses need to be able to observe and report on *the entire process* so that the public can determine whether lethal injections are fairly and humanely administered." *Id.* (emphasis added) (citing *CFAC*, 299 F.3d at 876).

Although the Ninth Circuit has not specifically addressed the public's right to access a Medical Team Room, *CFAC* and its progeny require access here. The public's right of access to executions is not limited to some formulaic view of what qualifies as the actual execution, but rather reflects "a more open interpretation" of the whole process. *See L.A. Times Commc'ns LLC v. Kernan*, No. 18-CV-02146-RS, 2018 WL 10419787, at *4 (N.D. Cal. Aug. 17, 2018). Simply put, "the public has a First Amendment right to view executions in their *entirety*[,]" *Ryan*, 938 F.3d at 1075 (emphasis added), including all procedures that are "inextricably intertwined with the process of putting the condemned inmate to death," *CFAC*, 299 F.3d at 877.

Here, the tasks the medical team will undertake in the Medical Team Room fall squarely within the scope of the right to access as defined by the Ninth Circuit. Under the IDOC's current protocol, the team members inside the Medical Team Room are responsible for tasks such as preparing and labeling syringes; drawing the lethal injection drug or drugs into the prepared syringes; tracking the syringes to ensure they are not damaged or mixed up; monitoring the condemned person through a closed-circuit camera; and monitoring the condemned person's vital signs through an EKG monitor or other medical equipment. *See IDOC ECPA*, at 5-6; Boone Decl. ¶ 49. Additionally, it is inside the Medical Team Room that the medical team will administer the lethal injection drugs into the IV lines. In other words, all the tasks that are involved in ultimately carrying out an execution occur inside the Medical Team Room. Thus, these tasks are not just "inextricably intertwined" with the execution process but are also its most critical. Without them, the State cannot perform an execution by lethal injection. Thus, the public's First Amendment right of access to executions encompasses the Medical Team Room. It is only through access to this part of the execution will

witnesses be able to provide information from which the public can determine whether the death penalty is being humanely administered. Boone Decl. ¶¶ 53-57.

Notably, the only district courts in this circuit to consider this question have similarly found that the public's right to witness an execution applies with equal force to the activities undertaken in a "chemical" or "medical" room. *See, e.g., Guardian News*, 225 F. Supp. 3d 859; *Kernan*, 2018 WL 10419787, at *4. In *Guardian News*, a group of media outlets challenged Arizona's execution protocol, seeking the right "to see and hear the totality of an execution, including whether the State is administering additional doses of lethal injection drugs." 225 F. Supp. 3d at 865. Like Idaho's current scheme, Arizona utilized multiple rooms to conduct executions, including a witness room; an execution room; and a chemical room, where the special operations team prepared the drugs and syringes, and eventually injected them into the IV lines. *See id.* at 865. Again, like the IDOC's SOP, witnesses in Arizona were able to observe the placement of IV lines through a closed-circuit feed, at which point the curtains to the execution room were removed and the witnesses could view the condemned prisoner through a window during the final stages of an execution. *Id.* However, at no point during the execution were the witnesses able to view or hear what was happening in the chemical room. In other words, just like in Idaho, witnesses could always see and hear the condemned individual during the execution, but they could not see what was happening in the separate room where the lethal drugs were mixed and injected into the prisoner's IV lines. *Id.*

The district court held that *CFAC* applied "with equal force to the administration (or subsequent administrations) of doses of the lethal injection drugs when and if such additional injections are deemed necessary." *Id.* at 868. The court granted summary judgment in favor of the media outlets and permanently enjoined the state from conducting lethal injection executions without providing a means for the witnesses to be aware of the events taking place in the chemical room. *See id.* at 870; *see also Kernan*, 2018 WL 10419787, at *5 (finding that the allegations were "sufficient

to state a plausible claim [that] preparing the chemicals is inextricably intertwined with the execution process—including the process of administering the chemicals which *CFAC* has already found a right of access to observe").

As the district courts in Arizona and California found, there is no logical reason why the events that will take place in the Medical Team Room should fall outside the scope of the well settled First Amendment right to view an execution in its entirety. The tasks that the medical team will undertake in the Medical Team Room, are, at a minimum, "inextricably intertwined with the execution process," and are more accurately categorized as the active part of the execution, which the Ninth Circuit has held "in the clearest possible terms" is protected by the First Amendment. To carve out an exception from *CFAC* and its progeny in this matter would defy the logic and reasoning provided by the Ninth Circuit. Simply put, there is nothing more "intertwined" with the execution process then the preparation and administration of the very drugs that will effectuate Idaho's most severe punishment.

### 2. The Public Has a First Amendment Right to Access the Medical Team Room Under the *Press-Enterprise* Test.

Even if the Court finds that this matter is not directly answered by *CFAC* and its progeny, which it is, the Court should find that the public has a right of access to the Medical Team Room under the Supreme Court's *Press-Enterprise* test because the historical and functional prongs are satisfied. Each prong will be addressed in turn.

Regarding the first prong, whether the place and process have historically been open to the press and general public, the Ninth Circuit has already held that historical tradition strongly supports the public's First Amendment right to view executions in their entirety. *See CFAC*, 299 F.3d at 875. In *CFAC*, the court explained that in both England and the United States, executions were historically "open to all comers" and "fully open events[.]" *Id.* Further, once executions were moved into prisons, procedures were implemented to ensure that executions would remain open to some form of public

scrutiny. *See id.* Importantly, in coming to this holding, the court rejected California's attempt to narrowly define what qualified as an execution, but rather noted that the public generally had access to the entirety of the execution. *Id.* at 876.

The Ninth Circuit later found that the historical tradition of public access also "includes the ability to hear the sounds of executions." *See Ryan*, 938 F.3d at 1075. The court noted that there were "historical examples in which the public and the press were able to attend hangings with no barriers between the prisoners and witnesses." *Id.* Due to the historically open nature of executions, the court refused to carve out an exception for a limited aspect of the execution process.

Like in *CFAC* and *Ryan*, the historical access to open executions includes the tasks carried out in the Medical Team Room under IDOC's current protocol. As the Ninth Circuit discussed, executions have historically been conducted without barriers to the public and the press. Further, the actual means of execution has historically been open and obvious to the public whether it be rope, sodium cyanide gas, or electricity. *See Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668, at *5 (D. Ariz. Oct. 7, 2013). Generally, the public was not limited to viewing only a prisoner's death; they could "see the precise cause and its effects." *Id*. In other words, the public and the press were historically "allowed to see the specific means used to execute the prisoner." *Id*. Accordingly, being able to view the means and manner of how the IDOC intends to conduct its executions—i.e., the preparation and administration of the lethal injection drugs occurring in the Medical Team Room—falls within the public's historic access to executions.

The second prong of the *Press-Enterprise* test similarly supports the public's First Amendment right to view executions in their entirety. "Independent public scrutiny—made possible by the public and media witnesses to an execution—plays a significant role in the proper functioning of capital punishment." *CFAC*, 299 F.3d at 876. "To determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable

information about" how a state carries out its capital punishment. *Id*. To have reliable information, execution witnesses must "be able to observer and report on the *entire* [execution] process[.]" *Ryan*, 938 F.3d at 1076 (emphasis added) (citing *CFAC*, 299 F.3d 876).

Without access to the Medical Team Room, the press will not be able to inform the public on matters fundamental to the execution process, including the speed, manner, and care with which the lethal injection chemicals are handled during the execution, tracked, and administered. These tasks— the means and manner of lethal injunction—are not simply administrative tasks. Rather, if the lethal injection drugs are administered in too heavy of a dose, or in an improper manner, there can be significant ramifications on the pain or distress a condemned individual may feel. *See* Boone Decl. ¶¶ 55-56. Moreover, without public access to the Medical Team Room, it will be impossible for the public to know if the IDOC is even following its own SOP when executing individuals. The press must be able to play its role as the watchdog to ensure no wrongdoing occurs during executions. *See Salazar*, 677 F.3d at 900 ("When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate."). Thus, there is little doubt that the second prong of the *Press-Enterprise* test strongly supports a public right of access.

In sum, under either binding Ninth Circuit precedent or through a direct application of the *Press-Enterprise* test, the public's First Amendment right of access to executions encompasses the Medical Team Room. This Court should enjoin IDOC from prohibiting access to it.

### C.     The State Cannot Present a Sufficient Penological Interest That Is Likely to Justify Restricting Access to the Medical Team Room

If the public has a right of access, the State may still restrict access to a proceeding if it can establish a legitimate penological interest reasonably related to the policy barring access. *See Ryan*, 938 F.3d at 1076. IDOC has the burden to justify its restriction. *See Kernan*, 2018 WL 10419787, at *6 ("The burden remains with the State to propose a legitimate penological interest if one exists.");

*see also Armstrong v. Davis*, 275 F.3d 849, 874 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005). The State will not be able to do so here.

The IDOC has not offered any penological interest to justify restricting the public's access to the Medical Team Room. The Ninth Circuit already rejected Idaho's first attempt to justify restricting access to parts of the execution process. In *Associated Press*, Idaho argued it had multiple legitimate penological interests sufficient to justify limiting access to the initial execution procedures. 682 F.3d at 824. Idaho's interests were categorized in two groups: protecting the dignity and sensibility of the condemned individual, his family, and other fellow inmates; and protecting the anonymity of the medical team participating in the execution. *Id.* The court rejected both positions finding that Idaho was unlikely to succeed in showing that the restriction was reasonably linked to any of the asserted legitimate penological objectives. *Id.* at 824.

The court explained that it had "significant doubt" that the "State's asserted interests in protecting the dignity of condemned prisoners and the sensibilities of their family and fellow inmates qualif[ied] as legitimate penological concerns in the first place[.]" *Id*. The court further found that, "[i]t strains credulity" to assert that any interest would be "offended to a meaningful[] degree" by allowing witnesses to view the initial procedures when witnesses were already allowed to watch inmates die. *Id*. The court similarly explained the desire to protect the anonymity of the medical team was not sufficient to justify Idaho's restriction. *Id.* at 825. Despite noting that the interest was more substantial, it concluded the State's alleged concern was nothing more than "pure speculation" and "[t]he use of surgical garb is a practical alternative to restricting access to witness lethal injection executions in order to conceal the identity of such execution staff should security concerns warrant such concealment." *Id*. at 825 (quoting *CFAC*, 299 F. 3d at 884).

If the State were to assert any of these justifications here, they would be equally flawed. There is no legitimate argument that providing access to the activities that take place in the Medical Team

Room will meaningfully affect any interest involving the condemned prisoner, their family, or other inmates that does not already exist due to the public's access to the Execution Preparation Room and the Execution Chamber. As the Ninth Circuit has stated, "[t]he State of Idaho already offends the dignity of the condemned inmates and the sensibilities of their families and fellow inmates by allowing strangers to watch as they are put to death." *Id*.

Similarly, preserving the medical team's anonymity cannot justify restricting the public's access to the Medical Team Room. As the Ninth Circuit already explained, the use of surgical garb is a low-cost and practical alternative to protect the medical team members' anonymity. *See CFAC*, 299 F.3d at 884-85; *Associated Press*, 682 F.3d at 825. Additionally, under current procedures, witnesses are already able to see the medical team members as they insert the IV lines and attach the EKG monitors in the Execution Preparation Room. *See* IDOC News, [IDOC updates Execution SOP, Protocols (Oct. 15, 2024)](). The IDOC thus feels its current procedures are sufficient to safeguard the anonymity of medical team members before entering the Medical Team Room; it is hard to imagine why that would cease to be the case simply because the medical team will be in a different room. This is especially true given that the SOP already requires "total anonymity of the personnel in the Medical Team Room," where personnel will never "be address[ed] by name or asked anything that would require a verbal response." SOP at 31. Simply put, while the Media Groups do not dispute that maintaining the anonymity of the medical team is an important interest to some degree, limiting the public's access to the Medical Team Room is not reasonably related to that interest. Moreover, the Media Groups have repeatedly followed the instruction to maintain the anonymity of the medical team members. Boone Decl. ¶ 13.

The only conceivable interest that the IDOC could put forth that may come close to being considered legitimate is that, as constructed, the F Block does not have a direct line of sight from either of the potential witness rooms. Without conceding that this is a legitimate interest, there is a

reasonable and low-cost alternative that would sufficiently accommodate the public's right to access the events that will take place in the Medical Team Room—a closed-circuit feed.[3] Under the current SOP the IDOC already intends to use a closed-circuit audio and video feed to provide access from the Execution Preparation Room to the witness rooms and from the Execution Chamber to the Medical Team Room. In short, the State has the means, capability, and intent to use closed-circuit feeds in the two rooms that are necessary to protect the public's First Amendment rights. Whatever the expense may be to add one more additional feed, it cannot justify the IDOC restricting access to the Medical Team Room.

In sum, there is a strong likelihood that the Media Groups will prevail on the merits of their First Amendment claim. The law in this Circuit is well settled and demonstrates that the public, including the press, has a First Amendment right to witness the activities that will occur in the Medical Team Room that are "inextricably intertwined" with the execution of a condemned individual. Furthermore, the IDOC will not be able to offer any legitimate penological interest sufficient to justify its restriction of access. Accordingly, the first factor weighs heavily in favor of granting preliminary injunctive relief.

## II.     Absent Injunctive Relief, the Media Groups Will Suffer Irreparable Injury

The Media Groups will suffer irreparable harm if the Court does not grant its request for a preliminary injunction or TRO. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (citation omitted). "Irreparable harm is relatively easy to establish

---

[3] Notably, the Media Groups' request to have access to the Medical Team Room predates the IDOC's recent renovation. The IDOC's refusal to adhere to clear binding precedent should not ultimately provide a lasting justification for restricting the access of the public. Any burden to comply with the First Amendment should fall on the IDOC. *See, e.g., Associated Press*, 682 F.3d at 822 ("The State of Idaho has had ample opportunity for the past decade to adopt an execution procedure that reflects this settled law.").

in a First Amendment case because the party seeking the injunction need only demonstrate the existence of a colorable First Amendment claim." *Fellowship of Christian Athletes*, 82 F.4th at 694-95 (cleaned up). Most importantly, the Ninth Circuit has already found that infringing on the public's right to witness executions in their entirety, even for just one execution, will result in irreparable injury. *Associated Press*, 682 F.3d at 826. Thus, the second factor also weighs strongly in favor of the Media Groups.

### III.    The Balance of Equities and the Public Interest Favor Granting a Preliminary Injunction

Where the government opposes the issuance of a preliminary injunction, the final two preliminary injunction factors—the balance of equities and the public interest—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors weigh heavily in the Media Groups' favor.

When a plaintiff "raise[s] serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in [their] favor." *Fellowship of Christian Athletes*, 82 F.4th at 695 (internal quotations and citation omitted). "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press*, 682 F.3d at 826 (citation omitted).

Like the likelihood of success factor, the Ninth Circuit has already explained that this factor weighs in favor of the public under these circumstances. *See id.* Thus, the Media Groups need not belabor this point—the final two factors tip strongly in its favor.

## CONCLUSION

For the above reasons, the Media Groups respectfully asks this Court to enter a preliminary injunction or TRO prohibiting the IDOC from restricting access to the Medical Team Room leading up to, during, and immediately after any future executions of condemned individuals.

DATED:  December 6, 2024

STOEL RIVES LLP

/s/ Wendy J. Olson
Wendy J. Olson
Anders Pedersen

*Attorneys for Plaintiffs The Associated Press,*
*The Idaho Statesman, and East Idaho News*