WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
ANDERS PEDERSEN, Bar No. 11626
anders.pedersen@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: 208.389.9000
Facsimile: 208.389.9040

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

THE ASSOCIATED PRESS; THE MCCLATCHY COMPANY, LLC, dba The Idaho Statesman; and EAST-IDAHO-NEWS.COM, LLC, dba East Idaho News,

Plaintiffs,

v.

JOSH TEWALT, in his official capacity as the Director of the Idaho Department of Correction,

Defendant.

Case No. 1:24-cv-00587-DKG

**DECLARATION OF REBECCA BOONE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Rebecca Boone, declare and state as follows:

1. I am the supervisory correspondent for Idaho for The Associated Press ("AP"). As such I have personal knowledge of the facts and statements contained in this declaration.

2. I have 26 years of journalism industry experience, much of that time spent covering the judicial branch, the U.S. prison system, the Idaho Department of Correction ("IDOC") and criminal justice issues including the death penalty.

3. I graduated from the University of Idaho with a bachelor's degree in journalism in 1999, and I covered the courts and law enforcement beat for The Lewiston Tribune before I joined the AP in 2002 as a reporter in the Boise bureau.

4. In 2013 I was promoted to my current position of supervisory correspondent, tasked with leading AP's news coverage in Idaho. I have extensive experience covering the death penalty and issues surrounding the use of the death penalty in the United States.

5. I also cover the Idaho Legislature, including efforts by lawmakers and individuals to shape Idaho laws and policies surrounding the use of the death penalty.

6. I was an Idaho Press Club board member from 2014 until 2023, when I stepped down due to time constraints. I am a longtime advisory board member of the University of Idaho's School of Journalism and Mass Media. I became a Loyola Law School Journalism Law School Fellow in 2012. I also regularly serve as a panelist for training programs offered to teachers and journalists through a partnership between the University of Idaho College of Law, the Idaho Supreme Court, the U.S. District Court of Idaho and the Idaho Press Club. During those panels I typically train attendees on subjects including news literacy, how to access court documents, the ethics of covering the courts, how to incorporate the rule of law into press coverage and why press coverage of the courts, prisons, executions and other criminal justice issues is vital for an informed citizenry.

7. I have served as the AP designated media witness for two completed executions and one attempted execution in Idaho; witnessing the lethal injection execution of Paul Ezra Rhoades on Nov. 18, 2011; the lethal injection execution of Richard Albert Leavitt on June 12, 2012; and the attempted lethal injection execution of Thomas Eugene Creech on Feb. 28, 2024. *See* Killer Paul Ezra Rhoades put to death in Idaho – state's first execution in 17 years, The

Oregonian (Nov. 18, 2011), https://www.oregonlive.com/pacific-northwest-news/2011/11/killer_paul_ezra_rhoades_put_t.html; Idaho executes Richard Leavitt for woman's Killing in 1984 (Jun. 12, 2012), https://www.oregonlive.com/pacific-northwest-news/2012/06/idaho_executes_richard_leavitt.html; Idaho halts execution by lethal injection after 8 failed attempts to insert IV line (Feb. 28, 2024), https://apnews.com/article/idahoexecution-creech-murders-serial-killer-91a12d78e9301adde77e6076dbd01dbb?utm_source=copy&utm_medium=share.

8. I was also the AP's designated media witness for the planned execution of Mr. Creech on Nov. 13, 2024, and completed the "Witness Acknowledgement and Agreement Form" as required by the IDOC for that event. The execution has since been stayed, but I expect to be the AP's designated witness if it is rescheduled.

9. In order to be allowed to witness the executions of Mr. Rhoades and Mr. Leavitt, and the attempted execution of Mr. Creech, I underwent a criminal background check and approval process as required by the IDOC, including signing IDOC-generated forms outlining my duties as a media witness.

10. The IDOC "witness acknowledgement and agreement" form includes several terms outlining the rules of conduct for media witnesses. By signing that form, I agreed to maintain appropriate behavior and demeanor throughout the execution; to obey directives issued by IDOC staff while on IDOC premises; to be searched before entering the Idaho Maximum Security Institution; to refrain from bringing any disallowed personal property including recording devices, cameras, pens, pencils, phones or contraband into IDOC facilities; to refrain from making any video, audio or digital recordings of any event inside the execution chamber;

and to participate in a news conference immediately after the execution to report my experience and observations to the public.

11. I followed all IDOC rules and abided by the terms of the "witness acknowledgement and agreement" for the attempted execution of Mr. Creech in February, and intended to do the same during the planned execution of Mr. Creech on Nov. 13, 2024.

12. IDOC had similar forms and requirements for media witnesses during the executions of Mr. Rhoades and Mr. Leavitt, and during both events I followed IDOC's terms and fulfilled all media witness requirements.

13. During each of those events, IDOC's execution team members obscured their identities using personal protective equipment and medical gear at all times including surgical masks, hair coverings, and balaclava-style face coverings. These methods are effective at keeping their identities secret – I have never determined the identity of an execution team member.

14. To my knowledge and understanding, the IDOC execution facility at the Idaho Maximum Security Institution includes several adjoining rooms and staging areas that are all used during the process of executing a condemned person.

15. Those rooms have been referred to using various names over the last two decades, but for the purposes of this declaration I will refer to them using the following names:

16. The "Execution Chamber" includes a table or gurney where the condemned person is placed for the execution, as well as a telephone that the warden may use to check the status of any last-minute stays or clemency.

17. The "State of Idaho Witness Area" is an adjoining room where media witnesses, members of the victims' families, prosecuting attorneys, law enforcement officials, government

officials and prison officials are typically seated. This room includes a large, clear window through which the witnesses may view the events occurring inside the Execution Chamber.

18. The "Condemned's Witness Area" is next to the State of Idaho Witness Area, and also adjoins the Execution Chamber. The Condemned's Witness Area also includes a large, clear window through which occupants may view the events occurring inside the Execution Chamber. People typically seated inside the Condemned's Witness Area include two approved visitors selected by the condemned person, an IDOC liaison, the condemned person's attorney and sometimes a spiritual advisor.

19. There is a door on the left side of the Execution Chamber (as seen from the State of Idaho Witness Area). This is the door through which the condemned person enters the Execution Chamber, accompanied by the IDOC execution escort team.

20. There is a door on the right side of the Execution Chamber (as seen from the State of Idaho Witness Area). This is the door through which the coroner typically enters to confirm death of the condemned person after a completed execution.

21. There is a small portal or opening in the wall of the Execution Chamber, and the IV lines that are attached to the condemned person pass through this opening into another area of the execution facility.

22. There is a room somewhere within the execution facility that is now called the "Medical Team Room" (and previously has been called the "chemical preparation room" or the "medication room"). I have never seen the Medical Team Room, but based on my interviews with IDOC officials and IDOC policy documents, I believe it is where the lethal injection chemicals are administered into the IV lines attached to the condemned person.

23. There is a newly completed or renovated room somewhere inside the execution facility that was built this year. It is called the "Execution Preparation Room."

24. I have never seen the Execution Preparation Room, but based on information provided to me by IDOC through interviews, press releases and policy documents, the room is equipped with closed-circuit cameras. Those cameras will relay real-time audio and video footage of the events occurring in the Execution Preparation Room to monitors placed inside both witness areas.

25. Prior to the execution of Mr. Rhoades, the AP and other news organizations in the state asked IDOC to change its policy barring media witnesses from viewing the insertion of peripheral IV lines into the condemned person. The AP and other news organizations cited a 2002 California lawsuit in which the Ninth U.S. Circuit Court of Appeals found that the public – through media representatives – had a First Amendment right to view an execution in its entirety. The IDOC denied those requests.

26. During the execution of Mr. Rhoades, media witnesses were not allowed to see the insertion of the peripheral IV lines. That work was done in the Execution Chamber, but a curtain was drawn over the window, blocking the view of myself and others seated in the State of Idaho Witness Area.

27. After Mr. Rhoades' execution, I persuaded my supervisors at the AP to sue the state for viewing access to that portion of the execution, and I helped create a coalition of other news organizations in the state to join the lawsuit. That lawsuit, *Associated Press v. Otter and Idaho Department of Correction*, was filed in U.S. District Court of Idaho on May 22, 2012.

28. U.S. District Judge Edward Lodge found the plaintiffs had a strong case on the merits and that the public has an interest in viewing executions in entirety, but also found that the

case was not timely filed and that the public had a greater interest in seeing the execution carried out as scheduled.

29. The AP and other news organizations filed an interlocutory appeal to the Ninth U.S. Circuit Court of Appeals, which reversed the lower court on June 8, 2012. A three-judge appellate panel found the public has a First Amendment right to view executions, including those moments that are "inextricably intertwined with the process of putting the condemned inmate to death." The appellate court's ruling cited the circuit's previous findings in California's *First Amendment Coalition v. Woodford* (2002).

30. On June 12, 2012 – just four days after the Ninth Circuit's ruling – I and other media witnesses were allowed to view the insertion of the peripheral IVs into Mr. Leavitt's arms during the start of his execution.

31. We were not allowed to see anything that occurred inside the Medical Team Room, a fact I publicly noted during my portion of the media witness press conference immediately following Mr. Leavitt's execution.

32. During the attempted execution of Mr. Creech, I and other media witnesses were able to watch as execution team members tried eight times to place a viable peripheral IV line in Mr. Creech's arms and legs. That execution was called off after the execution team and prison administrators determined they could not successfully set an IV line.

33. Based on information provided to me by IDOC through interviews, press releases and documents, I believe that execution team members will now attempt to place peripheral IV lines in the Execution Preparation Room, and if those efforts are not successful they will instead place a central venous catheter using the larger, deeper veins in the condemned person's neck, groin, chest or upper arm.

34. Based on information provided to me by IDOC through interviews, press releases and documents, I believe that media witnesses will be able to view those attempts via closed-circuit cameras installed by IDOC inside the Execution Preparation Room.

35. I have repeatedly notified IDOC officials that the AP would like visual and audio access, even by closed-circuit camera, to any events occurring in the Medical Team Room because they are critical to the execution process.

36. Those notifications included orally asking three different directors for media witness access to the Medical Team Room over the last several years. I asked IDOC Director Brent Reinke, his successor IDOC Director Kevin Kempf, and his successor, current IDOC Director Josh Tewalt for such access during interviews as well as during informal conversations.

37. I also asked the AP to make a more formal written request for media witness audio and visual access to the events occurring in the Medical Team Room.

38. When I learned in 2021 that IDOC was preparing to execute death row inmate Gerald Pizzuto, I asked AP's legal counsel to push for media witness access to the Medical Team Room as well as to the Condemned's Witness Area.

39. On Nov. 1, 2021, attorney Charles Brown (now retired) wrote a letter to IDOC Director Josh Tewalt on behalf of the AP seeking media witness access to both areas. The letter noted the AP's previous successful lawsuit seeking fuller media access to executions in Idaho.

40. When IDOC did not respond to that letter, the AP sent a follow-up letter asking for a response prior to Mr. Pizzuto's execution date. Deputy Attorney General Kristina Schindele responded on behalf of IDOC on Feb. 4, 2022.

41. In that response, Ms. Schindele said IDOC's execution unit was not configured in a way to permit the media to be present in the Condemned's Witness Area. Ms. Schindele also

said IDOC has significant interest in preserving the anonymity of execution team members, and also needed to eliminate the physical risk of interference with the administration of chemicals. She also said IDOC does not have closed-circuit television cameras in place in the "chemical room," which is another name for the Medical Team Room.

42. In March 2022, Mr. Brown replied on behalf of the AP. That letter reiterated AP's interest in access to both the Condemned's Witness Area and the Medical Team Room, but recognized physical limitations created by the facility layout. In the interest of maintaining a dialogue and avoiding litigation, the AP agreed to put aside the question of access to the Condemned's Witness Area for the time being, in order to focus on access to the Medical Team Room.

43. In that March 2022 letter, Mr. Brown and the AP suggested that a viewing window could be installed in the medication room, or that closed-circuit cameras could be installed and utilized to provide visual and audio access for the media witnesses.

44. To my knowledge, neither IDOC nor Ms. Schindele ever replied to that letter.

45. Mr. Pizzuto's execution was ultimately put on hold, and my AP colleague in Boise retired, leaving me as the sole AP journalist in Idaho. With no executions imminently scheduled, I focused on other major breaking news stories for the next several months. Because of personal and professional time constraints, I was unable to revisit the matter with IDOC before the attempted execution of Mr. Creech in February 2024.

46. When IDOC announced that it had constructed the Execution Preparation Room and installed closed-circuit cameras for media witness viewing inside the execution facility, I again asked IDOC Director Josh Tewalt if media witnesses would be able to view the events occurring inside the Medical Team Room by closed-circuit camera. Director Tewalt told me that

IDOC did not add closed-circuit cameras to that portion of the facility and said the agency would not take that step in the future.

47. To my knowledge, the IDOC is planning on maintaining its practice of restricting witnesses' access to the Medical Team Room during any future execution.

48. Based on IDOC's written policy, "Execution Chemicals Preparation and Administration"; my own interviews with IDOC officials; interviews with physicians familiar with the lethal injection process and interviews with experts in lethal injection and the death penalty, I believe that members of the IDOC execution team carry out several tasks inside the Medical Team Room, and that the execution of those tasks is integral to the process of executing a condemned person.

49. In fact, based on IDOC policy documents the execution would not occur without the events occurring inside the Medical Team Room.

50. According to IDOC policy documents those tasks include preparing and labeling syringes that will be used to contain the lethal injection drug or drugs; drawing the lethal injection drug or drugs into the prepared syringes; tracking the syringes to ensure they are not damaged or mixed up; monitoring the condemned person through a closed-circuit camera, video feeds or other viewing system; and monitoring the condemned person's vital signs through an EKG monitor or other medical equipment.

51. According to IDOC policy documents medical team members inside the Medical Team Room also must administer the prepared lethal injection drug or drugs from the syringes into the IV lines attached to the condemned person, potentially flushing the lines with saline or another substance between drug administrations.

52. Under IDOC policy, the medical team is also tasked with monitoring the electrical activity of the condemned person's heart as shown on an EKG monitor, and for advising the coroner that the execution has been completed after the monitor shows that all electrical activity of the heart has ceased.

53. By being able to view the events inside the Medical Team Room, I would be able to inform the public on several matters that are critical to the execution process, including the speed, manner and care with which the lethal injection chemicals are handled during the execution, tracked and administered.

54. In other states, these details have at times been key to public understanding of the death penalty and the way it is being enacted.

55. For instance, on May 24, 1989, a condemned man named Stephen McCoy in Texas had such a violent reaction to lethal injection drugs that one of the witnesses fainted. Texas Attorney General Jim Mattox later said, "The drugs might have been administered in a heavier dose or more rapidly," the Houston Chronicle reported in an article published three days after the execution.

56. In 2014, Arizona inmate Joseph R. Wood III was injected with 15 times the recommended dosage of lethal medication before he died during a nearly two-hour-long execution process, during which he repeatedly gasped for air. *See* Astrid Galvan, AP reporter's account of Arizona execution, The Associated Press (July 24, 2014), https://apnews.com/general-news-99d4d4ce9e734bb4a32859ee66032c84?utm_source=copy&utm_medium=share.

57. Lethal injection drugs are increasingly difficult for states to obtain, and they typically cost a large amount of taxpayer money.

58. The housing of death row inmates and the administration of the death penalty are also very expensive processes that rely on taxpayer funds.

59. There is much public discussion and debate about whether death by lethal injection is humane, ethical, moral or just.

60. As a journalist, my role is to act as the eyes and ears of the public, informing them about the state's administration of executions. That includes doing my professional best to observe whether lethal injection is carried out in accordance with IDOC policy, as well as observing the actual impact of that policy on the public. This is part of the "watchdog" function of journalism.

61. One of the first things that journalists are taught is to seek proof for themselves – a rule often summed up by the maxim: "If your mother says she loves you, check it out." IDOC's policy restricting the Medical Team Room from media witnesses restricts journalists from performing the watchdog function of a free press.

62. When Idaho inmates are executed, they are put to death by the state of Idaho – which is acting on behalf of Idaho residents, in the name of justice.

63. Idaho citizens and the general public have a vested interest in being able to decide for themselves the many financial, ethical and moral aspects of the death penalty.

64. It is my belief that the public deserves the fullest possible transparency on such a weighty public policy issue.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: December 6, 2024

/s/ Rebecca Boone
REBECCA BOONE