RAÚL LABRADOR
ATTORNEY GENERAL

Karin Magnelli (ISBN 6929)
Lead Deputy Attorney General
Kristina M. Schindele (ISBN 6090)
Deputy Attorney General
Idaho Department of Correction
1299 North Orchard St., Suite 110, Boise, Idaho 83706
Telephone: (208) 658-2094; Facsimile: (208) 327-7485
kmagnell@idoc.idaho.gov; krschind@idoc.idaho.gov

Michael J. Elia (ISBN 5044)
Special Deputy Attorney General
Tanner J. Smith (ISBN 12245)
MOORE ELIA KRAFT & STACEY, LLP
Post Office Box 6756, Boise, Idaho 83707
Telephone: (208) 336-6900; Facsimile: (208) 336-7031
mje@melawfirm.net; tanner@melawfirm.net

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRIC COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE ASSOCIATED PRESS et al., | Case No. 1:24-cv-00587-DKG |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |
| vs. | |
| JOSH TEWALT, | |
| Defendants. | |

COMES NOW Defendant, by and through undersigned counsel, and hereby submit his

Memorandum in Support of Motion to Dismiss as follows:

## INTRODUCTION

Plaintiffs are three media organizations who are trying to claim a First Amendment right

to force the Idaho Department of Correction ("IDOC") to install a closed-circuit camera and audio

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 1**

feed in F-Block's chemical room so that they can potentially watch IDOC's Medical Team during an unscheduled future execution. Plaintiffs claim fails for at least five reasons. First, the Supreme Court has explained that these issues concern non-justiciable political questions, and these are matters constitutionally committed to Idaho's Executive and Legislative branches. Second, Plaintiffs fundamentally misunderstand what rights, if any, the First Amendment provides them in this respect. Indeed, while Plaintiffs base their claim on two Ninth Circuit cases, there is serious reason to conclude that those cases were decided in error and are clearly irreconcilable with the reasoning and theories propounded in relevant Supreme Court cases. *See Miller v. Gammie*, 335 F.3d 889, 890, 893 (9th Cir. 2003) (District Court is not bound by Ninth Circuit case law that is irreconcilable with Supreme Court precedent). Regardless, even if those cases were correctly decided, Plaintiffs misconstrued the confines of the supposed right recognized therein and overlooked the portions of those cases indicating that they do not apply in the manner they claim here. Third, Plaintiffs lack standing because their claim is not cognizable under the Constitution and no execution is scheduled. Fourth, Plaintiffs' claim is not ripe because it is premised on contingent future events that may not occur. And finally, the PLRA's needs-narrowness-intrusiveness precludes Plaintiffs' desired relief. Therefore, Plaintiffs' Complaint should be dismissed.

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) may be based on either: (1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable legal theory. *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc*., 710 F.3d 946, 956 (9th Cir. 2013). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 2**

alleged." *Ashcroft*, 556 U.S. at 678. The Court need not accept as true conclusory allegations, unreasonable inferences, legal characterizations, or unwarranted deductions of fact or legal conclusions couched as factual allegations. *Id.* at 678-79.

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. "Federal courts have subject matter jurisdiction over 'actual cases or controversies.'" *Miller v. Burrow*, No. 1:23-CV-00042-DCN, 2024 WL 2213537, at *1 (D. Idaho May 16, 2024) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016)). The Court can consider materials beyond the four corners of the complaint to determine if it has jurisdiction. *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

## ARGUMENT

### 1. Plaintiffs' claims are non-justiciable political questions.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). In *Baker v. Carr*, 369 U.S. 186, 217 (1962), the Supreme Court articulated seven independent formulations for determining whether courts should defer to the political branches on an issue. These formulas preclude Article III jurisdiction where there is:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Supreme Court precedent forecloses the justiciability of Plaintiff's claims for being political questions. In *Holden v. State of Minnesota*, 137 U.S. 483 (1890), the Supreme Court explained

that determining when, where, and how an execution shall be carried out, determining who, if anyone, can witness the execution, and regulating the character of who can witness an execution are purely legislative tasks. *Id.* at 491. The Supreme Court explained that "[t]hese are regulations which the legislature, in its wisdom, and for the public good, could legally prescribe in respect to executions …." *Id.* Then in *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), the Supreme Court reaffirmed these concepts by explaining that access to penal institutions is "clearly a legislative task which the Constitution has left to the political processes." 438 U.S. at 13. At issue in *Houchins* was whether "the news media have a constitutional right of access to a county jail, over and above that of other persons, to interview inmates and make sound recordings, films, and photographs for publication and broadcasting by newspapers, radio, and television." *Id.* at 3. The Court rejected the plaintiff's request, in part, because it involved a political question *Id.* at 12, 15–16. And more recently, in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), the Court again reaffirmed these concepts by explaining that penal institutions are not open or public, and that "there is no doubt that legislative committees could exercise plenary oversight and 'visitation rights.'" *Id.* at 576 n. 11. As set forth in these cases, determining access to penal institutions to witness an execution and what can be seen during an execution are issues committed to nonjudicial discretion.

Further, Idaho has acted consistently with these Constitutional concepts and committed these decisions to branches of government other than the Federal Judiciary.[1] Control of state prisons is a state matter. *E.g., Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). The Idaho Constitution vests a constitutional commitment for regulating state execution procedures to the Executive and Legislative branches. Article 10, Section 5 of the Idaho Constitution provides that the Board of

---

[1] Defendant recognizes that the determination of whether a policy violates the Constitution is for the Court.

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 4**

Correction "shall have the control, direction and management of the penitentiaries of the state, their employees and properties, and of adult felony probation and parole, with such compensation, powers, and duties as may be prescribed by law." IDAHO CONST. Art. X, § 5. The Legislature codified that IDOC's Director "shall determine the procedures to be used in any execution." I.C. § 19-2716(6). The Director has determined the procedures by which executions are to be performed in Idaho by approving Idaho's execution protocol.[2] SOP 135 provides that only four media representatives can witness an Idaho execution, subject to change by the Director, and that each such representative must apply for selection fourteen days prior to a scheduled execution. (Ex. A, p. 11). Prescribing who can witness an execution, along with the bounds of access, are beyond the confines of the Court's Article III jurisdiction because those determinations are constitutionally committed to Idaho's Executive and Legislative branches.

And because IDOC has already constitutionally determined the witness process for executions as well as what those witnesses will see and hear, entertaining Plaintiffs' requests would make it impossible for the Court independently review the issues without expressing lack of the respect due to coordinate branches of government. For the same reasons, the political question doctrine requires the Court to adhere to the political decision already made.

Accordingly, Plaintiffs have failed to present a justiciable issue, and the Court should dismiss Plaintiffs' Complaint.

---

[2] IDOC's execution protocol is composed of two policies: SOP 135.02.01.001 and the Execution Chemicals Preparation and Administration. The current version of SOP 135.02.01.001 can be found at https://forms-idoc.idaho.gov/WebLink/0/edoc/283090/Execution%20Procedures.pdf (also attached as **Exhibit A**) and the current version of the Execution Chemicals Preparation and Administration can be found at https://forms-idoc.idaho.gov/Web-Link/DocView.aspx?dbid=0&id=982043&page=12&cr=1 (also attached as **Exhibit B**). Herein, Defendant will refer to SOP 135.02.01.001 as "SOP 135" and the Execution Chemicals Preparation and Administration as the "Chemicals Preparation and Administration."

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 5**

**2.  Plaintiffs' claim is not ripe for review.**

A case must be ripe to be justiciable. *Natl. Park Hosp. Ass'n v. Dept. of Int.*, 538 U.S. 803, 807–08 (2003). Ripeness is designed to prevent courts "from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* (collecting sources). A claim is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. U.S.*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 580 (1985)). While the constitutional ripeness components are somewhat less stringent when dealing with the First Amendment, the prudential considerations are "amplified." *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002) (collecting sources).

Here, Plaintiffs' claims are not cognizable because there is not an IDOC execution scheduled. Indeed, the two inmates Plaintiffs mention in their papers as having previously scheduled executions (Thomas Creech and Gerald Pizzuto) both have stays of executions entered by the District Court. *See Creech v. Valley*, 1:24-cv-00485-GMS, Dkt. 20; *Pizzuto v. Tewalt*, 1:23-cv-00081-BLW, Dkt. 31, p. 3; (Dkt. 1, ¶¶ 25–26). Further, Plaintiffs' claims are contingent on them being permitted to attend a future execution. But the process for attending involves an application, approval of that application at the discretion of the Director, and a lottery. (Ex. A, p. 11). There are too many contingencies between now and a potential future execution to bring Plaintiffs' claim within the Court's Article III jurisdiction. The Court should dismiss Plaintiffs' Complaint.

**3.  The First Amendment does not provide Plaintiffs the right they claim.**

Plaintiffs' claim is premised on an overbroad extension of Ninth Circuit case law that found a First Amendment right of access to executions. However, as set forth below, the Court is not

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 6**

bound by those cases because they are inconsistent with longstanding Supreme Court precedent, which multiple courts have acknowledged. *See Miller*, 335 F.3d at 900 (explaining that Ninth Circuit case law is not binding where reasoning or theory underlying it is "clearly irreconcilable" with Supreme Court precedent). Further, even if the Ninth Circuit was correct when creating these rights, the rights are "severely limited" per the Ninth Circuit's own words and do not extend beyond seeing and hearing the condemned during an execution. Regardless, any such right is not implicated here because IDOC has gone above and beyond what the Constitution requires under either Supreme Court precedent or Ninth Circuit case law, including all cases Plaintiffs cited in their preliminary injunction materials. Plaintiffs' claim fails and this suit should be dismissed.

### 3.1. The First Amendment does not provide a right to access executions.

The Supreme Court has never recognized a First Amendment right of access to executions. Indeed, the Supreme Court has indicated that no such right exists. *See Holden*, 137 U.S. at 491 (state can constitutionally limit number and character of witnesses, or exclude witnesses altogether); *Houchins*, 438 U.S. at 7–17 (neither First nor Fourteenth Amendments provide right of access to government information and press has no greater right than general public (collecting sources)); *Richmond Newspapers*, 448 U.S. at 576 n. 11 (penal institutions are not open or public places, in contrast to courts, and states can exercise plenary oversight and visitation rights).

Even with this backdrop, the Ninth Circuit has read a limited and qualified right of access to executions into the First Amendment. *California First Amend. Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002). No other circuit court has ever recognized this claimed right. Every other court (but one) to analyze whether the First Amendment provides the media and public a right to access executions has conclusively held that there is no such right, and that the Ninth Circuit erred when finding one. *See, e.g., Oklahoma Observer v. Patton*, 73 F. Supp. 3d 1318 (W.D. Okla. 2014)

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 7**

(holding that the Ninth Circuit's analysis was in error and no such First Amendment right exists); *BH Media Group, Inc. v. Clarke*, 466 F. Supp. 3d 653 (E.D. Va. 2020), *vacated and remanded on other grounds*, 851 Fed. Appx. 368 (4th Cir. 2021) (unpublished) (same); *Arkansas Times, Inc. v. Norris*, No. 5:07-CV-195 SWW, 2008 WL 110853 (E.D. Ark. Jan. 7, 2008) (same); *but see Philadelphia Inquirer v. Wetzel*, 906 F. Supp. 2d 362 (M.D. Pa. 2012) (recognizing the purported right before the state abolished the death penalty).

In *Woodford*, 299 F.3d 868, the Ninth Circuit analyzed whether California's protocol violated the First Amendment because it allowed California to "obscure the witnesses' view of the execution chamber." 299 F.3d at 871. California's protocol allowed curtains in the chamber to be drawn, which kept witnesses from seeing the condemned be brought into the chamber, laid down and secured to the gurney, IVs being inserted, the execution team inside the chamber, or the condemned while he laid alone waiting for chemical to be administered. The chamber's curtains would be opened after the execution team left the chamber and shortly before chemical was administered; witnesses would be able to view from then on. The Ninth Circuit held that this violated the First Amendment by creating a right of the public to "view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." 299 F.3d at 877.

Then in *First Amend. Coal. of Arizona, Inc. v. Ryan*, 938 F.3d 1069 (9th Cir. 2019), the Ninth Circuit extended *Woodford* to also include a right to "hear the sounds of executions in their entirety." 938 F.3d at 1075. *Ryan* involved Arizona's protocol which provided that curtains would be drawn on the chamber during the "preliminary steps of the execution," i.e., as the condemned was secured to the table, made his last statement, and IVs were inserted. During this time, the witnesses saw and heard the condemned in the chamber through a closed-circuit television system.

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 8**

After IVs were inserted, the closed-circuit monitors and microphones were turned off and the cur-

tains to the chamber were opened. The witnesses saw the condemned from then on, but they could

not hear him other than for brief moments where the microphone was turned back when the med-

ical team to provide updates on consciousness. The Ninth Circuit held that this violated the First

Amendment by finding a right to "hear the sounds of executions in their entirety." *Id.* at 1075.

While finding these purported rights, the Ninth Circuit qualified them.[3] Specifically, the

*Ryan* court explained that the First Amendment does not provide the public or press a right "to

examine executions in minute detail, such that witnesses could see the drug labels and the name-

tags of execution team members," and that there is not a First Amendment right to "all information

that is 'inextricably intertwined' with executions." 938 F.3d at 1079. The Ninth Circuit did not

"change the default rule that the right of access 'does not extend to every piece of information that

conceivably relates to a governmental proceeding, even if the governmental proceeding is itself

open to the public.'" *Id.* at 1049–80 (quoting *Wood v. Ryan*, 759 F.3d 1076, 1092 (9th Cir. 2014)

(Bybee, J., dissenting)). These decisions also did not change the concept that whatever rights the

press receives under the First Amendment, such rights are "co-extensive with the public's right to

the same information." *Woodford*, 299 F.3d at 875. And the Ninth Circuit did not alter the concept

that "whatever First Amendment right might exist to view executions, the 'right' is severely lim-

ited." *California First Amend. Coalition v. Calderon*, 150 F.3d 976, 982 (9th Cir. 1998).

To reach its holdings in *Woodford* and *Ryan*, the Ninth Circuit improperly extended the

holdings in *Richmond Newspapers*, 448 U.S. 555, *Globe Newsp. Co. v. Super. Ct. for Norfolk*

*Cnty.*, 457 U.S. 596 (1982), *Press-Enter. Co. v. Super. Ct. of California, Riverside Cnty.* ("*Press-*

---

[3] The Ninth Circuit also determined that this purported qualified right is subject to a "unitary, deferential standard of review," *Woodford*, 299 F.3d at 977–78, i.e., rational basis review.

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 9**

*Enter. I*"), 464 U.S. 501 (1984), and *Press-Enter. Co. v. Super. Ct. of California for Riverside Cnty.* ("*Press-Enter. II*"), 478 U.S. 1 (1986), all of which concerned access to courtrooms. The *Woodford* court misapplied Supreme Court principles involved in criminal adjudicatory processes to the post-adjudication penal system by implanting the principles from those cases onto *Pell v. Procunier*, 417 U.S. 817 (1974). The problem with this approach, though, is that while those cases post-dated *Pell*, *Pell* did not frame the analysis of any of those cases. *Accord BH Media Group*, 466 F. Supp. 3d at 662. The only one of those opinions to even discuss *Pell*, *Richmond Newspapers*, did it in passing to differentiate the traditional openness experienced by the courts from penal institutions which, by definition, have not experienced such openness.[4] 448 U.S. at 556 n. 11. Indeed, *Pell* even upheld prison regulations restricting access of the press under First Amendment principles. 417 U.S. at 834–35. Further, the most recent of those cases, *Press-Enter. II*, defined the scope of the exception therein as being confined to "criminal proceedings," 478 U.S. at 12, from which executions are separate and distinct.

Further, to find its supposed rights, the Ninth Circuit had to overlook the analyses and holdings in *Pell*, *Houchins*, and *Saxbe v. Washington Post Co*., 417 U.S. 843 (1974). All these cases upheld limitations on press access to penal institutions. As previously acknowledged by the Ninth Circuit, those cases respected the institutions' discretion to limit access to prisons and held that the First Amendment was not infringed simply because "the challenged policies did not 'deny the press access to sources of information available to members of the general public.'" *Calderon*, 150 F.3d at 981 (citing *Pell*, 417 U.S. at 835). As applied to the present issue, those cases provide, at most, that the First Amendment is not implicated unless the press is denied access that is provided to the public. *Pell*, 417 U.S. at 835; *Saxbe*, 417 U.S. at 850; *Houchins*, 438 U.S. at 14–16.

---

[4] Justice Burger's *Globe Newspaper* dissent also cites *Pell*. 457 U.S. at 616.

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 10**

That is not being contested here.

And while the *Woodford* court acknowledged its apparent inconsistency with the Supreme Court's analysis in *Holden*, it disregarded that case by claiming that the Ninth Circuit "declined to adopt such a categorical interpretation" in *Calderon*, because *Holden* discussed the Constitution generally instead of the First Amendment specifically, and by claiming that *Holden* is inconsistent with more modern Supreme Court jurisprudence, such as *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) (striking down statute enjoining any "malicious, scandalous, and defamatory newspaper, magazine, or other periodical" as an unconstitutional prior restraint). 299 F.3d at 875 n. 3. But *Calderon* does not necessarily stand for the proposition that the Ninth Circuit claimed in *Woodford*. *Calderon* analyzed whether there was a First Amendment right of access to executions and declined to find any such right. 150 F.3d at 982. The *Calderon* court was mindful of *Holden*, acknowledged that it upheld a total ban to witness executions, and never expressed disagreement with it. Instead, the *Calderon* court read *Holden* in combination with *Pell* for the principle that whatever First Amendment rights the press enjoy, it is "severely limited" and no greater than that of the public. 150 F.3d at 982. The Ninth Circuit, in other words, took the petitioner's argument at face value to show that *even if there was a right under the First Amendment*, it was not implicated. And while *Holden* didn't specifically analyze the First Amendment, it explained that no provision of the Constitution precludes penal institutions from limiting witnesses altogether. 137 U.S. at 491.

Further, while the *Woodford* court opined that *Holden* was outdated, to believe such, the *Woodford* court overlooked how more recent case law, e.g., *Houchins* and *Richmond Newspapers* (both decided after *Olson*), reestablished the same principles. *See Houchins*, 438 U.S. at 12–17; *Richmond Newspapers*, 448 U.S. at 576 n. 11. Indeed, *Houchins* explicitly addressed the First Amendment when reaching its holding, detailed how Supreme Court precedent establishes that

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 11**

there is no right of newsmen to access penal institutions above the general public, and explained that there is not a basis under the First Amendment to compel the government to supply information. 438 U.S. at 8–16 (collecting sources). Further, *Richmond Newspapers* explicitly differentiated access to prisons from court access—which directly negates the Ninth Circuit's analysis in *Woodford* and *Ryan*. 448 U.S. at 576.

Further, the reasoning utilized by the Ninth Circuit in *Woodford* and *Ryan* relies on a logical fallacy. The Supreme Court has explained that penal institutions may regulate who can witness an execution and how many people can witness an execution. No court disagrees that prisons can limit and regulate who can witness an execution. The Supreme Court has explained that penal institutions can outright prevent anyone from witnessing an execution. How, then, can there be a First Amendment right to view an execution if it is constitutional to execute an inmate without witnesses? There can't. Further, because the First Amendment rights of the press are co-extensive with the public at large, there cannot be special treatment provided to the press to dictate how and what is seen at executions when it is constitutional to prohibit the public at large from attending. Indeed, even under *Woodford*'s and *Ryan*'s unitary, deferential standard of review, the public can be prohibited from witnessing an execution if such restrictions are rationally related to any single legitimate interest.

There is not a First Amendment right of access to executions. Because the cases relied on by the Ninth Circuit do not apply to the prison context, much less the execution context, the Supreme Court cases include qualifiers confining those holdings to the criminal court process, and the Supreme Court has distinguished access to prisons from access to criminal adjudications, the Ninth Circuit erred by extending the First Amendment to include a right of access to executions. *Accord Arkansas Times*, 2008 WL 110853, at *2–5; *Oklahoma Observer*, 73 F. Supp. 3d at 1323–

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 12**

28; *BH Media Group*, 466 F. Supp. 3d at 659–65. The Ninth Circuit cases are inconsistent and irreconcilable with Supreme Court precedent and the First Amendment. Accordingly, those cases are not binding on this Court. *See Miller*, 335 F.3d at 899–900 (explaining that Ninth Circuit case law is not binding where Supreme Court precedent "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."). For the reasons discussed above, the Constitution does not provide Plaintiffs the right they claim. IDOC's policies are constitutionally compliant because the press and public are provided the same scope of access during executions. Plaintiffs' Complaint should be dismissed.

**3.2. Notwithstanding, even if the First Amendment includes the rights identified in *Woodford* and *Ryan*, IDOC's procedures satisfy those requirements.**

The rights created by *Woodford* and *Ryan* are confined to seeing and hearing the condemned in the execution chamber. *See UPS Supply Chain Sols., Inc. v. Megatrux Transp., Inc.*, 750 F.3d 1282, 1293 (11th Cir. 2014) (stating the foundational maxim, "holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision."). *Woodford* was limited to seeing the condemned "as he enters the execution chamber, is forcibly restrained and fitted with the apparatus of death." 299 F.3d at 877. *Ryan* was limited to hearing the condemned in the execution chamber. 938 F.3d at 1076. The Ninth Circuit has never extended the principles in *Woodford* or *Ryan* to areas of penal institutions beyond the chamber, and certainly never beyond access to the condemned.

Indeed, *Ryan* indicates that the access Plaintiffs seek here is not required under the First Amendment. In addition to hearing the condemned, the plaintiffs in *Ryan* sought ancillary materials and information concerning the chemicals and team members. 938 F.3d at 1078. The Ninth Circuit determined that this information was not within the scope of the First Amendment. *Id.* at 1078–80. The Ninth Circuit noted that while it once thought such a right was likely, the Supreme

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 13**

Court expressly rejected that notion in *Ryan v. Wood*, 573 U.S. 976 (2014). The Ninth Circuit determined that the information is not subject to First Amendment disclosure because it is "not part of any official record of the execution proceeding," but instead is "simply information in the government's possession that would enhance the understanding of executions." *Id.* at 1079.

Further, the *Woodford* and *Ryan* holdings were premised on a historical tradition of allowing the public and press to "watch the condemned inmate enter the execution place, be attached to the execution device and then die." *Woodford*, 299 F.3d at 876. Even if there is such a tradition, there does not exist a tradition of observing the execution team before, during, or after an execution. There is not a history of access to watching executioners clean and prepare their rifles for firing nor sharpen their blade for traditional methods. Indeed, Plaintiffs have not even tried to identify such a tradition in their Complaint or preliminary injunction materials. Because access to execution teams has not historically been allowed, even if the Ninth Circuit correctly identified a First Amendment right, it does not attach to the things Plaintiffs seek here. *See Creech v. Tewalt*, 84 F.4th 777, 790 (9th Cir. 2023) (holding that there was not a First Amendment right to execution related materials under *Woodford*'s or *Ryan*'s reasoning in part because the inmate failed to point to comparable history respecting execution information). Because Plaintiffs are not challenging access to the condemned while he is within the chamber, the rights created by the Ninth Circuit are inapposite here.

Additionally, the purported rights found in *Woodford* and *Ryan* are confined in scope and do not encompass the type of information sought here. As stated, those rights are "severely limited," *Calderon*, 150 F.3d at 982, do not include a right to examine executions "in minute detail," and do not include "all information that is 'inextricably intertwined' with executions." *Ryan*, 938 F.3d 1079. And even if executions are public, the Ninth Circuit explained that this claimed right

does not "change the default rule that the right of access 'does not extend to every piece of information that conceivably relates to a governmental proceeding." *Id.* at 1049–50. But that is the type of information Plaintiffs seek here. Plaintiffs are not seeking to see the condemned within the chamber, his expressions, conduct, or utterances; rather, they are seeking to observe the medical team in an adjacent room. (Dkt. 1, ¶¶ 5–6, 35, 57). Plaintiffs seek to see the happenings in the chemical room before, during, and after the execution. (*Id.* ¶ 6). Plaintiffs seek to see the medical team's preparation, labeling of syringes, drawing of chemical, and analyzing the syringes to ensure they are not damaged or mixed up, along with being able to, themselves, monitor the condemned's vitals and witness the medical team's administration of chemical from the chemical room. (*Id.* ¶ 57). This information has nothing to do with witnessing the condemned during the execution or being able to report if the condemned expresses signs of unconstitutional pain—the purpose for which the media serves. *See Ryan*, 938 F.3d at 1076. Plaintiffs' request is an improper attempt to conflate the First Amendment with a FOIA request. *See Houchins*, 438 U.S. at 14–15; *Wood*, 759 F.3d at 1091–93 (Bybee, J., dissenting). The requested information exceeds the confines of *Woodford* and *Ryan* and involves the minute details of Idaho's execution process that are beyond the First Amendment's scope. This is the type of information the Ninth Circuit was referring to when explaining that its holdings do not extend to every piece of information that conceivably relates to a governmental proceeding. *Ryan*, 938 F.3d at 1080; *see also Wood*, 759 F.3d at 1091–93 (Bybee, J., dissenting) (explaining that the First Amendment is not FOIA or the Official Secrets Act and the right of access applies only to "proceedings and documents filed therein and nothing more.").

To better understand the Ninth Circuit's confines, it is helpful to consider the cases the Ninth Circuit used to create the purported rights. The Ninth Circuit relied on access to courts cases in which the Supreme Court held that there is a right to access the criminal adjudication process.

*Richmond Newspapers* found a right of access to criminal trials, *Globe Newspaper* found a right to hear testimony of a child victim of sex offense, *Press-Enter. I* found a right to observe voir dire, and *Press-Enter. II* found a right to witness preliminary hearings. But there is not a right to watch judges within chambers while they decide issues or write opinions, and there certainly is not a right to install cameras within chambers that feed to the press. That is a direct corollary to the right Plaintiffs seek here. Indeed, the Supreme Court has held that there is not a First Amendment right to access exhibits displayed in court but kept in the custody of the court clerk. *Nixon v. Warner Commun., Inc.*, 435 U.S. 589, 609 (1978). Further, in *Ryan*, the Ninth Circuit explained it has never found a right to access judicial conference notes or all documents within a prosecutor's office, and that the Supreme Court has indicated such rights do not exist. 938 F.3d at 1079. And while the media has a right to attend court proceedings, that right is "no more than a right to attend the trial and report on their observations." *Radio and TV News Ass'n of S. California v. U.S. Dist. Ct. for Cent. Dist. of California*, 781 F.2d 1443, 1447 (9th Cir. 1986). Likewise, even if there is a right to access an execution, it is limited to attending and viewing the condemned. The information Plaintiffs seek is only related to the minute, ancillary details of an execution. Even though this type of information may conceivably relate to a governmental process, the First Amendment does not provide the public a right to see or examine it. For if the scope of the First Amendment's right to access court proceedings is drawn "at the courthouse door," *Nixon*, 435 U.S. at 609 (collecting sources), any such right to an execution is drawn at the execution chamber.

Notwithstanding, even if the First Amendment attached to the type of information sought, IDOC not having a camera in the chemical room passes First Amendment muster. The supposed rights identified by the Ninth Circuit are subject to a "unitary, deferential standard of review." *Woodford*, 299 F.3d at 977–78. This standard asks "whether the regulation is 'reasonably related'

to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns." *Id*. at 878 (citing *Turner v. Safley*, 482 U.S. 78, 87 (1987)). The four *Turner* factors dictate whether the supposed right was violated:

> (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally and (4) whether there exist ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Id.* (quoting *Turner*, 482 U.S. at 89–91, cleaned up).

Defendant acknowledges that he is limited in his scope of argument on this point under Rule 12. Defendant's fuller argument on these points is included in his preliminary injunction response. Notwithstanding, Plaintiff's claim fails even under Rules 8 and 12 review because the second and fourth factors (alternative means and ready alternatives) justify no camera being placed in the chemical room. To start, it is not contested that execution witnesses can adequately see the condemned through all parts of the execution process. (Dkt. 1, ¶ 37). Further, SOP 135 requires full documentation of the administration of chemical during an execution. (Ex. B, pp. 6–7). And "[a]ny deviation from the written procedure must be noted and explained on the form." (*Id.*). Thus, what happens in the chemical room is fully documented. Additionally, under SOP 135, after IV access in the condemned has been established, the medical team draws the chemical into the appropriate syringes. (*Id.* at p. 1). The Medical Team Leader then notifies the IMSI Warden that the team is ready to proceed, and the Warden then gives them the go ahead. IDOC's team also verbally notifies witnesses when chemical is being administered. Thus, the witnesses will know when chemicals are administered. Therefore, the witnesses have an alternative means of knowing the information sought here. Plaintiffs' claim fails under a unitary, deferential standard review.

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 17**

Even if the First Amendment included a right to access executions, it does not include the access Plaintiffs seek here. Plaintiffs lack a constitutional basis to force IDOC to provide camera access to the chemical room. Plaintiffs' claims fail as a matter of law.

### 3.3. The arguments in Plaintiffs' preliminary injunction materials fail.

Plaintiffs submitted a motion for preliminary injunction with their Complaint. To support that motion, Plaintiffs submitted a memorandum outlining why they believe they enjoy a constitutional right of access to the chemical room. Plaintiffs primarily rely on *Woodford*, *Ryan*, and *Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d 859 (D. Ariz. 2016). The problem with Plaintiffs' argument, however, is that none of those cases provide such a right. As stated, *Woodford* and *Ryan* are only concerned with access to the condemned in the execution chamber. That is not being challenged here, and thus, the supposed rights identified there are not implicated.

Plaintiff's reliance on *Guardian News*, 225 F. Supp. 3d 859, is similarly misplaced. That case involved Arizona's death penalty practices. At the time, Arizona utilized a somewhat similar multi-room system in which its medical team administered chemical to the condemned in a different room than the chamber. The plaintiffs in that case were media outlets who sought to be able to see within the medical room and view the medical team during the execution. The *Guardian News* court extended *Woodford* and *Ryan* to grant the plaintiffs an injunction which, in relevant part, prohibited Arizona "from conducting lethal injections executions without providing a means for witnesses to be aware of the administration(s) of lethal drugs." *Id.* at 870. Importantly, that injunction did not provide the plaintiffs in *Guardian News* the type of relief Plaintiffs here seek (video and audio access to the medical room). Instead, it deferred to the state the ability to come up with a way it found fit to alert witnesses that chemical is being administered. IDOC's current practices, however, are compliant with *Guardian News* because under its protocol, witnesses know when

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 18**

chemical is being administered. Thus, even if there is a potential First Amendment right to such information, IDOC has complied with whatever the Constitution requires.

Plaintiffs' claims fail as a matter of law. The Court should dismiss the Complaint.

**4. Plaintiffs lack standing.**

Standing requires a plaintiff to have suffered an injury in fact that is both "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180 (2000). Here, the Associated Press and Idaho Statesman claim an injury because their staff have previously been granted permission to attend executions and they "intend" to ask for permission to attend any future executions. (Dkt. 1, ¶¶ 18–19, 28–30, 25Dkt. 2-2, ¶7; Dkt. 2-3, p. 1). East-Idaho-News.com claims the same injury but does not claim to have ever attended an execution and states that they may never attend an execution. (*Id.* ¶ 30). Regardless, none of that matters because there is no IDOC inmate with an active death warrant and IDOC does not currently have any scheduled executions. Indeed, Plaintiffs pleaded that there are currently stays in place for the two IDOC inmates that may be executed. (Dkt. 1, ¶¶ 25–26). And while SOP 135 provides that the Associated Press will be granted one witness to attend an execution in the future, if there is one, that is currently inapposite because they, along with all other media witnesses, must still submit a request for that witness to be approved fourteen days before a scheduled execution. (Ex. A, p. 11). IDOC retains full ability to deny all such people from attending, and the three witnesses not with the Associated Press are subject to being picked in a drawing. (*Id.* pp. 11–13). Because there is not a currently scheduled execution, Plaintiffs' claimed injuries are entirely speculative and hypothetical. Additionally, as explained above, Plaintiffs lack the right they claim, but even if it existed, IDOC's policies comply with whatever the First Amendment requires. Plaintiffs lack standing.

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 19**

5.  **The PLRA's needs-narrowness-intrusiveness test bars Plaintiff's relief.**

The PLRA "was enacted 'to stop federal courts from micromanaging our Nation's prisons' and 'from providing more than the constitutional minimum necessary to remedy the proven violation of federal rights.'" *Balla v. Idaho State Bd. Of Correction*, 2020 WL 2812564, *6 (D. Idaho 2020) (citation omitted). In furtherance of that purpose, the PLRA precludes court involvement in the prison system "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626. For the reasons stated above, there is no need for the Court to intermingle itself in IDOC's execution processes because IDOC's processes comply with whatever the Constitution requires. *See Armstrong v. Newsom*, 58 F.4th 1283, 1293 (9th Cir. 2023) (PLRA precludes court involvement if there isn't a violation). And because IDOC's policies are constitutionally compliant, any involvement from the Court would not be narrowly drawn, *see Edmo v. Corizon, Inc.*, 935 F.3d 757, 783 (9th Cir. 2019), and would be overly intrusive. *Newsom*, 58 F.4th at 1297. Therefore, Plaintiffs' claim is barred from adjudication under the PLRA and the Complaint should be dismissed.

## CONCLUSION

The Court should grant Defendant's Motion and dismiss Plaintiff's Complaint.

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 20**

Respectfully submitted this 27th day of December 2024.

MOORE ELIA KRAFT & STACEY, LLP

*/s/ Tanner J. Smith*
Tanner J. Smith
Attorneys for Defendants

OFFICE OF THE ATTORNEY GENERAL

*/s/ Kristina M. Schindele*
Kristina M. Schindele
Deputy Attorney General
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of December 2024, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Wendy Olson
Anders Pedersen
Stoel Rives, LLP
101 S. Capitol Blvd., Ste. 1900
Boise, Idaho 38702

☐ U.S. Mail, postage prepaid
☐ Hand Delivered
☐ Overnight Mail
☐ Facsimile Transmission
☒ E-Mail: wendy.olseon@stoel.com;
anders.pedersen@stoel.com

*Attorneys for Plaintiff*

*/s/ Tanner J. Smith*
Tanner J. Smith

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS - 21**

Exhibit A

| Idaho Department of Correction | Standard Operating Procedure | Title: **Execution Procedures** | | Page: 1 of 34 |
|---|---|---|---|---|
| | | Control Number: **135.02.01.001** | Version: **5.0** | Adopted: 05/18/1998 |

**Josh Tewalt, Director of the Idaho Department of Correction, approved this document on 10/11/2024**

Open to the public: ☒ **Yes**

**SCOPE**

This standard operating procedure (SOP) applies to all Idaho Department of Correction (IDOC) staff members involved in the administration of capital punishment and to persons in IDOC custody sentenced to capital punishment, hereafter referred to as condemned person.

**Note:** This SOP is subject to revision at the discretion of the Director of IDOC. The Director may revise, suspend, or rescind any procedural steps, at any time, at the Director's sole discretion.

| Revision Summary |
|---|
| Revision date (10/11/2024) version 5.0: Revisions were made to reflect physical plant changes to F Block; the process for the condemned individual to request religious accommodation; revised qualifications for the medical team; clarified process steps throughout; updated forms to reflect IV placement and syringe and chemical preparation process steps. |

## TABLE OF CONTENTS

Board of Correction IDAPA Rule Number 135 ............................................................. 2

Policy Control Number 135................................................................................................ 2

Purpose............................................................................................................................... 2

Responsibility ..................................................................................................................... 2

Standard Procedures ......................................................................................................... 5

1.  Introduction .............................................................................................................. 5

2.  Monitoring Appellate Activities................................................................................ 5

3.  Staff Conduct and Professionalism ......................................................................... 6

4.  Attempted Disruption of Execution Process ......................................................... 6

5.  Specialty Teams and Training and Practice Requirements.................................... 6

6.  Death Warrant for Pregnant Person ....................................................................... 9

7.  Stay of Execution ..................................................................................................... 9

8.  Public Information and Media Access......................................................................10

9.  External Security ......................................................................................................12

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 2 of 34 |

10.  Persons Allowed in the Execution Unit During Execution ..............................................12

11.  General Timeline ..............................................................................................................14

12.  Upon Service of a Death Warrant...................................................................................14

13.  Briefing and Communication: After the Death Warrant is Served................................16

14.  Conditions of Confinement ............................................................................................16

15.  Thirty to Twenty-One Days Prior to the Execution .......................................................19

16.  Twenty-One to Seven Days Prior to the Execution .......................................................24

17.  Seven to Two Days Prior to the Execution....................................................................25

18.  Two Days Prior to the Execution ..................................................................................27

19.  Twenty-Four to Twelve Hours Prior To the Execution .................................................28

20.  Twelve Hours Prior To the Execution............................................................................30

21.  Final Preparations ..........................................................................................................31

22.  Pronouncement of Death ...............................................................................................31

23.  Return of the Death Warrant .........................................................................................31

24.  Following the Execution .................................................................................................31

Definitions ..............................................................................................................................32

References................................................................................................................................32

## BOARD OF CORRECTION IDAPA RULE NUMBER 135

Executions

## POLICY CONTROL NUMBER 135

Executions

## PURPOSE

The purpose of this SOP is to establish specific procedures for administration of capital punishment through lethal injection in accordance with Idaho Code and the Constitutions of the United States of America and the State of Idaho.

## RESPONSIBILITY

### *Director of IDOC*

The Director of IDOC is responsible for:

- Exercising overall control and approval of the administrative policy, SOP, field memoranda, and of the execution process itself.

- Communicating with Idaho Governor's Office, Idaho Board of Correction, Idaho Legislators, and Idaho Commission of Pardons and Parole.

- Determining execution protocol and ensuring that applicable chemicals are obtained and tested at an accredited lab following United States Pharmacopeia

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 3 of 34 |

or other applicable, nationally recognized or generally accepted testing standards.

- Approving news media representatives for media center access.

### *Chief of the Division of Prisons*

The Chief of the Division of Prisons, or designee, is responsible for:

- Field memoranda, and post orders related to the execution process.

- Contacting and notifying members of the victim's family.

- Contacting and notifying the State of Idaho's witnesses.

- Briefing witnesses before the execution.

- Disseminating briefings as needed to staff following the issuance of a death warrant.

### *Deputy Chief of the Division of Prisons*

The Deputy Chief of the Division of Prisons, or designee, is responsible for:

- Appointing one or more staff member(s) within the division to assist the Idaho Maximum Security Institution (IMSI) Warden.

- Coordinating IDOC activities as the Incident Command System (ICS) command center operations chief at IDOC's South Boise Complex, which includes IMSI, Idaho State Correctional Institution (ISCI), South Idaho Correctional Institution (SICI), and South Boise Women's Correctional Center (SBWCC).

- Activating the following teams and overseeing their activities:

  ♦ ICS
  ♦ Correctional Emergency Response Team (CERT)
  ♦ Maintenance
  ♦ Critical Incident Stress Management (CISM)
  ♦ Traffic Control Team
  ♦ ISCI media center
  ♦ SICI grounds and perimeter security.

**Note:** IDOC may have more than one Deputy Chief of Division of Prisons, any of whom will share the responsibilities for the position set out by this SOP or individually as assigned by the Director of IDOC or the Chief of the Division of Prisons.

### *Administrative Team*

The Administrative Team consists of the Deputy Chief of the Division of Prisons, the IMSI Warden, the backup to the IMSI Warden for the purpose of serving as the execution director, and any additional IDOC staff the Director or the Chief of the Division of Prisons may appoint.

The Administrative Team is responsible for:

- Providing, planning, directing, and implementing all pre-execution and post-execution activities.

- Coordinating all processes associated with specialty team personnel selection, equipment, supply acquisition, training, rehearsal, and performance.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 4 of 34 |

- Conducting preparatory steps in order to ensure that the execution process is conducted in accordance with this SOP.

- Reviewing and ensuring that the department adheres to Idaho Code sections 19-2705, 19-2713, 19-2714, 19-2715, 19-2716, 19-2716A, 19-2718, and IDAPA 06.01.01.135.

- Selecting staff for the Escort Team and Medical Team.

- Selecting emergency medical personnel to be on site during the execution procedure.

- Ensuring that all the equipment such as electrical, plumbing, heating, and cooling units in the execution chamber are in working order.

- Ensuring that an annual training schedule is established and scheduling dates for periodic on-site rehearsal sessions by the Escort Team, Medical Team, and ICS that complies with the requirements of this SOP.

### *Idaho Maximum Security Institution (IMSI) Warden*

The IMSI Warden is responsible for:

- Providing notification to the condemned that a death warrant has been issued.

- Assigning an IDOC liaison for the condemned person.

- Creating and maintaining a log documenting the events leading up to the execution date that serves as a permanent record of the execution activities.

- Issuing all the orders to facilitate an execution at IMSI.

- Ensuring all visitors and execution witnesses meet the standard IDOC visitor requirements and any additional requirements implemented by this SOP.

### *Idaho Maximum Security Institution (IMSI) Deputy Warden of Security*

The IMSI Deputy Warden of security is responsible for:

- Internal security at IMSI.

- Scheduling staff for regular posts and additional security to begin 48 to 24 hours prior to the execution up to and including a 'level C response' in accordance with the ICS.

### *Idaho State Correctional Institution (ISCI) Warden*

The ISCI Warden is responsible for:

- Establishing field memoranda to identify authority and guidelines to coordinate media activity. The Chief of the Division of Prisons must approve the field memoranda.

- Providing logistical and communication support at the IDOC's South Boise Complex.

### *South Idaho Correctional Institution (SICI) Warden*

The SICI Warden is responsible for:

- Establishing field memoranda to identify authority and guidelines to coordinate and implement external security measures, including guidelines for other law enforcement and support agencies operating on the IDOC's South Boise Complex. The Chief of the Division of Prisons must approve the field memoranda.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 5 of 34 |

## STANDARD PROCEDURES

### 1. Introduction

Enforcing capital punishment is one of the most serious and controversial responsibilities of IDOC. IDOC leadership and staff must be aware of the pressures an execution places on them and the prison population and be prepared and able to meet the situations that might arise. A high regard for the dignity of all individuals involved must be maintained.

All executions, both males and females, will be conducted at IMSI. The condemned person will be transported to IMSI immediately when the death warrant is issued, if not already housed there.

No IDOC staff member or contractor, except as identified by Idaho Code or contract, will be required to participate in an execution and can withdraw from the process at any time and a replacement will be appointed in accordance with Idaho law and this SOP.

IDOC will make every effort in the planning and preparation of an execution to ensure that the execution process:

- Complies with the Constitution of the United States, the Constitution of the State of Idaho and Idaho law, specifically Idaho Code Sections 19-2705, 19-2713, 19-2714, 19-2715, 19-2716, 19-2716A, 19-2718, and IDAPA Rule 06.01.01.135.

- Is handled in a manner that minimizes its impact on the safety, security, and operational integrity of the prison in which it occurs.

- Does not cause the condemned person to suffer cruelly during the execution.

- Accommodates the public's right to obtain certain information concerning the execution and strives to minimize the impact on the community and the State of Idaho.

- Respects the privacy interests of families of the victims and of the condemned person.

- Provides contingency planning to identify and address unforeseen problems.

- Maintains lines of communication necessary to receive information regarding stays of execution, commutations, and other circumstances throughout the execution process.

- Provides opportunity for citizens to demonstrate in a lawful manner.

- Ensures there is an appropriate response to unlawful civil disobedience, trespass, and other violations.

### 2. Monitoring Appellate Activities

The Deputy Chief of the Division of Prisons, in conjunction with the Deputy Attorneys General (DAGs) representing IDOC, will monitor the appellate process of those under the sentence of death. When it appears an individual may be within one year or less of exhausting appeals, the Deputy Chief of the Division of Prisons will notify the Director of IDOC, the Chief of the Division of Prisons, and the IMSI Warden of the possibility of the issuance of a death warrant within the next year.

The Administrative Team will begin the planning and preparation process when an inmate is within this one-year timeframe.

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 6 of 34 |

## 3. Staff Conduct and Professionalism

All IDOC staff and contractors must maintain a high degree of professionalism regarding the execution process, to include all IDOC and contract facilities that are not involved in the execution process. Expectations demonstrating professionalism include, but are not limited to, the following:

- Restraint and courtesy when interacting with residents, witnesses, demonstrators, attorneys, news media, law enforcement and any member of the public regarding the implementation of the death penalty.

- Proficient performance of all assigned duties in a respectful manner.

- Conduct that appropriately reflects the gravity of the execution process.

## 4. Attempted Disruption of Execution Process

IDOC is required by Idaho law to carry out capital punishment sentences from Idaho courts. IDOC will take those actions necessary to fulfill this requirement and prevent the disruption of an execution or disruption to the safe and orderly operation of its correctional facilities. Prohibited activities include, but are not limited to the following:

- Filming, taping, recording, broadcasting or otherwise electronically documenting the execution.

- Trespassing or entering upon IDOC property without authorization.

- Participating in unlawful demonstrations or unlawful attempts to disrupt, prevent or otherwise interfere with an execution.

- Unlawfully threatening, intimidating, or otherwise attempting to influence persons involved in the execution process.

These prohibitions apply to the incarcerated population, contractors, IDOC staff, and the public.

IDOC will ensure adequate law enforcement is present to ensure the safe control of the public on IDOC property, including officers stationed at the Execution Unit, if necessary. This may include members of the Boise Police Department, the Ada County Sheriff's Department, or the Idaho State Police, and other law enforcement agencies.

## 5. Specialty Teams and Training and Practice Requirements

The execution process requires three specialty teams: The Escort Team, the Medical Team, and the Administrative Team.

The names of the individuals on the Escort Team and Medical Team will be treated with the highest degree of confidentiality. The identity of all individuals (except those Administrative Team Members identified by law or rule) participating in or performing any ancillary functions in the execution and any information contained in the records that could identify those individuals is confidential and not subject to disclosure. The identities of Escort Team and Medical Team Members are available to the Director of IDOC, the Chief of the Division of Prisons, and the Administrative Team. See IDAPA 06.01.01.108.04 and 06.01.01.135.

### *Escort Team Members – Criteria and Selection Requirements*

Service on the Escort Team is voluntary. Staff may withdraw at any time.

Staff must meet the following criteria to be selected for the Escort Team:

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 7 of 34 |

- Demonstrated high degree of professionalism

- Demonstrated ability to maintain confidentiality

- No personnel disciplinary action in the past 12 months

- Current IDOC employee with at least one year of satisfactory employment

- No blood or legal relationship to the victim or victim's family

- No blood or legal relationship to the condemned person or family

The Administrative Team will identify qualified personnel to serve on the Escort Team, verify qualifications, and complete criminal background checks before approving participation on the Escort Team.

The Deputy Chief of the Division of Prisons will designate an Escort Team Leader and at least one alternate Escort Team Leader.

The Escort Team Leader reports to a designated Administrative Team Member and ensures that all Escort Team Members understand all provisions of this SOP and are well-trained in the escort procedures.

### *Medical Team Members – Criteria and Selection Requirements*

- The Medical Team consists of volunteers whose training and experience include establishing intravenous (IV) access by peripheral line and/or central venous line. The Medical Team will be responsible for inserting IV catheters, ensuring the line is functioning properly throughout the procedure, preparing the chemicals, preparing the syringes, drawing the chemicals, monitoring the condemned person (including the level of consciousness), and administering the chemicals as described in. *Execution Chemicals Preparation and Administration*.

To serve on the Medical Team, individuals must meet the following criteria:

- At least three years of medical experience as an emergency medical technician (EMT), licensed practical nurse (LPN), military corpsman, paramedic, phlebotomist, physician assistant (PA), physician (MD or DO), nurse practitioner (NP), registered nurse (RN), or other medically trained personnel including those trained in the United States military.

- Have current peripheral line venous access proficiency (i.e., understand medical orders, read and understand medical labels, draw chemicals, and deliver chemicals through either an injection or IV) through ongoing training, education and experience, and/or current job duties

- Have current pharmacodynamics proficiency (i.e., understand the effect of a chemical or pharmaceutical on the human body) through ongoing training, education and experience, and/or current job duties

- Be certified in CPR.

- No blood or legal relationship to the victim or victim's family.

- No blood or legal relationship to the condemned person or condemned person's family.

In addition to the above minimum qualifications, to establish central venous line IV access, individuals must meet the following criteria:

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 8 of 34 |

- Medically-licensed physician.
- Have current central venous line catheter placement proficiency.

### The Administrative Team

The Administrative Team will identify qualified persons to serve on the Medical Team; verify their professional qualifications (to include professional licensing and certification), training, and experience; complete criminal background checks; and conduct personal interviews before approving participation on the Medical Team.

The Administrative Team will ensure that all Medical Team Members understand all provisions of this SOP and are well-trained in the execution procedures.

**Note:** Licensing and certification, and criminal history reviews will be conducted prior to placement on the Medical Team, annually after placement on the Medical Team and after issuance of a death warrant. Participation on the Medical Team is contingent on passing these reviews.

### The Deputy Chief of the Division of Prisons

The Deputy Chief of the Division of Prisons will designate a Medical Team Leader and at least one alternate Medical Team Leader.

### The Medical Team Leader

The Medical Team Leader will have direct oversight of the Medical Team and will report to a designated Administrative Team Member.

### Training and Rehearsal Requirements

The Administrative Team will establish a training schedule for each calendar year that identifies dates for on-site training and rehearsal sessions for the Escort Team, Medical Team, and Incident Command Staff. All training and rehearsal sessions must be documented and submitted to a designated Administrative Team Member. A minimum of 10 training sessions will be scheduled each calendar year for the Escort Team and Medical Team.

The Director of IDOC may, in his discretion, suspend or modify the number and frequency of trainings if no execution is anticipated in that calendar year. The Director may, in his discretion, increase the number and frequency of trainings to ensure the adequate training of the Escort and Medical Teams.

In order to participate in an execution, Escort Team, Medical Team, and ICS Members must participate in a minimum of four training sessions within the twelve months prior to an execution. Training and rehearsal sessions for the Medical Team will include the placement of peripheral line IV catheters and administering IV fluids through peripheral lines in a minimum of two live volunteers.

After a death warrant is served, the Escort Team, Medical Team, and ICS will train weekly before the scheduled execution date.

In the forty-eight hours prior to the scheduled execution, the Escort Team, Medical Team, and Incident Command Staff Members must participate in a minimum of four training sessions and two rehearsals.

### Emergency Medical Personnel and Ambulance Service

Emergency medical personnel and ambulance service will be present near the Execution Unit as determined by the Administrative Team to provide emergency medical assistance

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 9 of 34 |

and transport to anyone requiring such care during the process, including any necessary resuscitation effort of the condemned person and first aid emergency care for any person in the immediate area if needed. Emergency medical personnel will have access to an on-site medical crash cart, applicable medications, and defibrillator.

Emergency medical services provided under this section are not considered part of the execution procedures.

Emergency medical personnel will maintain proper professional licensing or certification as required by the scope of the emergency medical services to be provided. The Administrative Team will verify professional licensure and certification and will complete criminal background checks upon the issuance of the death warrant.

The identities of emergency medical personnel are confidential and will be protected from disclosure in the same manner described for the Medical Team and Escort Team Members. See IDAPA 06.01.01.108 and 06.01.01.135.

## 6. Death Warrant for Pregnant Person

If there is reason to believe that a condemned person is pregnant, a jury of three physicians will be appointed as required by Idaho Code section 19-2713 to determine whether the person is pregnant. If pregnant, the facility Warden will immediately notify the prosecuting attorney of the county with jurisdiction over the sentence of death, the Idaho Governor's Office, and the sentencing court. The facility Warden will suspend the execution until the person is no longer pregnant and the sentencing court has appointed a day for execution.

## 7. Stay of Execution

Upon notification that a court has issued a stay of execution, the following will occur:

### Director of IDOC

- Provide notification of the stay to the following:
- Administrative Team Members.
- Office of the Idaho Governor.
- Executive Director of the Idaho Commission of Pardons and Parole.
- Victim Liaison.

### Deputy Chief of the Division of Prisons

- Advise facilities staff that a stay of execution has been issued.
- Begin systematically deescalating the operation and when applicable instruct execution activities and related operations to stand down.
- When appropriate, return all IDOC and contract facilities to normal operations.

### IDOC Public Information Officer (PIO)

- Issue a press release to the media.

### IMSI Warden

The IMSI Warden will determine housing and visiting in accordance with Idaho Code § 19-2705; SOP 319.02.01.001, *Restrictive Housing*; and SOP 604.02.01.001, *Visiting*.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 10 of 34 |

If a stay of execution is received the day of a scheduled execution, in addition to the process steps above, the following will also occur:

***Administrative Team***

Ensure that all chemicals and medical supplies are handled in accordance with Execution Chemicals Preparation and Administration.

***IMSI Warden***

If the stay is anticipated to last more than two hours, IMSI Warden will consult with the Director and the Medical Team Leader regarding whether and when to remove the IV catheters. The IMSI Warden may direct the condemned individual to returned to a designated cell and return of the condemned person's property.

## 8. Public Information and Media Access

The PIO is responsible to prepare and release information to the media. The Director of IDOC will approve each release prior to dissemination.

A media center will be located on-site at the IDOC's South Boise Complex.

The PIO will act as the IDOC's liaison with all media agencies requesting access to the IDOC's South Boise Complex or information regarding the execution. The PIO will notify all news media of the following IDOC rules:

- Media representatives must comply with IDOC visiting standards for access to witness the execution and to have access to the media center. This includes IDOC's prohibition on weapons and tobacco use on IDOC premises.

- Cameras, video cameras, cellular telephones, and recording devices are not allowed inside IMSI or the execution chamber.

- Cameras, video cameras, and recording devices are allowed in the media center and at the area(s) designated for media on the IDOC's South Boise Complex.

- Individuals entering IDOC premises are subject to search (metal detector and clothed body search), must arrive at the designated time, and must enter IDOC property as instructed.

***News Media Representatives***

A news media representative is a person whose primary employment is gathering or reporting news for:

- A newspaper, as defined in Idaho Code section 60-106.

- A news magazine having a normal circulation being sold by newsstands and by mail circulation to the general public.

- Radio and television news programs of stations holding Federal Communication Commission licenses.

- The Associated Press.

News organizations which distribute content primarily via internet will be admitted on a case-by-case basis. The PIO will verify that each internet-based organization is a bona fide news media. The Director of IDOC will be the final authority to approve admittance of news media representatives from internet-based news agencies to the media center.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | 11 of 34 |

### Media Representative Witnesses to the Execution

IDOC will permit up to four news media representatives to witness the execution. This is subject to change by the Director of IDOC.

Fourteen days prior to the execution, any news media representative who desires to witness the execution must submit a fully completed *Execution Witness Acknowledgment and Agreement* to the PIO for the purposes of undergoing a criminal background check and approval.

The media representative witnesses will be selected as follows:

- The Associated Press will select one media representative witness.
- One media representative witness will be randomly selected from each of the following groups:
  - ♦ Media organizations that focus on and primarily cover the region in which the county of conviction is located. The Director of IDOC will determine which media agencies provide substantial coverage to the residents in the county of conviction.
  - ♦ Print and internet news media organizations that focus on and primarily cover and deliver local news to communities in Idaho.
  - ♦ Broadcast news media organizations that focus on and primarily cover and deliver local news to communities in Idaho.

Each media organization may only submit one representative for selection.

### Media Representative Witness Selection

Approximately seven days before the scheduled execution, the PIO will conduct the drawing for three media representative witnesses. A drawing for alternates in each category will be conducted at the same time. Selected media witnesses are not permitted to transfer or delegate their selection to any other individual.

Media representative witnesses must agree to return directly to the media center following the execution and share information and observations with the other news media representatives. The PIO will facilitate that discussion and briefing.

### Media Staging

The Deputy Chief of the Division of Prisons will determine the schedule and location for media vehicle staging and the schedule when news media representatives who are not participating in the witness pool must arrive.

On the day of the execution, media representative witnesses must arrive at the media center at the time designated by the PIO. News media representatives will sign in at the designated media center. IDOC will transport the four media representative witnesses from the media center to IMSI. The news media witnesses will be escorted to the Execution Unit with the state witnesses.

The transport officers will remain in a pre-assigned area at IMSI until the execution is declared completed by the IMSI Warden. The escort officers will then transport the media representatives back to the media center to participate in the news conference.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 12 of 34 |

9.  **External Security**

   ***IDOC's South Boise Complex Security Zones***

   The IDOC South Boise Complex will be broken down into four security areas:

   - **Inner perimeter zone:** the area within the respective facilities' fences.

   - **Controlled perimeter zone:** an extended perimeter around the four facilities listed above.

   - **Restricted zones:** areas designated for the media.

   - **Extended zones:** areas designated for observers/demonstrators.

   At the designated time, the SICI Warden will control access to the South Boise Complex.

   SBWCC will provide security staff as needed to the SICI Warden to help support security of the controlled perimeter zone.

   The SICI Warden is responsible for establishing posts at strategic access and checkpoints in the controlled perimeter zone surrounding the facilities.

10. **Persons Allowed in the Execution Unit During Execution**

   The Director of IDOC will have the discretion to determine the number of persons allowed in the Execution Unit at any time. In exercising this discretion, the Director of IDOC will consider the safe and orderly operation of IMSI, the interests of the victim's family, and whether multiple death warrants are being executed concurrently.

   By permitting individuals to witness the execution, IDOC is not creating any right or privilege that does not already exist. Individual placement of witnesses in the Execution Unit is subject to change at the discretion of the IMSI Warden. Individuals who fail to adhere to the requirements and directives of IDOC may be escorted out of the Execution Unit, IMSI, or IDOC premises.

   IDAPA 06.01.01.135.06 provides that in most instances the following persons should be allowed in the Execution Unit, subject to the discretion of the Director of IDOC:

   - The Administrative Team

   - The Escort Team Members

   - The Medical Team Members

   - The emergency medical personnel

   - The Director of IDOC

   - The Idaho Board of Correction representative

   - The Chief of the Division of Prisons or designee

   - The IMSI Warden or designee

   - The Ada County Coroner

   - The prosecuting attorney from the county of conviction

   - The sheriff from the county of conviction

   - A district judge from the county of conviction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 13 of 34 |

- The Idaho Governor or representative
- The Idaho Attorney General or representative
- Two members of the victim's family
- The spiritual advisor for the condemned person
- Two witnesses selected by the condemned person
- An attorney of record for the condemned person
- Four media representatives

In addition, the IDOC liaison for victim families and the IDOC liaison for the condemned will be allowed in the Execution Unit, subject to the discretion of the Director of IDOC.

The Execution Unit includes two witness areas, the Execution Chamber, Execution Preparation Room, the Medical Team Room, and staging areas. The persons permitted in each area are as follows:

***State of Idaho Witness Area***
- One Escort Team Member
- The Chief of the Division of Prisons
- Two members of the victim's family
- Four media representatives
- The prosecuting attorney from the county of conviction
- The sheriff from the county of conviction
- A district judge from the county of conviction
- A representative of the Idaho Board of Correction
- The Idaho Governor or representative
- The Idaho Attorney General or representative
- IDOC Victim Family Liaison or IDOC-designated victim coordinator

***Condemned's Witness Area***
- One Escort Team Member
- One IDOC liaison
- Two approved visitors selected by condemned person
- One attorney of record for condemned person

***Execution Chamber***
- The condemned person
- Two Escort Team Members
- Interpreter (if necessary)
- The Director of the IDOC

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 14 of 34 |

- The IMSI Warden or designee
- One Spiritual Advisor – may be present in the condemned witness area or in the execution chamber if approved by IMSI Warden as set forth in this procedure.

**Note:** The Ada County Coroner and the emergency medical personnel will be located at a staging area near the execution chamber as determined by the IMSI Warden.

*Medical Team Room*
- Medical Team Members
- Administrative Team Members
- The Director of IDOC

**Execution Preparation Room**
- The condemned person
- IMSI Warden or designee
- Two Escort Team Members
- The Director of IDOC

## 11. General Timeline

The processes described in this SOP are based on a general timeline. The timeline is generally divided into the following stages:

- Upon Service of a Death Warrant
- Thirty to Twenty-one Days Prior to the Execution
- Twenty-one to Seven Days Prior to the Execution
- Seven to Two Days Prior to the Execution
- Two Days Prior to the Execution
- Twenty-Four to Twelve Hours Prior to the Execution
- Final Preparations
- Pronouncement of Death

The timeline is subject to change to accommodate unforeseen events.

**Note:** The procedures for carrying out the execution are found in *Execution Chemicals Preparation and Administration.*

## 12. Upon Service of a Death Warrant

Only the Director of IDOC can accept service of the death warrant. Once service of the death warrant is accepted, the following steps will be implemented.

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 15 of 34 |

**Process Steps**

| Functional Roles | Step | Tasks |
|---|---|---|
| **Director of IDOC** | 1 | <ul><li>Immediately notify the Warden of the facility in which the condemned person is housed and the IMSI Warden.</li><li>Immediately forward the death warrant to the Warden of the facility in which the condemned person is housed.</li></ul> |
| Director of IDOC | 2 | Notify:<ul><li>Idaho Board of Correction</li><li>Chief of Prisons</li><li>Executive Director of the Idaho Commission of Pardons and Parole</li><li>Idaho Governor's Office</li><li>IDOC PIO</li><li>Office of the Attorney General (via the DAGs assigned to IDOC)</li></ul> |
| **Facility Warden** | 3 | Begin a log to provide a comprehensive chronological history of every aspect of the execution procedure. |
| Facility Warden | 4 | Deliver a copy of the death warrant to the condemned person. |
| Facility Warden | 5 | Immediately segregate the condemned person from the general population. |
| Facility Warden | 6 | Place the condemned person under constant observation by two staff members for 24 hours a day, seven days a week.<br><br>An observation logbook will be immediately established to record staffs' observation of the condemned person's activities and behavior. Entries will be chronological. Each day will be recorded beginning at midnight as MM/DD/YYYY. During the final four hours before the execution, staff will record each entry noting the time in hours and minutes and make entries a minimum of once every 30 minutes. |
| Facility Warden | 7 | Notify the facility Health Services Administrator (HSA) and a designated mental health professional that the condemned person has been placed in solitary confinement under a death warrant. |

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 16 of 34 |

| Functional Roles | Step | Tasks |
|---|---|---|
| Facility Warden | 8 | • Retain the original death warrant.<br>• Place a copy of the death warrant in the condemned person's central file. |
| Facility Warden | 9 | Within 24 hours after the death warrant is served, appoint a staff member (normally an IMSI Deputy Warden) to relieve the Warden of all duties except those duties related to the execution process until there is a stay of execution or the execution process has been completed. |
| Facility Warden | 10 | Appoint a staff member to serve as liaison between the condemned person, the condemned person's family, and the IMSI Warden (If the condemned person does not speak English, ensure an interpreter is obtained and available to communicate with the condemned person).<br><br>Appoint a person to serve as liaison between the victim, victim's family, and IDOC. In most cases, this will be the IDOC Victim Services Coordinator or a non-IDOC trained victim witness coordinator designated by the IMSI Warden. |

**13. Briefing and Communication: After the Death Warrant is Served**

The facility Warden will ensure that at a minimum, a weekly briefing will occur for all involved staff commencing after the death warrant is served until the facility has returned to normal operations. The CISM Team Members will be available to speak with interested and affected staff, individuals, or groups who have been identified by the facility Warden or other staff.

At a minimum, briefings and communication will be conducted as follows:

- Immediately after the death warrant is served.
- If any changes are made to the established execution timeline.
- As deemed necessary to keep staff well informed during the week prior to the execution.
- The day after the execution.

**14. Conditions of Confinement**

Immediately following the service of a death warrant, the condemned person will be moved to a predetermined isolation cell in accordance with Idaho Code § 19-2705. The isolation cell will be supplied a fresh mattress and pillow that has been thoroughly inspected, and clean bedding. An unclothed body search will be conducted, and the condemned person will be given clean clothes and different shoes. Any needs of the condemned person that require special accommodations will be identified and implemented as necessary.

Until the execution has been stayed or completed:

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 17 of 34 |

- Any movement of the condemned person will require escort by two correctional staff members with appropriate restraints.

- The condemned person will be placed under 24-hour, constant observation by two uniformed staff members.

- The condemned person will be allowed daily outdoor exercise, showers, and telephone access.

- The condemned person will be provided access to a television set and any electronics previously purchased by the condemned and approved by the IMSI Warden. Some functionality of the electronics may be limited at the direction of the IMSI Warden.

***Property***

The condemned person's personal property will be inventoried. The condemned person will be allowed to keep not more than six cubic feet of legal papers and religious materials, a pencil and paper, books, periodicals, and commissary food items. All remaining property will be boxed, sealed, and removed from the cell. It will be stored pending receipt of written instructions from the condemned person regarding disposition of property or otherwise disposed of as outlined in SOP 312.02.01.001, *Death of an Inmate*.

***Commissary***

The condemned person will be allowed to purchase food items from the commissary until the delivery date of commissary is within seven days of the execution. The IMSI Warden has discretion to extend this time frame. Non-food purchases must be approved by the IMSI Warden. The spending limit will be the same as established in SOP 320.02.01.001, *Property: State-issued and Resident Personal Property*. However, the IMSI Warden can increase or decrease this amount with approval of the Deputy Chief of the Division of Prisons. The condemned person may retain consumable commissary items as approved by the IMSI Warden until completion of the last meal.

***Last Meal***

For the last meal, the condemned person can select a meal from the established IDOC menu. The last meal will be served at approximately 1900 hours the day prior to the scheduled execution.

***Hygiene Items***

The condemned person will receive the following hygiene supplies: bar soap, toothpaste and toothbrush, towel, and washcloth. These items will be exchanged as necessary.

Clean clothing and bedding will be issued as necessary.

If requested, shaving supplies will be issued and immediately removed once shaving is finished.

***Access to the Condemned Person***

Access to the condemned person will be limited to the following:

- Law enforcement personnel investigating matters within the scope of their duties.

- The condemned person's attorney of record and agents of the condemned person's attorney of record. "Agents of the attorney of record" means employees of the attorney of record including investigators, paralegals, legal interns, and mitigation

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 18 of 34 |

specialists but does not include retained experts or other independent contractors of the attorney of record.

- Facility healthcare services staff.

- Spiritual advisors selected by condemned person.

- Condemned person's immediate family. The condemned person's immediate family is limited to the following:

  - Mother or father, including stepparents
  - Siblings of whole or half-blood, by adoption, and stepsiblings.
  - Legal spouse verified by marriage license or other operation of law.
  - Natural children, adopted children, and stepchildren.
  - Grandparents of blood relation.
  - Grandchildren (adult) of blood relation

### *Visiting*

Visiting for the condemned person will be limited to:

- Attorney of record and agents of the attorney of record.

- Spiritual advisors selected by condemned person.

- Condemned person's immediate family.

All visits by the attorneys of record and agents of the attorney of record must be in accordance with SOP 604.02.01.002, *Attorney and Professional Individual Access to Inmates* and the guidelines established in this SOP. The condemned person's attorney of record and agents of the attorney of record will be permitted contact visits under staff visual observation, but so that the staff members cannot hear the conversation.

All other visits, including social visits by attorneys and their agents, must be in accordance with SOP 604.02.01.001, *Visiting*, and the guidelines established in this SOP. Normally, minor children will not be allowed to visit. Any exception must be approved by the Deputy Chief of the Division of Prisons.

Spiritual advisors and immediately family will have non-contact visits until seven days immediately preceding the scheduled execution. Contact visits by spiritual advisors and immediate family may commence in the seven days immediately preceding the execution.

The IMSI Warden will have the authority to approve and establish the frequency and duration in which visits occur and will have the authority to suspend or deny visits when public safety or the safe, secure, and orderly operation of the prison could be compromised.

### *Spiritual Advisor*

The condemned person can select a spiritual advisor. The spiritual advisor must be approved by the facility Warden for visiting before visits can occur. A spiritual advisor cannot be an IDOC staff member or the staff member of a contract facility. A spiritual advisor may be a contract provider for volunteer and religious activities. Only one spiritual advisor will be permitted to witness the execution.

During the execution, the spiritual advisor can be present in the condemned witness area or execution chamber if approved by the IMSI Warden. The condemned person

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 19 of 34 |

must submit a concern form to the IMSI Warden requesting the presence of a spiritual advisor in the execution chamber no later than 14 days prior to the scheduled execution. The request must include the following information: name of advisor, list of religious items requested, and list of religious practices requested. The IMSI Warden will provide a response no later than 7 days prior to the scheduled execution.

### *Healthcare*

The IMSI Warden will request that the facility Health Services Administrator review the condemned person's healthcare record and identify any prescribed medication(s) or health care issues.

Facility healthcare services staff will dispense all medications in unit doses and when available, in liquid form. No medication including over-the-counter medications will be provided or maintained by the condemned person as keep-on-person.

The facility Health Services Administrator will provide the condemned person an opportunity to complete an Idaho Physician Orders for Scope of Treatment form.

Facility healthcare services staff will take necessary steps to maintain the condemned person's health prior to the execution, will respond appropriately to health care issues and emergencies including suicide attempts, and will take reasonable steps to revive the condemned person in medical distress at all times prior to the execution, subject to a Physician Orders for Scope of Treatment directive.

Facility healthcare services staff will monitor the condemned person daily for significant changes in the condemned person's medical or mental health. If the condemned person's health changes, facility healthcare services staff must report the condemned person's condition immediately to the IMSI Warden.

**Note:** All access, visits, etc. will be documented in the constant observation log.

## 15. Thirty to Twenty-One Days Prior to the Execution

After service of the death warrant until twenty-one days prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the Director of IDOC, Chief of the Division of Prisons, and the Deputy Chief of the Division of Prisons.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

### *Director of IDOC*

- Continue communication with the Idaho Board of Correction.

- Continue communication with the Idaho Governor's Office.

- Communicate as needed with the Executive Director of the Idaho Commission of Pardons and Parole.

- Meet with the Chief of the Division of Prisons, the Deputy Chief of the Division of Prisons, and other members of the IDOC Leadership Team as needed.

### *Chief of the Division of Prisons*

- Continue to provide briefings to IDOC staff.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 20 of 34 |

- Send *Witness Notification and Agreement* form to local and state government officials the director of the IDOC has identified as potential witnesses to the execution.

- Monitor planning related to the scheduled execution.

### *Administrative Team*

- Communicate with the Ada County Coroner's office regarding the disposition of the body, security for the Ada County Medical Examiner's vehicle, and the custodial transfer of the body.

- Confirm the qualifications of the team members to serve on the Escort and Medical Teams, approve or deny each team member, review the current specialty team rosters, and make replacements if needed.

- Ensure the assigned Medical Team Members physically evaluate the condemned person to predetermine appropriate venous access locations.

- Arrange tests of all equipment and systems such as electrical, audio, plumbing, HVAC units in the execution chamber to ensure they are in working order.

- Contact the emergency medical personnel identified to provide resuscitation for the condemned and emergency services for others on the scheduled day of execution to ensure availability to perform duties as identified herein and gather any information necessary for a background check.

- Assign a staff member to test and perform maintenance as needed to all utilities (HVAC units, plumbing, electrical etc.) in the Execution Unit and establish a schedule for testing and reporting unit status during the time leading up to the execution date.

- Ensure the Medical Team Room, Execution Chamber, and Execution Preparation Room are equipped with one synchronized clock each. The synchronized clocks will be the official time keeping devices for the execution procedures.

- Ensure that execution chemicals have been purchased or that sources have been established. When chemicals are received, immediately start a chain of custody document, secure the chemicals, and monitor to ensure compliance with manufacturer specifications. Access to the chemicals is limited to the members of the Administrative Team.

- If chemicals are on site, check the expiration dates on each item to ensure they will not expire before the execution date. If any chemical will expire before the execution date, immediately dispose of it appropriately.

- Consult with Medical Team Members regarding the equipment for the procedure and ensure all equipment and other medical supplies necessary to properly conduct the procedure are on site, immediately available for use, functioning properly and have not expired.

- Ensure that all backup medical equipment, including a backup electrocardiograph (EKG) machine and instruments, crash cart, and defibrillator are on site, immediately available for use, functioning properly, and have current service dates.

- Check applicable dates on medical supplies to ensure they are useable on the execution date.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 21 of 34 |

- Ensure that the Escort Team, Medical Team, and Incident Command Staff are conducting training as required by this SOP in preparation for the execution.
- Ensure that communication devices with inter-operability capability and restricted frequencies are available and will be on site before the execution date.

### *Deputy Chief of the Division of Prisons*

- Notify facility heads at all IDOC correctional facilities of the pending execution and provide instruction to the facility heads regarding staff briefings and expectations.
- Direct all IDOC facility heads to develop incident action plans (IAP) for their respective facilities for facility management during the period leading up to and following the execution. The IAPs must be submitted to the Deputy Chief of the Division of Prisons at least 21 days before the scheduled execution date.
- Identify and assign team leaders and members. Activate the teams.
- Establish the IDOC's South Boise Complex security zones as defined *supra* in section 9 and provide that information to facility heads and other staff as needed.
- Confirm with the IMSI Warden that the training schedule has been activated ensuring that specialty team members have received adequate training, written instruction, and practice, and that all training has been documented.
- Discuss preparations at IMSI with the IMSI Warden.
- Confirm with all IDOC South Boise Complex facility Wardens that the training schedule has been activated ensuring that staff members participating in the execution have received adequate training, written instruction, and practice, and that all training has been documented.
- Contact the CISM team.
- If necessary, request through the appropriate authority that the Federal Aviation Administration (FAA) place a 24-hour temporary flight restriction.
- Ensure state and local law enforcement agencies are periodically briefed and prepared for the execution.
- Establish the agenda, schedule meetings, and lead the discussion with state and local law enforcement and applicable IDOC staff regarding community safety, traffic control, and crowd control.
- Ensure that personnel from law enforcement agencies who have not participated in training sessions or who have not previously been involved in the execution process are briefed and their responsibilities explained.
- Invite state and local law enforcement liaisons to participate in periodic briefings about the execution and its impact on the community including access restrictions, crowd control, additional security precautions that may be warranted, and other pertinent information. Collaborate with each agency to determine each agency's role and each jurisdiction's responsibilities.
- Schedule tabletop and simulation exercises with State of Idaho and local law enforcement, identifying areas and activities for improvement and incorporate the findings into future simulations.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | 22 of 34 |

- Contact the applicable manager to discuss potential issues and ensure that appropriate management and/or support plans are developed if it is determined that any IDOC staff member, contractor, volunteer, or other person under IDOC jurisdiction is a family member, has a legal or other significant relationship with the condemned person, the condemned person's family, the victim, or the victim's family.

### IDOC PIO

- Issue a news release announcing the date and time of the execution.

- Provide *Execution Witness Acknowledgment & Agreement* form to media contacts and as requested and establish a deadline for the return of all forms that provides enough time for background checks to be conducted prior to the execution date.

- Lead and coordinate media representative witness selection process.

### IDOC Victim Services Coordinator

- Determine if IDOC has documented the victim or victim's immediate family who have requested notification and obtain contact information. The Victim Services Coordinator will provide the contact information to the Chief of the Division of Prisons. If possible, the Chief of the Division of Prisons, or designee, will first contact the victim or victim's family by telephone.

- Provide a copy of the *Execution Witness Acknowledgment & Agreement* form to each victim or victim's family member who expresses interest in witnessing the execution using certified mail with a return receipt or other method that permits delivery tracking. Completed *Execution Witness Acknowledgment & Agreement* forms must be received at least 14 days before the execution.

- Notify the Victim-Witness Coordinator in the county in which the crime originated.

- Serve as liaison to victim families.

### IMSI Warden

- Once death warrant is served, begin an execution log to be kept in the IMSI Warden's office. This log will provide a comprehensive and chronological history. The IMSI Warden will document every aspect of the execution proceeding, including tasks and/or actions assigned to, or completed by an Administrative Team Member, until the condemned person has been executed or has received a stay of execution. When the process has been completed either by execution or stay, the log will be placed in the condemned person's central file.

- Ensure that the facility Health Services Administrator provides the condemned person an opportunity to complete an Idaho Physician Order for Scope of Treatment form.

- Ensure that the facility healthcare service is providing medications in unit doses and when available, in liquid form; that no medication, including over-the-counter medication, is being provided to the condemned person as keep-on-person; and that any medication the condemned person has requested be discontinued is no longer being provided.

- Inform the condemned person of the following on the day the death warrant is served:

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 23 of 34 |

- Right to select a spiritual advisor. Advise the condemned person regarding spiritual advisor processes as set forth in section 14 above.

- Options available for the condemned person to identify witnesses to their execution. The condemned person may decline to have any witnesses present. Within two business days of service of the death warrant, provide *Execution Witness Acknowledgment & Agreement* form to individuals selected by condemned person as potential witnesses by certified mail or other means which can verify delivery.

- Conditions of confinement as modified by this SOP.

- Opportunity to contact the condemned person's attorney of record by phone and to speak with a facility volunteer and religious activity coordinator (VRC) or spiritual advisor.

- Relevant aspects of the execution process as set forth in the *Summary of Procedures* with the condemned.

- Inform the condemned person of the following additional information:

  ♦ Options available for the disposition of the condemned person's body. Advise the condemned person that directions for disposition must be provided seven days before the execution date. If no such direction is provided, the bodily remains will be disposed of in accordance with SOP 312.02.01.001, *Death of an Inmate*. Give the condemned person a copy of SOP 312.02.01.001.

  ♦ Process for requesting a last meal from the IDOC standard food service menu.

- Ensure that the condemned person's file is reviewed thoroughly to determine if there are any IDOC staff members, contractors, or volunteers who are family members, have a legal relationship, or any other significant relationship with the condemned person, the victim, or victim's family; or if there are any persons under IDOC jurisdiction who are family members, have a legal relationship, or any other significant relationship with the condemned person, the victim, or victim's family. If any such persons are identified, relay that information to the Deputy Chief of the Division of Prisons.

- Notify the commissary provider of the restrictions placed on the condemned person's commissary purchases.

- Contact the condemned person's family by telephone to inform them of the scheduled execution date, the name and contact information of the Warden's liaison, and any other related issues.

- Direct the IDOC Health Services Director to develop a medical emergency response plan that provides adequate emergency response in the Execution Unit.

- Ensure that healthcare services staff obtain the condemned person's current weight and enter that information into the IMSI Warden's execution log.

### IMSI Warden's Liaison to Condemned Person

Meet with the condemned person at least once each working day and forward all questions and concerns directly to the IMSI Warden.

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 24 of 34 |

### IMSI Deputy Warden (Acting as Facility Head)

- Establish a management plan including staffing, meals, and contingency plans to ensure the safe and orderly operation of the facility during the time leading up to the execution.

- Brief the Deputy Chief of the Division of Prisons on the management plan.

- Monitor IMSI activities and brief the Deputy Chief of the Division of Prisons if any concerns or problems arise.

## 16. Twenty-One to Seven Days Prior to the Execution

Twenty-one to seven days prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the Director of IDOC, Chief of the Division of Prisons, and the Deputy Chief of the Division of Prisons.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

### Chief of the Division of Prisons

- Continue to provide briefings to IDOC staff.

- Compile a list of State of Idaho and media witnesses and forward all completed *Execution Witness Acknowledgment & Agreement* forms to the Deputy Chief of the Division of Prisons.

- Monitor planning related to the scheduled execution.

### Administrative Team

- Ensure that the Escort Team, Medical Team, and Incident Command Staff are conducting training in preparation for the execution.

- Contact the Ada County Coroner's office and finalize the protocol regarding the transfer of the condemned person's body to the coroner's custody following the execution and forward that information to the IMSI Warden.

- Take steps to resolve any outstanding equipment and inventory issues.

### Deputy Chief of the Division of Prisons

- Brief Director of IDOC and Chief of the Division of Prisons.

- Continue to conduct tabletop and live exercises with the previously identified teams.

- Review IDOC facility IAPs and continue discussion and preparation with facility heads.

- Contact the CISM Team Leader and ensure the team is making appropriate preparations.

- Convene a meeting with state and local law enforcement agencies to discuss any changes or modifications to crowd control, traffic control, and community safety.

### IDOC PIO

- Address media-specific inquiries.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 25 of 34 |

- Forward all completed *Execution Witness Acknowledgment & Agreement* forms provided by potential media representative witnesses to the Deputy Chief of the Division of Prisons or designee for a criminal background check.

- Notify members of the media regarding the status of their witness applications.

### IMSI Warden

- Communicate with the condemned person as needed.

- Retrieve the completed *Execution Witness Acknowledgment & Agreement* forms for the condemned person's identified potential witnesses.

- Ensure the condemned person has provided directions for the handling of their remains. If no information is provided or the information is insufficient or incorrect, the remains will be handled according to SOP 312.02.01.001, *Death of an Inmate*.

- Ensure that the condemned person has had the opportunity to complete an Idaho Physician Orders for Scope of Treatment form.

- Ensure the condemned person has provided directions for the disposition of property and inmate trust fund.

- Meet with the facility Health Services Administrator and IDOC Health Services Director to review plans for coverage and emergency response before and following the scheduled execution.

- Provide a response to spiritual advisor request, if any, no later than 7 days prior to the scheduled execution.

### IMSI Warden's Liaison to Condemned Person

- Continue daily contact with the condemned person.

- Stay in contact with the condemned person's family.

- Update the IMSI Warden on any issues, requests, or questions.

### IMSI Deputy Warden (Acting as Facility Head)

- Ensure that the necessary action steps have been taken regarding the IMSI management plan including staffing, meals, and contingency plans to ensure the safe and orderly operation of the facility during the time leading up to the execution.

- Brief the Deputy Chief of the Division of Prisons on the status of the management plan.

- Continue to monitor IMSI activities and brief the Deputy Chief of the Division of Prisons if any concerns or problems arise.

## 17. Seven to Two Days Prior to the Execution

Seven to two days prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the Director of IDOC, the Chief of the Division of Prisons, and the Deputy Chief of the Division of Prisons.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 26 of 34 |

### *Chief of the Division of Prisons*

- Continue to provide briefings to IDOC staff.

- Compile a list of all names of those planning to witness the execution.

- Monitor planning related to the scheduled execution.

### *Administrative Team*

- Ensure that the Escort Team, Medical Team, and Incident Command Staff have completed all training sessions required by this SOP.

- Confirm maintenance for all utilities in the Execution Unit has been performed as required by this SOP.

- Test equipment, lighting, audio, HVAC units, etc. in the Execution Unit.

- Ensure that audio/video equipment is ready and operational.

- Confirm that the inventory of equipment, necessary supplies, and backup materials are on-site.

- Recheck the medical supplies and chemicals to ensure that each item is ready, has not expired, is properly packaged, and if applicable sterilized.

- At least three days before the scheduled execution date, obtain technical assistance for the purpose of reviewing the lethal substances, review chemical test results and certificate of analysis, the amounts, the methods of delivery and injection, and the condemned person's physical and historical characteristics to evaluate compliance with this SOP. The individual(s) conducting the technical review will observe the Medical Team place peripheral venous access IV catheters and establish an IV drip line in a live body. The individual(s) conducting the technical review will meet with the Administrative Team to review the findings. The Director of the IDOC will make the final determination regarding compliance with this SOP.

### *Deputy Chief of the Division of Prisons*

- Brief Director of IDOC and Chief of the Division of Prisons.

- Continue tabletop and live exercises as needed.

- Confirm staffing levels and necessary vehicles for regular operations and the execution are appropriate and ready.

- Ensure state and local law enforcement agencies are fully briefed.

- Gather all information regarding media, potential media witnesses, and those who will be present at the execution and ensure all potential witnesses have completed an *Execution Witness Acknowledgment & Agreement* form and all necessary background checks have been completed or are in process.

- In conjunction with the IDOC Leadership Team, ISCI and IMSI Wardens, finalize the media plan, potential media witnesses, and those who will be present at the execution.

### *IDOC PIO*

- Conduct the selection process for media representative witnesses and alternates approximately seven days prior to the execution.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 27 of 34 |

- Compile a list of the media representatives who want to be at the South Boise Complex or in the media center, but not present at the execution.

- Forward the lists of media agencies, media staff members, and potential media witnesses to the Director of the IDOC, Chief of the Division of Prisons, Deputy Chief of the Division of Prisons, and IMSI Warden.

- Conduct a preliminary briefing with potential media representative witnesses and media representatives serving as pool reporters.

***Medical Team Leader***

- Ensure serviceability of all medical equipment including EKG machines (to include instruments), the defibrillator, and the availability of graph paper.

- Ensure heart monitor lead lines are sufficient in length.

***IMSI Warden***

- Communicate with the condemned person as needed.

- Address any unresolved questions or issues.

- Review and comply with the response to the spiritual advisor request, if any.

***IMSI Warden's Liaison to Condemned Person***

- Continue daily contact with the condemned person.

- Have the condemned person complete a withdrawal slip for any remaining funds in his or her trust account and designate to whom the funds should be sent.

- Stay in contact with the condemned person's family.

- Update the IMSI Warden on any issues, requests, or questions.

***IMSI Deputy Warden (Acting as Facility Head)***

- Review staffing to ensure there is adequate coverage near the execution date.

- Review use of force inventories, less than lethal weapons and munitions to ensure that adequate supplies are in place if needed for emergency response.

- Brief shift commanders, unit sergeants, and case managers.

- Ensure that proper tool and key control procedures are being followed.

- Ensure that transportation vehicles that are not assigned to the execution process are available if needed for IMSI operational needs.

- Meet with maintenance staff to review any problems or concerns with infrastructure.

- Meet with the facility Health Services Administrator to ensure that an adequate emergency response plan is in place for the time frame near the execution.

- Brief the IMSI Warden and the deputy chief of the Division of Prisons regarding the emergency plan preparedness and any issues or concerns.

## 18. Two Days Prior to the Execution

Two days prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 28 of 34 |

notify the Director of IDOC, Chief of the Division of Prisons, and the Deputy Chief of the Division of Prisons.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

***Chief of the Division of Prisons***

- Continue to provide briefings to IDOC staff.

- Monitor planning related to the scheduled execution.

***Administrative Team***

- Conduct at least two rehearsal sessions with the Escort Team, Medical Team, and ICS.

- Confirm that Escort and Medical Teams, the emergency medical personnel identified to provide resuscitation for the condemned person and emergency services for others, and the Ada County Coroner are scheduled and will be on-site at the established time.

- Restrict access to the execution chamber to those with expressly assigned duties.

- Ready the execution chamber for the execution.

- Verify execution inventory and equipment checks are completed and open issues resolved.

***Deputy Chief of Division of Prisons***

- Schedule and conduct South Boise Complex simulation exercises as necessary and modify practices if warranted.

- Ensure that contracted services have planned their activities to coincide with the incident action plans for modified operational status related to the scheduled execution.

- Contact IDOC facility heads to monitor their preparation and status.

- Confirm adequate staffing, equipment, and materials are in place for regular operations and the execution.

## 19. Twenty-Four to Twelve Hours Prior to the Execution

Twenty-four to twelve hours prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the Director of IDOC, Chief of the Division of Prisons, and the Deputy Chief of the Division of Prisons.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

***Administrative Team***

- Ensure the final preparation of Execution Unit is complete. Each room receives a final evaluation specific to its functions including security, climate control, lighting, sound, and sanitation.

- Ensure that video and audio monitoring and intercom systems are functioning properly.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 29 of 34 |

- Ensure the Medical Team Room, Execution Preparation Room, and Execution Chamber clocks are accurately set and working.

- Ensure that appropriate restraints are ready.

- Ensure that communication devices are ready.

- Ensure that the Medical Team Leader checks the EKG machine instruments to confirm they are functioning properly.

- Ensure that the crash cart and defibrillator are in place and functioning properly.

- Check medical supply and chemical inventory.

***Deputy Chief of the Division of Prisons***
- Activate the following teams:
    - Incident Command Team
    - CERT
    - Maintenance
    - CISM state-wide
    - Traffic Control Team
- Modify operation of the IDOC's South Boise Complex.
- Contact IDOC facility heads to ensure they are prepared to activate their IAPs for modified operation.
- Establish the ICS Command Center.

***IDOC PIO***
Establish the media center.

***IDOC Health Services Director***
Review the condemned person's medical file and healthcare.

***IMSI Warden***
- Ensure that all the condemned person's remaining property, except one religious item, is removed and inventoried, and that there is a completed disposition sheet for personal property.
- Ensure that both witness areas are in order.
- Ensure that transportation vehicles are ready.
- Ensure that food service is prepared to serve the requested last meal.
- Comply with the response to the spiritual advisor request, if any.

***IMSI Deputy Warden (Acting as Facility Head)***
- Activate the IMSI facility management plan.

**Note:** The plan can be activated earlier if activities, behaviors, or other issues indicate it prudent to do so.

- Ensure that detailed staff briefings are provided.

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 30 of 34 |

- Ensure that CISM is on-site at IMSI.

**20. Twelve Hours Prior To the Execution**

Twelve hours prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the Director of IDOC, Chief of the Division of Prisons, and the Administrative Team.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

***Deputy Chief of the Division of Prisons***

Contact IDOC facility heads to ensure they have activated their incident action plans for modified operation.

***Restricting Access to IDOC Property***

During the final 12 hours prior to the execution, access to the IDOC's South Boise Complex is limited. Restrictions will remain in effect until normal operations resume after the execution or upon a stay of execution.

Access is limited to the following:

- On-duty personnel

- On-duty contract personnel

- Volunteers deemed necessary by the facility wardens

- Approved delivery vehicles

- Approved media representative

- Approved execution witnesses

- Law enforcement personnel on business-related matters

- Others as approved by the ICS Operations Chief

***Incarcerated Population Management***

- The IDOC's South Boise Complex facilities will go on secure status as defined and ordered by the ICS Operations Chief at conclusion of a formal count and not less than nine hours prior to the scheduled execution.

- After the conclusion of the execution or upon a stay of execution, all IDOC and contract prison facilities will return to regular operations at the direction of the ICS Operations Chief.

***Activities of the Condemned Person***

- Ensure the last meal is served by approximately 1900 hours the day prior to the scheduled execution. All eating utensils and remaining food and beverage will be removed upon completion of the meal.

- Telephone calls will be terminated at 2100 hours the day prior to the execution, excluding calls with the attorney of record and others approved by the IMSI Warden.

- Visits will be terminated at 2100 hours the night prior to the execution, excluding visits from the attorney of record and others as approved by the IMSI Warden. Any deviation from these hours must have Deputy Chief approval.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 31 of 34 |

- No later than 2300 hours the night prior to the execution, the facility healthcare services staff will offer the condemned person a mild sedative.

- No later than five hours prior to the execution, the condemned person will be offered a light snack.

- No later than four hours prior to the execution, the facility healthcare services staff will offer the condemned person another mild sedative.

## 21. Final Preparations

During the final preparations, the IMSI Warden will be unavailable to address issues not directly related to the execution process. All other inquiries will be directed to a member of the Administrative Team.

### *Witness Briefing*

Prior to entering the execution witness areas, the Chief of the Division of Prisons or designee will provide briefings of the execution process to the execution witnesses. The victim's family and condemned person's family will receive separate briefings.

### *Procedures to Carry Out the Execution*

The procedures for carrying out the execution are found in *Execution Chemicals Preparation and Administration*.

**Note:** Total anonymity of personnel in the Medical Team Room must be maintained. At no time will the personnel be addressed by name or asked anything that would require a verbal response.

## 22. Pronouncement of Death

Idaho Code Section 19-2716 requires that the death of a condemned person be pronounced by the Ada County Coroner or Deputy Coroner.

The Ada County Coroner or Deputy Coroner will be staged in or near the Execution Unit during the execution process. When the execution process has been completed, the coroner will enter the execution chamber, examine the condemned person, and pronounce the condemned person's death. The IMSI Warden will announce that the sentence of death has been carried out as ordered by the court and the execution has been completed.

## 23. Return of the Death Warrant

After the execution, the IMSI Warden must complete and return the death warrant, showing the date, time, and manner in which it was executed. The original death warrant will be returned to the sentencing court. A copy of the death warrant with the return information will be filed in the condemned person's central file. An additional copy of the death warrant with the return information will be provided to the DAGs representing IDOC.

## 24. Following the Execution

### *Administrative Team*

- After completion of the execution or upon a stay of execution, ensure that the Medical Team:

  - Returns all unused medical supplies to the safe in the Execution Unit and properly disposes of all used medical supplies.

Idaho Department of Correction

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | | 32 of 34 |

- Secures the unused and undrawn execution chemicals in the IMSI Warden's safe.

- Disposes of any execution chemicals that have been opened but not used.

- Inventories the execution chemicals, completes the chain of custody form representing any disposal of execution chemicals. Gather all documents, logs, recordings, sequence of chemical forms, EKG machine tape, list of identifiers, etc. .

### Deputy Chief of the Division of Prisons

Contact all facility heads and determine each facilities' status and any issues that were experienced related to the execution process.

### Execution Chamber and Condemned Isolation Cell Cleaning

Under the supervision of a person designated by the Administrative Team, the Execution Unit will be cleaned and secured. Facility staff trained in infectious diseases preventive practices will utilize appropriate precautions in cleaning the Execution Chamber and Execution Preparation Room.

### Resuming Normal Operations

ICS Command Center will determine when the prisons resume normal operations after receiving assessments from all facility wardens.

IDOC staff will be deactivated at the direction of ICS Command Center.

### Debriefing

Within 48 hours of the completion of the execution, the Deputy Chief of the Division of Prisons and IMSI Warden will debrief the Director of IDOC and Chief of the Division of Prisons and other Leadership Team staff as the Director deems appropriate regarding the process and if applicable make recommendations to revise the standard operation procedure or other related processes or documents.

## DEFINITIONS

None

## REFERENCES

*Execution Chemicals Preparation and Administration*

*Summary of Procedures*

*Execution Witness Acknowledgement & Agreement*

*Execution Chemicals Preparation and Administration*

Idaho Code, Title 19, Chapter 27, Section 19-2705, *Death Sentence or Death Warrant and Confinement There under – Access to Condemned Person*

Idaho Code, Title 19, Chapter 27, Section 19-2713, *Proceedings When Female Supposed to be Pregnant*

Idaho Code, Title 19, Chapter 27, Section 19-2714, *Findings in Case of Pregnancy*

Idaho Code, Title 19, Chapter 27, Section 19-2715, *Ministerial Actions Relating to Stays of Execution, Resetting Execution Dates, and Order of Execution of Judgment of Death*

Idaho Code, Title 19, Chapter 27, Section 19-2716, *Infliction of Death Penalty*

Idaho Department of Correction

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 5.0 | Execution Procedures | 33 of 34 |

Idaho Code, Title 19, Chapter 27, Section 19-2716A, *Practice of Medicine and Possession of Controlled Substances – Exemption – Exceptions to Governmental Liability – Confidentiality – Licensure*

Idaho Code, Title 19, Chapter 27, Section 19-2718, *Return of Death Warrant*

Idaho Code, Title 60, Chapter 1, Section 60-106, *Qualifications of Newspapers Printing Legal Notices*

IDAPA 06.01.01.135, *Executions*

IDAPA 06.01.01.108, *Idaho Public Records Act*

Standard Operating Procedure 312.02.01.001, *Death of an Inmate*

Standard Operating Procedure 319.02.01.001, *Restrictive Housing*

Standard Operating Procedure 320.02.01.001, *Property: State-issued and Resident Personal Property*

Standard Operating Procedure 604.02.01.001, *Visiting*

– End of Document –

Exhibit B

**IDAHO DEPARTMENT OF CORRECTION**
**Execution Chemicals Preparation and Administration**

## A. Modifications to Protocols and Procedures

There must be no deviation from the procedures, protocols, and chemicals in this procedure without prior consent from the Director of IDOC. A member of the Administrative Team must monitor and ensure compliance with protocols and procedures related to the preparation and administration of chemicals.

## B. Execution Unit

There must be sufficient lighting and physical space in the Medical Team Room, the Execution Preparation Room, and the Execution Chamber to enable the Medical Team to function properly and to observe the condemned person. The Medical Team will monitor the condemned person during the execution process with the aid of a telescoping color camera as well as fixed cameras. The cameras will broadcast to the Medical Team Room on color monitors. The condemned person will be positioned on the gurney and in the Execution Chamber to enable the Medical Team Leader to view the condemned person's intravenous (IV) location and face during the administration of execution chemicals until completion of the execution.

## C. Preparation of Chemicals and Syringes

At the appropriate time, the IMSI Warden will transfer custody of the chemicals to the Medical Team Leader. The Medical Team Leader will supervise all activities related to chemical preparation and syringe preparation.

The Medical Team Leader shall assign a Medical Team member to prepare a set of syringes for primary set A, backup set B, and backup set C. The assigned Medical Team member shall prepare and label a set of sterile syringes in a distinctive manner identifying the specific chemical contained in each syringe by (a) assigned number, (b) chemical name, (c) chemical amount, and (d) the designated color, as set forth in the chemical chart below. This information must be preprinted on a label, with two (2) labels affixed to each syringe to ensure a label remains visible.

After the Medical Team Members have prepared and labeled the three (3) sets of syringes as described above, the Medical Team Leader will place the three (3) complete sets of syringes in the color-coded and labeled syringe trays in the order in which the chemicals are to be administered. The syringes will be placed in the color-coded and labeled syringe trays in a manner to ensure there is no crowding, with each syringe resting in its corresponding place in the shadow box which is labeled with the name of the chemical, color, chemical amount, and the designated syringe number. The syringes must be placed in such a manner to ensure the syringe labels are clearly visible.

After all syringes are prepared and placed in the color-coded and labeled syringe trays in proper order, the Medical Team Leader must confirm that all syringes are properly labeled and placed in the color-coded and labeled syringe trays in the order in which the chemicals are to be administered as designated by the applicable chemical chart.

After intravenous (IV) access is established via primary and backup peripheral catheters or a central venous line catheter, the Medical Team Leader will supervise the Medical Team Member assigned to draw chemical set A. The assigned Medical Team Member will draw the chemical into the properly labeled syringe as designated by the applicable chemical chart. After drawing each syringe, the properly labeled syringe will be placed back in the color-coded and labeled syringe tray in the order in which the chemicals are to be administered as designated by the applicable chemical chart. If backup chemical set B or backup chemical set C become necessary as described further herein, the assigned Medical Team Member will draw the chemicals for those sets in a similar manner.

Primary chemical set A will be drawn after (IV) access is established and before the execution process commences. The chemicals for back up chemical set B and/or C must be present and readily available to the Medical Team. Back up chemicals will only be drawn if deemed necessary by the Medical Team Leader.

After the assigned Medical Team Member draws primary set A, the Medical Team Leader will notify the IMSI Warden that the Medical Team is ready to proceed with the execution.

> **Note:** All of the open or drawn chemicals must be used or properly disposed of no later than 24 hours after the time designated for the execution to occur.
>
> **Note:** Should a stay delay the execution beyond 24 hours of the scheduled execution, another primary set of syringes must be prepared when the execution is rescheduled in accordance with the process set forth in this procedure. The replacement primary set of syringes will then be drawn in accordance with the process set forth in this procedure.

## D. Approved Chemicals

The IDOC has four (4) options for lethal injection methods. The option used is dependent upon the availability of execution chemicals.

The Director of IDOC has approved the following lethal injection chemicals and methods as described in Chemical Chart 1, Chemical Chart 2, Chemical Chart 3, and Chemical Chart 4:

*Method 1*

| CHEMICAL CHART 1 | |
|---|---|
| **Primary SET A** | |
| Syringe No. | Label |
| 1A (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 2A (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 3A (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 4A (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 5A (flush) | 60mL Saline, BLACK |
| 6A (complete 6-7) | 60mg Pancuronium Bromide, BLUE |
| 7A (complete 6-7) | 60mg Pancuronium Bromide, BLUE |
| 8A (flush) | 60mL Saline, BLACK |
| 9A (complete 9-10) | 120mEq Potassium Chloride, RED |
| 10A (complete 9-10) | 120mEq Potassium Chloride, RED |
| 11A (flush) | 60mL Saline, BLACK |

| CHEMICAL CHART 1 | | CHEMICAL CHART 1 | |
|---|---|---|---|
| **Backup Set B** | | **Backup Set C** | |
| Syringe No. | Label | Syringe No. | Label |
| 1B (complete 1-4) | 1.25 g Sodium Pentothal, GREEN | 1C (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 2B (complete 1-4) | 1.25 g Sodium Pentothal, GREEN | 2C (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 3B (complete 1-4) | 1.25 g Sodium Pentothal, GREEN | 3C (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 4B (complete 1-4) | 1.25 g Sodium Pentothal, GREEN | 4C (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 5B (flush) | 60mL Saline, BLACK | 5C (flush) | 60mL Saline, BLACK |
| 6B (complete 6-7) | 60mg Pancuronium Bromide, BLUE | 6C (complete 6-7) | 60mg Pancuronium Bromide, BLUE |
| 7B (complete 6-7) | 60mg Pancuronium Bromide, BLUE | 7C (complete 6-7) | 60mg Pancuronium Bromide, BLUE |
| 8B (flush) | 60mL Saline, BLACK | 8C (flush) | 60mL Saline, BLACK |
| 9B (complete 9-10) | 120mEq Potassium Chloride, RED | 9C (complete 9-10) | 120mEq Potassium Chloride, RED |
| 10B (complete 9-10 | 120mEq Potassium Chloride, RED | 10C (complete 9-10) | 120mEq Potassium Chloride, RED |
| 11B (flush) | 60mL Saline, BLACK | 11C (flush) | 60mL Saline, BLACK |

### Syringe Preparation (Method 1)

Syringes 1A, 2A, 3A, 4A, 1B, 2B, 3B, 4B, 1C, 2C, 3C and 4C each contain 1.25 gm/50ml. of sodium pentothal / 1 in 50 ml. of sterile water in four (4) 60 ml. syringes for a total dose of 5 grams of sodium pentothal in each set. Each syringe containing sodium pentothal will have a GREEN label which contains the name of chemical, chemical amount, and the designated syringe number.

Syringes 5A, 8A, 11A, 5B, 8B, 11B, 5C, 8C and 11C each contain 60 ml. of a saline solution and will have a BLACK label which contains the name of the chemical, chemical amount, and the designated syringe number.

Syringes 6A, 7A, 6B, 7B, 6C and 7C each contain 60 mg of pancuronium bromide for a total of 120 mg of pancuronium bromide in each set. Each syringe containing pancuronium bromide will have a BLUE label which contains the name of the chemical, chemical amount, and the designated syringe number.

Syringes 9A, 10A, 9B, 10B, 9C and 10C each contain 120 milliequivalents of potassium chloride for a total of 240 milliequivalents of potassium chloride in each set. Each syringe containing potassium chloride will have a **RED** label which contains the name of the chemical, chemical amount, and the designated syringe number.

After the Medical Team prepares the syringes and draws the chemical for primary set A, the Medical Team Leader shall enter the chamber and attach the IV tubing to the catheter site.

*Method 2*

| CHEMICAL CHART 2 | |
| --- | --- |
| Primary SET A | |
| Syringe No. | Label |
| 1A (compete 1-2) | 2.5 g Pentobarbital GREEN |
| 2A (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 3A (flush) | 60mL Saline, **BLACK** |
| 4A (complete 4-5) | 60mg Pancuronium Bromide, **BLUE** |
| 5A (complete 4-5) | 60mg Pancuronium Bromide, **BLUE** |
| 6A (flush) | 60mL Saline, **BLACK** |
| 7A (complete 7-8) | 120mEq Potassium Chloride, **RED** |
| 8A (complete 7-8) | 120mEq Potassium Chloride, **RED** |
| 9A (flush) | 60mL Saline, **BLACK** |

| CHEMICAL CHART 2 | | CHEMICAL CHART 2 | |
| --- | --- | --- | --- |
| Backup Set B | | Backup Set C | |
| Syringe No. | Label | Syringe No. | Label |
| 1B (complete 1-2) | 2.5 g Pentobarbital GREEN | 1C (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 2B (complete 1-2) | 2.5 g Pentobarbital GREEN | 2C (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 3B (flush) | 60mL Saline, **BLACK** | 3C (flush) | 60mL Saline, **BLACK** |
| 4B (complete 4-5) | 60mg Pancuronium Bromide, **BLUE** | 4C (complete 4-5) | 60mg Pancuronium Bromide, **BLUE** |
| 5B (complete 4-5) | 60mg Pancuronium Bromide, **BLUE** | 5C (complete 4-5) | 60mg Pancuronium Bromide, **BLUE** |
| 6B (flush) | 60mL Saline, **BLACK** | 6C (flush) | 60mL Saline, **BLACK** |
| 7B (complete 7-8) | 120mEq Potassium Chloride, **RED** | 7C (complete 7-8) | 120mEq Potassium Chloride, **RED** |
| 8B (complete 7-8) | 120mEq Potassium Chloride, **RED** | 8C (complete 7-8) | 120mEq Potassium Chloride, **RED** |
| 9B (flush) | 60mL Saline, **BLACK** | 9C (flush) | 60mL Saline, **BLACK** |

### *Syringe Preparation (Method 2)*

Syringes 1A, 2A, 1B, 2B, 1C, and 2C each contain 2.5 gm of pentobarbital for a total of 5 grams in each set. Each syringe containing pentobarbital will have a **GREEN** label which contains the name of chemical, chemical amount and the designated syringe number.

Syringes 3A, 6A, 9A, 3B, 6B, 9B, 3C, 6C and 9C each contain 60 ml. of a saline solution and will have a **BLACK** label which contains the name of the chemical, chemical amount and the designated syringe number.

Syringes 4A, 5A, 4B, 5B, 4C and 5C each contain 60 mg of pancuronium bromide for a total of 120 mg of pancuronium bromide in each set. Each syringe containing pancuronium bromide will have a **BLUE** label which contains the name of the chemical, chemical amount and the designated syringe number.

Syringes 7A, 8A, 7B, 8B, 7C and 8C each contain 120 milliequivalents of potassium chloride for a total of 240 milliequivalents of potassium chloride in each set. Each syringe containing potassium chloride will have a **RED** label which contains the name of the chemical, chemical amount and the designated syringe number.

After the Medical Team prepares the syringes and draws the chemical for primary set A, the Medical Team Leader shall enter the chamber and attach the IV tubing to the catheter site.

*Method 3*

| CHEMICAL CHART 3 | |
|---|---|
| **Primary Set A** | |
| Syringe No. | Label |
| 1A (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 2A (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 3A (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 4A (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 5A (flush) | 60mL Saline, **BLACK** |

| CHEMICAL CHART 3 | | CHEMICAL CHART 3 | |
|---|---|---|---|
| **Backup Set B** | | **Backup Set C** | |
| Syringe No. | Label | Syringe No. | Label |
| 1B (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** | 1C (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 2B (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** | 2C (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 3B (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** | 3C (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 4B (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** | 4C (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 5B (flush) | 60mL Saline, **BLACK** | 5C (flush) | 60mL Saline, **BLACK** |

### Syringe Preparation (Method 3)

Syringes 1A, 2A, 3A, 4A, 1B, 2B, 3B, 4B, 1C, 2C, 3C, and 4C each contain 1.25 gm/50ml. of sodium pentothal / 1 in 50 ml. of sterile water in four (4) 60 ml. syringes for a total dose of 5 grams of sodium pentothal in each set. Each syringe containing sodium pentothal will have a **GREEN** label which contains the name of chemical, chemical amount, and the designated syringe number.

Syringes 5A, 5B, and 5C each contain 60 ml. of a saline solution and will have a **BLACK** label which contains the name of the chemical, chemical amount, and the designated syringe number.

After the Medical Team prepares the syringes and draws the chemical for primary set A, the Medical Team Leader shall enter the chamber and attach the IV tubing to the catheter site.

*Method 4*

| CHEMICAL CHART 4 | |
|---|---|
| **Primary Set A** | |
| Syringe No. | Label |
| 1A (complete 1-2) | 2.5 g Pentobarbital **GREEN** |
| 2A (complete 1-2) | 2.5 g Pentobarbital **GREEN** |
| 3A (flush) | 60mL Saline, **BLACK** |

| CHEMICAL CHART 4 | | CHEMICAL CHART 4 | |
|---|---|---|---|
| **Backup Set B** | | **Backup Set C** | |
| Syringe No. | Label | Syringe No. | Label |
| 1B (complete 1-2) | 2.5 g Pentobarbital **GREEN** | 1C (complete 1-2) | 2.5 g Pentobarbital **GREEN** |
| 2B (complete 1-2) | 2.5 g Pentobarbital **GREEN** | 2C (complete 1-2) | 2.5 g Pentobarbital **GREEN** |
| 3B (flush) | 60mL Saline, **BLACK** | 3C (flush) | 60mL Saline, **BLACK** |

### Syringe Preparation (Method 4)

Syringes 1A, 2A, 1B, 2B, 1C, and 2C each contain 2.5 gm of pentobarbital for a total of 5 grams in each set. Each syringe containing pentobarbital will have a **GREEN** label which contains the name of chemical, chemical amount and the designated syringe number.

Syringes 3A, 3B, and 3C each contain 60 ml. of a saline solution and will have a **BLACK** label which contains the name of the chemical, chemical amount and the designated syringe number.

After the Medical Team prepares the syringes and draws the chemical for primary set A, the Medical Team Leader shall enter the chamber and attach the IV tubing to the catheter site.

**Note:** The chemical amounts as set forth in chemical charts 1, 2, 3, and 4 are designated for the execution of persons weighing 500 pounds or less. The chemical amounts will be reviewed and may be revised as necessary if weight exceeds 500 pounds.

**Note:** The full dose contained in each syringe of the chemical set in use must be administered to the condemned person and subsequently documented by the designated recorder. The quantities of the chemicals drawn and administered may not be changed in any manner without prior approval of the Director of IDOC after consultation with the Medical Team Leader. If all electrical activity of the heart ceases prior to administering all of the chemicals in the set, the Medical Team members must continue to follow this protocol and administer all remaining chemicals in the set being used in the order and amounts set forth in the applicable chemical chart.

### E. Preparation, Movement, and Monitoring of the Condemned Person

The condemned person will be offered a mild sedative. The sedative must be provided to the condemned person no later than four hours prior to the execution unless it is determined medically necessary.

Prior to moving the condemned person from the isolation cell to the Execution Preparation Room, the Director of IDOC will confer with the Idaho Attorney General, or designee, and the Idaho Governor, or designee, to confirm there is no legal impediment to proceeding with the lawful execution.

The witnesses will be escorted to the designated witness areas.

At the designated time, the Escort Team will secure the condemned person to the medical gurney. After the condemned person has been secured to the medical gurney, the Escort Team Leader will personally check the restraints which secure the condemned person to the medical gurney to ensure they are not so restrictive as to impede the condemned person's circulation, yet sufficient to prevent manipulation of the catheters and IV lines. The Escort Team will move the condemned person to the Execution Preparation Room.

The IMSI Warden or designee will confirm audio and video feeds from the Execution Preparation Room and the Execution Chamber are functioning and transmitting to the witness areas prior to the condemned person being moved from their cell. The microphones in the Execution Preparation Room and Execution Chamber will be positioned to broadcast any utterances or noises made by the condemned person. The audio and video feeds from the Execution Preparation Room will continue to transmit to the witness areas through the duration of the preparation process.  After peripheral or central line venous access has been established, the Escort Team Leader will again check the restraints which secure the condemned person to the medical gurney to ensure they are not so restrictive as to impede the condemned person's circulation, yet sufficient to prevent manipulation of the catheters and IV lines. The designated Medical Team Member will affix the EKG leads at appropriate locations on the condemned person. The Escort Team will move the condemned person to the Execution Chamber on the medical gurney.

Once the medical gurney is secured in the Execution Chamber, the Medical Team Leader will attach the leads to the electrocardiograph (EKG) monitor and confirm that the EKG monitor is functioning properly. The Medical Team Leader will ensure the proper graph paper is used. A backup EKG monitor must be on site and readily available if necessary. The Medical Team Leader will then attach the IV lines to the established venous access catheter sites and ensure they are flowing appropriately.

The Medical Team Leader will assign a Medical Team Member to monitor the EKG. The assigned Medical Team Member will observe the EKG monitor and mark the EKG graph paper at the commencement and completion of the administration of each chemical along with their assigned identifier.

Throughout the execution procedure, the Medical Team Leader and the Medical Team Member assigned to monitor the EKG are responsible for monitoring the condemned person's level of consciousness. The remaining Medical Team Members will maintain continual observation of the condemned person using one or more of the following methods: direct observation, audio equipment, video equipment, and television monitor as well as any other approved method(s) deemed necessary by the Medical Team Leader.

The Medical Team Leader will confirm the video and audio feeds in the Execution Chamber are functioning properly and transmitting to the Medical Team Room. The audio and video feeds will continue to transmit to the Medical Team Room throughout the execution process. The audio feed from the Execution Chamber will continue to transmit to the witness areas throughout the execution process.

The IMSI Warden must ensure there is a person present in the Execution Chamber throughout the execution who is able to communicate with the condemned person in their primary language. This person will be positioned to clearly see, hear, and speak to the condemned person throughout the execution. If the IMSI Warden can communicate with the condemned person in their primary language, he may serve in that capacity.

Once the condemned is prepared, the IMSI Warden must read aloud a summary of the death warrant.

The IMSI Warden will then ask the condemned person if he wishes to make a last statement and provide an opportunity to do so.

The IMSI Warden will offer the condemned person an eye covering.

### F. Intravenous Lines

Intravenous (IV) catheters necessary to carry out the execution will be inserted in the Execution Preparation Room.

The assigned Medical Team Members will determine the best sites on the condemned person to insert IV catheters. Peripheral venous access is the preferred method of IV catheter placement, unless the Medical Team Leader determines it is not possible to place two reliable peripheral catheters. If using peripheral venous access, a primary and backup IV catheter will be placed. If utilizing central line venous access as directed by the Medical Team Leader, a single IV catheter will be placed. All IV catheter insertions will be inserted by appropriately trained and certified or licensed persons using their professional training and experience. The peripheral insertion sites in order of preference will be arms, hands, ankles, and feet, with placement determined by the Medical Team Leader.

The Medical Team will make every reasonable effort to ensure that no unnecessary pain or suffering is inflicted on the condemned person during the IV catheter insertion process. At the discretion of the Medical Team Leader, the Medical Team may use a localized anesthetic to numb the venous access site.

To ensure proper insertion in the vein, the assigned Medical Team Members should confirm the flashback of blood at the catheter hub.

Prior to leaving the Execution Preparation Room, the assigned Medical Team Members must ensure the catheter is properly secured with the use of tape or adhesive material and/or sutures (if necessary) out of reach of the condemned person's hands.

Once the condemned person is moved into the Execution Chamber and the Medical Team Leader has attached the IV lines to the inserted IV catheter(s), a flow of saline will be started in each line and administered at a slow rate to keep the line open.

Should it be determined that the use of the backup IV catheter is necessary, a complete set of backup chemicals will be administered in the backup IV as set forth in the applicable chemical chart.

### G. Administration of Chemicals

The primary peripheral IV catheter or central line catheter will be used to administer the chemicals. Any failure of a venous access line must be immediately reported to the IMSI Warden. If directed to proceed, the backup peripheral IV catheter will be utilized.

The IV catheter or central line in use must not be covered and must remain visible throughout the entire execution process.

The IMSI Warden must physically remain in the Execution Chamber with the condemned person throughout the administration of the chemicals. The IMSI Warden must remain in a position sufficient to clearly observe the condemned person and all IV sites for any potential problems and must immediately notify the Medical Team Leader and Director of IDOC should any issue occur. Upon receipt of such notification, the Director of IDOC will stop the proceedings, consult with the Medical Team Leader, and

then direct the Medical Team to continue the execution process or discontinue the execution. The Medical Team Leader shall appoint a Medical Team recorder. The Medical Team recorder is responsible for completing the applicable sequence of chemical form (see appendices 1 through 4). The recorder must document on the form the amount of each chemical administered and confirm that it was administered in the order set forth in the chemical chart. Any deviation from the written procedure must be noted and explained on the form.

At the time the execution is to commence and prior to administering the chemicals, the Director of IDOC will confirm with the Idaho Attorney General, or designee, and the Idaho Governor, or designee, that there is no impediment to proceeding with the execution. Upon receipt of confirmation that there is no impediment, the Director of IDOC will instruct the IMSI Warden to commence the process to carry out the sentence of death. If there is an impediment to the execution, the Director of IDOC must instruct the IMSI Warden to stop the process and to notify the condemned person and witnesses that the execution has been stayed or delayed. The IMSI Warden, or designee, will notify the IDOC Public Information Officer and other staff as necessary.

Upon receiving the order to commence the execution process from the Director of IDOC, the IMSI Warden will instruct the Medical Team Leader to begin administering the chemicals.

### Methods 1 and 2

The Medical Team Leader will instruct the assigned Medical Team member to begin dispensing the first chemical.

Upon direction from the Medical Team Leader, the assigned Medical Team member will visually and verbally confirm the chemical name on the syringe and then administer the full dose of either sodium pentothal/or pentobarbital immediately followed by the saline flush. The saline is administered as a secondary precaution to further ensure the line is functioning properly and flushed between each chemical.

After the sodium pentothal/or pentobarbital and saline have been administered and before the Medical Team members begin administering the pancuronium bromide, the Medical Team Leader must confirm the condemned person is unconscious by direct examination. The Medical Team Leader, dressed in a manner to preserve anonymity, will enter the Execution Chamber to physically confirm the condemned person is unconscious by using all necessary and appropriate techniques such as giving verbal stimulus, soliciting an auditory response, touching the eyelashes, conducting a sternal rub. The Medical Team Leader will also confirm that the IV line remains affixed and functioning properly.

No further chemicals will be administered until the Medical Team Leader has confirmed the condemned person is unconscious. After three minutes have elapsed since the administration of the sodium pentothal/or pentobarbital, the Medical Team Leader will assess and confirm that the condemned person is unconscious. The Medical Team Leader will verbally advise the IMSI Warden of the condemned person's status.

If the condemned person is conscious, the Medical Team must assess the situation to determine the reason, if possible. The Medical Team Leader must communicate this information to the IMSI Warden, along with all Medical Team input. The IDOC Director will determine how to proceed, including whether to start the procedure over at a later time or stand down.

If deemed appropriate, the IMSI Warden may instruct the Medical Team to administer an additional 5 grams of sodium pentothal/or pentobarbital followed by the saline flush from backup set B.

Upon administering the sodium pentothal/or pentobarbital and saline from backup set B, the Medical Team Leader will again physically confirm the condemned person is unconscious and verbally advise the IMSI Warden of the same. Throughout the entire procedure, the Medical Team members and the IMSI Warden will continually monitor the condemned person using all available means to ensure that the condemned person remains unconscious and that there are no complications.

Only after receiving oral confirmation from the Medical Team Leader that the condemned person is unconscious and three minutes have elapsed since commencing the administration of the sodium pentothal/or pentobarbital and saline from backup set B, will the IMSI Warden instruct the Medical Team Leader to proceed with administering the next chemicals.

When directed by the IMSI Warden, the Medical Team Leader will instruct the assigned Medical Team members to begin administering the full doses of the remaining chemicals (pancuronium bromide and potassium chloride), each followed by a saline flush as set forth in the applicable chemical chart.

If after administering the potassium chloride and subsequent saline flush, the electrical activity of the condemned person's heart has not ceased, the additional potassium chloride and saline flush contained in backup set B must be administered.

<u>Methods 3 and 4</u>

The Medical Team Leader will instruct the assigned Medical Team member to begin dispensing the first chemical.

Upon direction from the Medical Team Leader, the assigned Medical Team member will visually and verbally confirm the chemical name on the syringe and then administer the full dose of either sodium pentothal/or pentobarbital immediately followed by the saline flush.

If after administering the sodium pentothal/or pentobarbital and subsequent saline flush in set A, and 10 minutes have elapsed, and the electrical activity of the condemned person's heart has not ceased, the Medical Team will draw chemical for backup set B. The additional sodium pentothal/or pentobarbital and saline flush contained in backup set B shall then be administered.

If after administering the sodium pentothal/or pentobarbital and subsequent saline flush in set B, and 10 minutes have elapsed, and the electrical activity of the condemned person's heart has not ceased, the Medical Team will draw chemical for backup set C. The additional sodium pentothal/or pentobarbital and saline flush contained in backup set C shall then be administered.

<u>Completion of Execution for All Methods</u>

For chemical set A and chemical set B (if used) and chemical set C (if used), the full dose contained in each syringe must be administered to the condemned person and subsequently documented by the designated recorder. The quantities of the chemicals drawn and administered may not be changed in any manner without prior approval of the Director of IDOC after consultation with the Medical Team Leader.

If all electrical activity of the heart ceases prior to administering all the chemicals in the chemical set being administered (A, B, or C), the Medical Team members must continue to follow this protocol and administer all remaining chemicals in that set in the order and amounts set forth in the applicable chemical chart.

When all electrical activity of the heart has ceased as shown by the EKG monitor, the Medical Team Leader will advise the Ada County Coroner that the procedure has been completed. The Medical Team Leader will ensure that the EKG monitor runs a print-out strip for two minutes after the last chemical is administered.

The Ada County Coroner will enter the execution chamber to examine and pronounce the death of the condemned person. The IMSI Warden will then announce that the sentence of death has been carried out.

The witnesses will be escorted from the Execution Unit back to the respective staging and exit locations.


**H. Documentation of Chemicals and Stay**

In the event that a pending stay results in more than a two-hour delay, the catheter may be removed in consultation with the Medical Team Leader and the condemned person will be returned to the isolation cell until further notice.

The Medical Team recorder will account for all chemicals that were drawn but not administered and document, in the applicable sequence of chemical form (*see* appendices 1 through 4), the chemical name, syringe identification code, amount, date, and the time. Time will be recorded based on the approved Medical Team Room clock. The Medical Team Leader and the Medical Team recorder each

will sign the applicable sequence of chemical form (*see* appendices 1 through 4). The Medical Team Leader will give the unopened, unused chemicals to a member of the Administrative Team.

All logs, the applicable sequence of chemical forms (*see* appendices 1 through 4), the list of identifiers, and the EKG monitor tape will be submitted to the designated member of the Administrative Team responsible for retention.

Upon completion of the execution or when a stay exceeding 24 hours is granted, the Administrative Team will ensure the Medical Team has disposed of all medical waste and supplies to include unused, drawn chemicals in accordance with state of Idaho and federal law.

## I. Contingency Procedure

A portable cardiac monitor/defibrillator will be readily available on site in the event that the condemned person goes into cardiac arrest at any time prior to administering the chemicals; trained medical staff must make every effort to revive should this occur, unless the condemned person has signed an Idaho Physician Orders for Scope of Treatment form.

Trained medical personnel and emergency transportation will be available in proximity to respond to the condemned person should any medical emergency arise at any time before the order to proceed with the execution is issued by the Director of IDOC.

The Director of IDOC will be immediately notified if any part of the execution process is not proceeding according to these procedures. The Director of IDOC will stop the proceedings, consult with the Medical Team Leader, and then direct the Medical Team to  continue with or discontinue the execution.


*Appendices 1-4 below

**IDAHO DEPARTMENT OF CORRECTION**
Sequence of Chemical Form – Method 1

Inmate: _____ IDOC #: _____ Date: _____

| Chemical Chart 1: PRIMARY SET A | | | |
|---|---|---|---|
| Syringe No. | Label | Time Administered | Comments |
| 1A | 1.25 g Sodium Pentothal, GREEN | | |
| 2A | 1.25 g Sodium Pentothal, GREEN | | |
| 3A | 1.25 g Sodium Pentothal, GREEN | | |
| 4A | 1.25 g Sodium Pentothal, GREEN | | |
| 5A | 60mL Saline, BLACK | | |
| 6A | 60mg Pancuronium Bromide, BLUE | | |
| 7A | 60mg Pancuronium Bromide, BLUE | | |
| 8A | 60mL Saline, BLACK | | |
| 9A | 120mEq Potassium Chloride, RED | | |
| 10A | 120mEq Potassium Chloride, RED | | |
| 11A | 60mL Saline, BLACK | | |

| Chemical Chart 1: BACKUP SET B | | | |
|---|---|---|---|
| Syringe No. | Label | Time Administered | Comments |
| 1B | 1.25 g Sodium Pentothal, GREEN | | |
| 2B | 1.25 g Sodium Pentothal, GREEN | | |
| 3B | 1.25 g Sodium Pentothal, GREEN | | |
| 4B | 1.25 g Sodium Pentothal, GREEN | | |
| 5B | 60mL Saline, BLACK | | |
| 6B | 60mg Pancuronium Bromide, BLUE | | |
| 7B | 60mg Pancuronium Bromide, BLUE | | |
| 8B | 60mL Saline, BLACK | | |
| 9B | 120mEq Potassium Chloride, RED | | |
| 10B | 120mEq Potassium Chloride, RED | | |
| 11B | 60mL Saline, BLACK | | |

| Chemical Chart 1: BACKUP SET C | | | |
|---|---|---|---|
| Syringe No. | Label | Time Administered | Comments |
| 1C | 1.25 g Sodium Pentothal, GREEN | | |
| 2C | 1.25 g Sodium Pentothal, GREEN | | |
| 3C | 1.25 g Sodium Pentothal, GREEN | | |
| 4C | 1.25 g Sodium Pentothal, GREEN | | |
| 5C | 60mL Saline, BLACK | | |
| 6C | 60mg Pancuronium Bromide, BLUE | | |
| 7C | 60mg Pancuronium Bromide, BLUE | | |
| 8C | 60mL Saline, BLACK | | |
| 9C | 120mEq Potassium Chloride, RED | | |
| 10C | 120mEq Potassium Chloride, RED | | |
| 11C | 60mL Saline, BLACK | | |

(Last updated 10/11/2024)

**IDAHO DEPARTMENT OF CORRECTION**
**Sequence of Chemical Form- Method 2**

Inmate: _____ IDOC #: _____ Date: _____

| Chemical Chart 2: PRIMARY SET A | | | |
|---|---|---|---|
| Syringe No. | Label | Time Administered | Comments |
| 1A | 2.5 g Pentobarbital GREEN | | |
| 2A | 2.5 g Pentobarbital GREEN | | |
| 3A | 60mL Saline, BLACK | | |
| 4A | 60mg Pancuronium Bromide, BLUE | | |
| 5A | 60mg Pancuronium Bromide, BLUE | | |
| 6A | 60mL Saline, BLACK | | |
| 7A | 120mEq Potassium Chloride, RED | | |
| 8A | 120mEq Potassium Chloride, RED | | |
| 9A | 60mL Saline, BLACK | | |

| Chemical Chart 2: BACKUP SET B | | | |
|---|---|---|---|
| Syringe No. | Label | Time Administered | Comments |
| 1B | 2.5 g Pentobarbital GREEN | | |
| 2B | 2.5 g Pentobarbital GREEN | | |
| 3B | 60mL Saline, BLACK | | |
| 4B | 60mg Pancuronium Bromide, BLUE | | |
| 5B | 60mg Pancuronium Bromide, BLUE | | |
| 6B | 60mL Saline, BLACK | | |
| 7B | 120mEq Potassium Chloride, RED | | |
| 8B | 120mEq Potassium Chloride, RED | | |
| 9B | 60mL Saline, BLACK | | |

| Chemical Chart 2: BACKUP SET C | | | |
|---|---|---|---|
| Syringe No. | Label | Time Administered | Comments |
| 1C | 2.5 g Pentobarbital GREEN | | |
| 2C | 2.5 g Pentobarbital GREEN | | |
| 3C | 60mL Saline, BLACK | | |
| 4C | 60mg Pancuronium Bromide, BLUE | | |
| 5C | 60mg Pancuronium Bromide, BLUE | | |
| 6C | 60mL Saline, BLACK | | |
| 7C | 120mEq Potassium Chloride, RED | | |
| 8C | 120mEq Potassium Chloride, RED | | |
| 9C | 60mL Saline, BLACK | | |

**IDAHO DEPARTMENT OF CORRECTION**
**Sequence of Chemical Form- Method 3**

Inmate: _____ IDOC #: _____ Date: _____

| Chemical Chart 3: PRIMARY SET A | | | |
|---|---|---|---|
| Syringe No. | Label | Time Administered | Comments |
| 1A | 1.25 g Sodium Pentothal, GREEN | | |
| 2A | 1.25 g Sodium Pentothal, GREEN | | |
| 3A | 1.25 g Sodium Pentothal, GREEN | | |
| 4A | 1.25 g Sodium Pentothal, GREEN | | |
| 5A | 60mL Saline, BLACK | | |

| Chemical Chart 3: BACKUP SET B | | | |
|---|---|---|---|
| Syringe No. | Label | Time Administered | Comments |
| 1B | 1.25 g Sodium Pentothal, GREEN | | |
| 2B | 1.25 g Sodium Pentothal, GREEN | | |
| 3B | 1.25 g Sodium Pentothal, GREEN | | |
| 4B | 1.25 g Sodium Pentothal, GREEN | | |
| 5B | 60mL Saline, BLACK | | |

| Chemical Chart 3: BACKUP SET C | | | |
|---|---|---|---|
| Syringe No. | Label | Time Administered | Comments |
| 1C | 1.25 g Sodium Pentothal, GREEN | | |
| 2C | 1.25 g Sodium Pentothal, GREEN | | |
| 3C | 1.25 g Sodium Pentothal, GREEN | | |
| 4C | 1.25 g Sodium Pentothal, GREEN | | |
| 5C | 60mL Saline, BLACK | | |

(Last updated 10/11/2024)

**IDAHO DEPARTMENT OF CORRECTION**
**Sequence of Chemical Form- Method 4**

Inmate: _____    IDOC #: _____    Date: _____

| Chemical Chart 4: PRIMARY SET A | | | |
|---|---|---|---|
| **Syringe No.** | **Label** | **Time Administered** | **Comments** |
| **1A** | 2.5 g Pentobarbital GREEN | | |
| **2A** | 2.5 g Pentobarbital GREEN | | |
| **3A** | 60mL Saline, **BLACK** | | |

| Chemical Chart 4: BACKUP SET B | | | |
|---|---|---|---|
| **Syringe No.** | **Label** | **Time Administered** | **Comments** |
| **1B** | 2.5 g Pentobarbital GREEN | | |
| **2B** | 2.5 g Pentobarbital GREEN | | |
| **3B** | 60mL Saline, **BLACK** | | |

| Chemical Chart 4: BACKUP SET C | | | |
|---|---|---|---|
| **Syringe No.** | **Label** | **Time Administered** | **Comments** |
| **1C** | 2.5 g Pentobarbital GREEN | | |
| **2C** | 2.5 g Pentobarbital GREEN | | |
| **3C** | 60mL Saline, **BLACK** | | |

(Last updated 10/11/2024)