WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
ANDERS PEDERSEN, Bar No. 11626
anders.pedersen@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: 208.389.9000
Facsimile: 208.389.9040

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE ASSOCIATED PRESS; THE MCCLATCHY COMPANY, LLC, dba The Idaho Statesman; and EAST-IDAHO-NEWS.COM, LLC, dba East Idaho News, <br><br> Plaintiffs, <br><br> v. <br><br> JOSH TEWALT, in his official capacity as the Director of the Idaho Department of Correction, <br><br> Defendant. | Case No. 1:24-cv-00587-DKG <br><br><br> **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS** |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................ 1

LEGAL STANDARD ........................................................................................................ 2

ARGUMENT .................................................................................................................. 3

I.    This Case Is Justiciable. ...................................................................................... 5

    a.    The Media Groups have standing to bring this lawsuit. ........................... 5

    b.    This lawsuit is ripe for judicial review. .................................................. 9

    c.    The Media Groups' First Amendment claim is not barred by the political question doctrine. ........................................................................ 10

II.    The Media Groups Sufficiently State a First Amendment Right of Access Claim on Which They Are Likely to Succeed. .................................................... 12

    a.    The Ninth Circuit's decisions on the public's First Amendment right of access to the entirety of an execution are binding here.............. 12

    b.    The Media Groups' right of access encompasses the Medical Team Room. ................................................................................................ 16

        i.    Calderon does not govern here. .................................................. 17

        ii.    CFAC and Ryan direct this Court to focus on whether the tasks in the Medical Team Room are inextricably intertwined with the execution and are part of the entire execution process. ........................................................................ 17

        iii.    Verbal alerts from the medical team that lethal drugs have been administered do not provide the required First Amendment access......................................................................... 19

        iv.    Defendant does not dispute that the tasks in the medical room are not inextricably intertwined with the execution process........................................................................................ 20

    c.    There is a historical tradition of access to the means and methods of an execution, which occur in the Medical Team Room under the current SOP. ........................................................................................ 21

    d.    Defendant has failed to satisfy the Turner Test. .................................... 24

## TABLE OF CONTENTS
(continued)

**Page**

III.    The PLRA Has No Applicability to This Case.................................................... 27

IV.    The Remaining Preliminary Injunction Factors Weigh in the Media
        Groups' Favor. ...................................................................................... 29

CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allen v. Horizon Tower Ltd., LLC,*
No. 1:23-cv-00559-BLW, 2024 WL 3067273 (D. Idaho June 20, 2024)..................................3

*Armstrong v. Newsom,*
58 F.4th 1283 (9th Cir. 2023) ................................................................................................28

*Associated Press v. Otter,*
682 F.3d 821 (9th Cir. 2012) ............................................................................... passim

*Balla v. Idaho State Bd. of Corr.,*
No. 1:81-CV-1165-BLW, 2020 WL 2812564 (D. Idaho May 30, 2020)..............................28

*Boquist v. Courtney,*
32 F.4th 764 (9th Cir. 2022) ....................................................................................................3

*Cal. First Amend. Coal. v. Calderon,*
150 F.3d 976 (9th Cir. 1998) ...................................................................................10, 15, 17

*California First Amendment Coalition v. Woodford,*
299 F.3d 868 (9th Cir. 2002) ............................................................................... passim

*Close v. Sotheby's, Inc.,*
894 F.3d 1061 (9th Cir. 2018) ...................................................................................13, 14

*Doe v. Harris,*
772 F.3d 563 (9th Cir. 2014) ................................................................................................19

*E.E.O.C. v. Peabody W. Coal Co.,*
400 F.3d 774 (9th Cir. 2005) ................................................................................................11

*Edmo v. Corizon, Inc.,*
935 F.3d 757 (9th Cir. 2019) ................................................................................................28

*Fellowship of Christian Athletes v. San Jose Unified Sch. Bd.,*
82 F.4th 664 (9th Cir. 2023) ................................................................................................29

*First Amend. Coal. of Ariz., Inc. v. Ryan,*
938 F.3d 1069 (9th Cir. 2019) (*Ryan*)...................................................................... passim

*Galbraith v. Cnty. of Santa Clara,*
307 F.3d 1119 (9th Cir. 2002) ................................................................................................13

*Guardian News & Media LLC v. Ryan,*
225 F. Supp. 3d 859 (D. Ariz. 2016) ............................................................... passim

# TABLE OF AUTHORITIES
(continued)

**Page**

*Holden v. Minnesota*,
    137 U.S. 483 (1890)..........................................................................................passim

*Houchins v. KQED, Inc.*,
    438 U.S. 1 (1978)......................................................................................13, 15, 16

*Koohi v. United States*,
    976 F.2d 1328 (9th Cir. 1992) ...........................................................................11

*Los Angeles Times Commc'ns LLC v. Kernan*,
    No. 18-cv-02146-RS, 2018 WL 10419787 (N.D. Cal. Aug. 17, 2018)............10, 19

*LSO, Ltd. v. Stroh*,
    205 F.3d 1146 (9th Cir. 2000) .............................................................................6

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................................5

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) ........................................................................12, 13

*Olivas v. Nev. ex rel. Dep't of Corr.*,
    856 F.3d 1281 (9th Cir. 2017) ...........................................................................28

*Page v. Torrey*,
    201 F.3d 1136 (9th Cir. 2000) ...........................................................................28

*Peace Ranch, LLC v. Bonta*,
    93 F.4th 482 (9th Cir. 2024) ...............................................................................5

*Pell v. Procunier*,
    417 U.S. 817 (1974)......................................................................................13, 16

*Pizzuto v. Tewalt*,
    997 F.3d 893 (9th Cir. 2021) .......................................................................7, 8, 10

*Pizzuto v. Tewalt*,
    No. 1:23-cv-00081-BLW, 2023 WL 4901992 (D. Idaho Aug. 1, 2023) ........6, 8, 10

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*,
    122 F.4th 825 (9th Cir. 2024) ..........................................................................8, 9

*Planned Parenthood of Idaho, Inc. v. Wasden*,
    376 F.3d 908 (9th Cir. 2004) ...............................................................................9

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
RESPONSE TO DEFENDANT'S MOTION TO DISMISS - iv

# TABLE OF AUTHORITIES
(continued)

**Page**

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980)..................................................................................4, 13, 14, 15

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) (per curiam)....................................................................29

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) .........................................................................2

*Saxbe v. Washington Post Co.*,
  417 U.S. 843 (1974)...................................................................................13, 16

*Spirit of Aloha Temple v. Cnty. of Maui*,
  49 F.4th 1180 (9th Cir. 2022) .......................................................................20

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..........................................................................................5

*Talamantes v. Leyva*,
  575 F.3d 1021 (9th Cir. 2009) .......................................................................28

*Turner v. Safley*,
  482 U.S. 78 (1987)...........................................................................................24

*Twitter, Inc. v. Paxton*,
  56 F.4th 1170 (9th Cir. 2022)) ....................................................................8, 9

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013) .........................................................................3

*United States v. Saba*,
  No. 1:22-cr-00248-AKB, 2023 WL 5333255 (D. Idaho Aug. 17, 2023) ................14

**Statutes**

18 U.S.C. § 3626...............................................................................................28

42 U.S.C. § 1983...............................................................................................28

Idaho Code § 19-2705.........................................................................................7

**Rules**

Fed. R. Civ. P.  12(b) .........................................................................................3

# TABLE OF AUTHORITIES
### (continued)

**Page**

Fed. R. Civ. P. 12(b)(1)..............................................................................................2, 3, 12

Fed. R. Civ. P.  12(b)(6)........................................................................................................3

**Constitutional Provisions**

Idaho Const., Art. III..........................................................................................................10

Idaho Const. Art. X § 5......................................................................................................11

U.S. Const. ..........................................................................................................................15

U.S. Const., amend. I .................................................................................................. passim

**Other Authorities**

*IDOC ECPA*, Execution Chemicals Preparation and Administration (Oct. 11,
    2024) ..............................................................................................................................2

*IDOC SOP*, Execution Procedures (Oct. 11, 2024) ...............................................2, 8, 26

Neil E. Nussbaum, *"Film at Eleven . . ."-Does the Press Have the Right to Attend
    and Videotape Executions?*, 20 N.C. Cent. Law J. 121 (1992)..........................14, 23

For the reasons set forth below and in the Plaintiff Media Groups' Motion for a Preliminary Injunction (Dkt. 2), the Court should deny Defendant's motion to dismiss (Dkt. 11), reject his arguments in opposition (Dkt. 12), and enter an order preliminarily enjoining Defendant from restricting Plaintiffs' access to the Medical Team Room during executions.

## INTRODUCTION

Despite Defendant's attempts to avoid binding precedent, *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 876 (9th Cir. 2002) (*CFAC*) and its progeny remain the law of this circuit. None of Defendant's arguments in support of his motion to dismiss or in opposition to the Media Groups' motion for a preliminary injunction dispel or diminish *CFAC's* unambiguous holding "that the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Id.* at 877. The tasks completed in the Medical Team Room are necessary to and inextricably intertwined with the execution process, and therefore, fall squarely within the "First Amendment right to view executions in their entirety." *First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069, 1075 (9th Cir. 2019) (*Ryan*).

Defendant does not dispute the vital importance of the tasks performed in the Medical Team Room. Instead, Defendant attempts to avoid the significance of those tasks and attempts to avoid the Media Groups' First Amendment claim in this case by raising unavailing justiciability arguments, relying on inapplicable Supreme Court authority, and presenting unnecessarily narrow interpretations of relevant authority not supported by the reasoning and logic of those cases. Those attempts, however, are futile. In the end, Ninth Circuit precedent and the historical access to open executions—including, in Idaho, the public's ability to view the lever or device

that effectuates a hanging—establishes that the public (and thus the press) has a right of access to the Medical Team Room and the events that occur in there.

There is no dispute regarding the underlying facts. Defendant concedes that the Idaho Department of Correction's (IDOC) recently updated Standard Operating Procedures for Executions (SOP), and Execution Chemicals Preparation and Administration document (ECPA), control the policies and procedures for all executions in Idaho. *See IDOC SOP*, Execution Procedures (Oct. 11, 2024); *IDOC ECPA*, Execution Chemicals Preparation and Administration (Oct. 11, 2024). Defendant also concedes that under the current protocol, witnesses to an execution will not be provided access to the Medical Team Room at any point during an execution.

The dispute here is thus narrow—whether there is a First Amendment right of access to the Medical Team Room. And, if so, whether Defendant demonstrated a legitimate penological interest sufficient to justify restricting access to that room. As discussed below and in the Media Groups' opening memorandum, the answer to the first question is yes. The latter—no. Accordingly, the Court should grant the Media Groups' motion for a preliminary injunction and deny Defendant's motion to dismiss.

## LEGAL STANDARD

The standard applicable to the Media Groups' motion for a preliminary injunction is set forth in the Media Groups' opening memorandum. *See Plf.s' Mem.*, Dkt. 2-1.

Defendant's motion to dismiss on justiciability grounds, including ripeness, standing, and the political question doctrine, is brought under Federal Rule of Civil Procedure 12(b)(1). A Rule 12(b)(1) motion asserts that the allegations in the complaint "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir.

2004). Defendant also moves to dismiss under Rule 12(b)(6), arguing that the Media Groups have failed to state a claim upon which relief can be granted.

In evaluating whether the Complaint should be dismissed under either subsection of Rule 12(b), "the court must take all the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Allen v. Horizon Tower Ltd., LLC*, No. 1:23-cv-00559-BLW, 2024 WL 3067273, at *1–2 (D. Idaho June 20, 2024) (addressing Rule 12(b)(1) motion to dismiss); *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (under Rule 12(b)(6), "the court accepts the facts alleged in the Complaint as true" in assessing whether plaintiffs have alleged a "cognizable legal theory."); *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (A court must "draw all reasonable inferences in favor of the nonmoving party" when considering a motion under Rule 12(b)(6) (citation omitted)).

## ARGUMENT

Defendant raises four arguments in opposition to the Media Groups' efforts to gain access to the Medical Team Room during an execution: (1) the Media Groups' claim is not justiciable; (2) the Media Groups do not have a First Amendment right of access to the conduct that occurs in the Medical Team Room; (3) the Prison Litigation Reform Act (PLRA) sets the standard of review, which the Media Groups' claim does not meet; and (4) in opposition to the motion for a preliminary injunction, the Media Groups do not meet the remaining preliminary injunction factors.

Defendant's motion to dismiss must be denied because the Media Groups' claim is justiciable, and the Complaint states a claim on which relief can be granted. Indeed, as set forth in the Media Groups' opening memorandum, the Complaint establishes a likelihood that the

Media Groups will succeed on the merits of their First Amendment claim. The Ninth Circuit made this clear in *CFAC* and *Ryan*. Defendant's attempts to overcome this binding Ninth Circuit precedent rely on a misunderstanding of *Holden v. Minnesota*, 137 U.S. 483, 491 (1890), improperly ask this Court to disregard binding precedent, and raise arguments under the PLRA and political questions doctrine that simply do not apply.

Moreover, Defendant's arguments are premised on three fundamental misunderstandings of the Media Groups' claim. First, the Media Groups seek no greater access to the Medical Team Room than that of the general public. The Media Groups well understand that their First Amendment rights are coextensive with the general public's. *Plf.s' PI Mtn.* at 1. Designated media witnesses to an execution function as "surrogates for the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980). Second, contrary to Defendant's argument, the Media Groups do not seek information about "ancillary details of an execution." *See Def.'s MTD Br.* at 16, Dkt. 11-1. Rather, the Media Groups only seek "visual and audio access to the Medical Team Room that is similar to the access already provided to the Execution Preparation Room or Execution Chamber." *Plf.s' PI Mtn.* at 2, Dkt. 2. In other words, the Media Groups seek at least a closed-circuit audio and video feed to the Medical Team Room providing a general ability to see and hear the integrally intertwined aspects of the execution process that occur there. Third, the Media Groups in no way "seek to enjoin IDOC from carrying out any execution until this entire case can be resolved[.]" *Def.'s Resp.* at 20, Dkt. 12. The Media Groups have no interest in enjoining or delaying any execution. They well understand that decisions about whether and when to execute an inmate who has received a death sentence are for the State to make. The Media Groups seek only to protect their First Amendment right of access to that procedure.

On the merits of the Media Groups' First Amendment claim, Defendant's arguments in opposition fail.

## I.    This Case Is Justiciable.

Defendant argues that this matter is not justiciable because (1) the Media Groups lack standing, (2) the Media Groups' claim is not ripe, and (3) the Media Groups' claim presents a political question. These arguments provide neither a basis to dismiss the Complaint nor a reason to find that the Media Groups are not likely to succeed on the merits of that claim. The Media Groups' First Amendment claim is justiciable.

     a.    <u>The Media Groups have standing to bring this lawsuit.</u>

To have standing a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).[1] Where the challenged policy "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 n.7 (9th Cir. 2024).

Defendant argues that the Media Groups lack standing because their claims are speculative and hypothetical since there is no active death warrant, and because these media organizations have not been approved as designated witnesses for any upcoming execution. *See Def.'s MTD Br.* at 19, Dkt. 11-1. Each argument contradicts recent history and the IDOC's own controlling procedures.

Defendant's first argument—that the Media Groups' injury is speculative because there is no active death warrant—is contradicted by Idaho's repeated recent conduct demonstrating that it

---

[1] Defendant does not challenge the Media Groups' standing under the causation or redressability elements.

intends to execute death row inmates. As discussed in the Media Groups' opening memorandum, the IDOC attempted to execute Thomas Creech on February 13, 2024. *See* Boone Decl. ¶ 7, Dkt. 2-2. After the IDOC's first attempt to execute Mr. Creech was unsuccessful, the IDOC remodeled its Execution Chamber. Almost immediately after finishing the remodel and adopting the now controlling SOP, Idaho issued a second death warrant for Mr. Creech. *See id.* ¶ 8. While that execution was stayed, Idaho continues to litigate in opposition to the issues raised in the stay, clearly demonstrating that it intends to execute Mr. Creech. Similarly, Idaho has issued at least three death warrants for Gerald Pizzuto since 2021. *See Pizzuto v. Tewalt*, No. 1:23-cv-00081-BLW, 2023 WL 4901992, at *2 (D. Idaho Aug. 1, 2023).

That both cases are stayed does not mean the Media Groups' claim is speculative. The State opposed the motions for stay, and its repeated efforts to execute each inmate suggests that it will issue a death warrant as soon as either stay is lifted, which could be at any point.[2] Defendant has not suggested any differently. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("Courts have also considered the Government's failure to disavow application of the challenged provision as a factor in favor of a finding of standing."). When Idaho inevitably issues another death warrant, the IDOC's SOP will control. Under that policy, there is no dispute that execution witnesses, including media representatives, will not have access to the Medical Team Room. Therefore, there is an immediate and real risk that Idaho will soon execute a death row inmate and that the public's First Amendment rights will be violated.

Moreover, Defendant's implicit argument that the Media Groups must wait until a death

---

[2] There are seven other condemned individuals in Idaho. *See* Death Row | Idaho Department of Correction. The State offers no reason to believe that it will not eventually seek to execute those prisoners.

warrant is issued would place a nearly impossible time constraint on the courts and would result in a Catch-22. The Media Groups would have to wait until an inmate is scheduled to be executed, a 30-day window before the actual execution, to file their lawsuit. *See* Idaho Code § 19-2705 (Idaho law requires that an execution occur no later than 30 days after a death warrant is issued). However, district courts routinely deny "eleventh-hour" challenges to executions as untimely.[3] *See Pizzuto v. Tewalt*, 997 F.3d 893, 901 (9th Cir. 2021). Therefore, Defendant's argument presents the Media Groups with an unsolvable dilemma—file their lawsuit before a death warrant is issued and be too early, or file after and be too late. *See id*. Simply put, standing is not a tool to evade review based on a game of "gotcha."

Additionally, Ninth Circuit case law supports the Media Groups' standing regardless of whether there is a pending execution. In *Pizzuto v. Tewalt*, 997 F.3d 893, 903 (9th Cir. 2021), although under a slightly different context, the Ninth Circuit addressed whether two death row inmates' (Pizzuto and Creech) right of access claims were ripe for judicial review. [4] *Id*. At the time of the inmates' appeal against the same Defendant in this case, there was no pending death warrant for either inmate. *Id.* at 900. Like here, Defendant asserted that because there was no death warrant, the inmates' claim was not ripe. *Id*. The court rejected that argument finding the claim was ripe "because judicial resolution of [the] allegations [was] possible" at that moment.

---

[3] Interestingly, Idaho made this exact argument last time its execution procedures were challenged under the First Amendment. *See Associated Press v. Otter*, 682 F.3d 821, 824 (9th Cir. 2012). In that case, Idaho complained about the "last-minute nature" of the media organization's First Amendment challenge that was raised seven days before a scheduled execution. *See id*. at 823. Idaho's inconsistent positions demonstrate Idaho's attempt to evade complying with the requirements imposed by the First Amendment during executions.

[4] The inmates' first claim—that the IDOC was currently violating the inmates' First Amendment right to information—is not relevant here. However, the inmates' second claim—that the right of access to executions included their lawyers' right to access the Execution Chamber and be permitted access to cameras and phones during the execution—is directly on point. *Id*. at 904.

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS - 7

*Id*. at 904. Although, as the court noted, the claim was "more in the nature of a pre-enforcement challenge," it explained that the inmates would "suffer certain injury if their allegations [were] true." *Id*.

Although *Pizzuto* addressed ripeness, the same principles apply to the standing analysis here. Indeed, the Ninth Circuit has explained that ripeness is often "synonymous with the injury-in-fact prong of the standing inquiry." *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 839 (9th Cir. 2024) (quoting *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022)).

Defendant's second standing argument—that the media organizations have not been approved as designated witnesses for any upcoming execution—is similarly flawed. First, Defendant's suggestion that the Associated Press (AP) may not apply for or have a designated witness at future executions is contrary to fact. The AP's Rebecca Boone has shown a long-standing dedication to fairly and unbiasedly serving as a media representative at executions. She has attended every Idaho execution—or attempted execution—over the last two decades. Declaration of Rebecca Boone in Support of Plaintiff's Motion for Preliminary Injunction (Boone Decl.), ¶ 4, 7, Dkt 2-2. She was also designated as a witness for Creech's November 13, 2024 execution before it was stayed. *Id.* ¶ 8. Finally, Ms. Boone has asserted that she intends to serve as a media representative if and when that execution is rescheduled. *Id.* ¶¶ 7-8.

Moreover, under the IDOC's SOP, the AP is specifically named as one of the four designated media witnesses. *See IDOC SOP* at 33; *see also Def.'s Resp.* at 5, Dkt. 12 ("the Associated Press is designated [as] one witness"). Therefore, although Ms. Boone will have to submit an application to be a designated witness, IDOC's own policy and past practice demonstrate that Ms. Boone (or someone else from AP) will be a media witness at the next Idaho

execution. AP's attendance at future executions is not speculative or hypothetical but a near

certainty. Additionally, if the AP's right of access is violated for even one execution, it will

suffer an immediate and irreparable injury. *See Associated Press v. Otter*, 682 F.3d 821, 826 (9th

Cir. 2012) (*Otter*) (finding that infringing on the public's right to witness executions in their

entirety, even for just one execution, will result in irreparable harm). The Court should,

therefore, find that the AP has standing. [5]

Similarly, the Idaho Statesman and East Idaho News have covered executions in the past

and intend to cover any future executions. *See* Cripe Decl. ¶ 4, Dkt. 2-3; Sunderland Decl. ¶ 6,

Dkt. 2-4. Further, if either media organization does not serve as a media representative, both

organizations intend to report on any future execution through the accounts of the media

representatives that do serve as witnesses. *See* Cripe Decl. ¶ 5, Dkt. 2-3; Sunderland Decl. ¶ 6,

Dkt. 2-4. Therefore, regardless of whether the Idaho Statesman or East Idaho News is permitted

to have a journalist present during a future execution, they will be dependent on the public's

right of access to an execution to report on future executions. Accordingly, the Idaho Statesman

and East Idaho News also have standing to bring this lawsuit.

      b.    <u>This lawsuit is ripe for judicial review.</u>

The ripeness "doctrine is intended to prevent 'premature adjudication' and judicial

entanglement in 'abstract disagreements.'" *Planned Parenthood Great Nw., Haw., Alaska, Ind.,*

*Ky.*, 122 F.4th at 839 (citation omitted). Like standing, the ripeness requirements are applied

"less stringently in the context of First Amendment claims." *Twitter, Inc.*, 56 F.4th at 1173-74

---

[5] Although each media organization individually has standing to bring this lawsuit, only one
plaintiff must have standing for this lawsuit to proceed. *See Planned Parenthood of Idaho, Inc. v.*
*Wasden*, 376 F.3d 908, 918 (9th Cir. 2004) (noting that where one plaintiff has standing to bring
suit, the court need not consider the standing of the other plaintiffs).

(internal quotation marks and citation omitted).

Defendant presents a limited argument that this lawsuit is not ripe for judicial review, largely repeating his standing argument. Defendant claims that "there are too many contingencies between now and a potential future execution to bring [the Media Groups'] claim within the Court's Article III jurisdiction." *See Def.'s MTD Br.* at 6. As set forth above, *Pizzuto* forecloses Defendant's ripeness argument.

The Media Groups' claim is capable of resolution now. *Pizzuto*, 997 F.3d at 903. Idaho continues to make clear that it intends to implement the death penalty. Additionally, it is not speculative that, at a minimum, the AP will have a representative designated as a media witness and present for any future executions, and both the Statesman and East Idaho News have expressed their intention to apply to be a media representative. It is also not speculative that, unless and until the IDOC issues a new SOP, the controlling policy excludes execution witnesses from accessing the Medical Team Room. Accordingly, this matter is ripe for judicial review.

> c.    The Media Groups' First Amendment claim is not barred by the political question doctrine.

Finally, Defendant argues that "Supreme Court precedent forecloses the justiciability of [the Media Groups'] claims for being political questions." *Def.'s MTD Br.* at 3, Dkt. 11-11 (citing *Holden*, 137 U.S. 483). This argument misunderstands *Holden* and the political question doctrine's applicability to the Media Groups' First Amendment claims. Defendant relies on cases that do not address First Amendment claims. Conversely, the Ninth Circuit and district courts within the circuit have consistently addressed the issue in front of this Court without interference from the political question doctrine. *See, e.g.*, *Ryan*, 938 F.3d 1069; *Otter*, 682 F.3d at 824; *CFAC*, 299 F.3d at 876; *Cal. First Amend. Coal. v. Calderon*, 150 F.3d 976, 982 (9th Cir. 1998); *Los Angeles Times Commc'ns LLC v. Kernan*, No. 18-cv-02146-RS, 2018 WL 10419787, at *3

(N.D. Cal. Aug. 17, 2018); *Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d 859, 866 (D. Ariz. 2016).

The Ninth Circuit has explained that "[a] nonjusticiable political question exists when, to resolve a dispute, the court must make a policy judgment of a legislative nature, rather than resolving the dispute through legal and factual analysis." *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 784 (9th Cir. 2005) (citing *Koohi v. United States,* 976 F.2d 1328, 1331 (9th Cir. 1992)). That is exactly what this lawsuit asks the Court to do. The question before the Court is whether the public has a right of access, under the First Amendment, to the Medical Team Room in light of the tasks integral to an execution that the State conducts there. This legal question is well within the scope of the judiciary to resolve. In fact, even the "Defendant recognizes that the determination of whether a policy violates the Constitution is for the Court." *Def.'s MTD Br.* at 4 n.1, Dkt 4.

Additionally, if the Court determines that there is a First Amendment right of access to the Medical Team Room and grants the Media Groups' injunction, it will have a limited—if any—effect on the IDOC's authority to govern the procedures of an execution, and it will have no impact on IDOC's ability to maintain "control, direction and management of the penitentiaries of the state, their employees and properties[.]" *Def.'s MTD Br.* at 6 (quoting Idaho Const. Art. X § 5). The only effect that an injunction will have is that the IDOC will be required to comply with the First Amendment and provide some form of video and audio access to the Medical Team Room. The IDOC will continue to dictate every aspect of the execution process, as it does now.

Simply put, resolution of the Media Groups' claim does not require the Court to make a policy determination. Rather, the Court can resolve this dispute through legal and factual

analysis, just as many courts have already done. Accordingly, this Court should not dismiss this case under Rule 12(b)(1) based on the political question doctrine, and this argument does not undermine the Media Groups' likelihood of success on the merits of their First Amendment claim.

## II.     The Media Groups Sufficiently State a First Amendment Right of Access Claim on Which They Are Likely to Succeed.

Defendant's arguments that the Media Groups' Complaint fails to state a claim and that such a claim is not likely to succeed on the merits fall into four categories. First, Defendant argues that *CFAC* and its progeny—*Associated Press v. Otter*, 682 F.3d 821, 824 (9th Cir. 2012) and *First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069 (9th Cir. 2019)—are not binding on this Court. Second, Defendant claims that, even if *CFAC* and its progeny are binding, those cases do not support a right of access to the Medical Team Room. Third, Defendant contends that no historical tradition of access to the Medical Team Room exists. Finally, Defendant argues that the State has a legitimate penological interest in not allowing access to the Medical Team Room. Each argument should be rejected.

### a.     The Ninth Circuit's decisions on the public's First Amendment right of access to the entirety of an execution are binding here.

Throughout his motion to dismiss and opposition to the preliminary injunction, Defendant repeatedly argues that this Court is not bound by *CFAC* and its progeny because they are "clearly irreconcilable with Supreme Court precedent." *See Def.'s Resp.* at 11, Dkt. 12. This argument, however, misunderstands the "clearly irreconcilable" test and, therefore, fails.

The clearly irreconcilable test allows a district court to disregard Ninth Circuit precedent when an intervening decision by a court of last resort, i.e., an *en banc* Ninth Circuit panel or the United States Supreme Court, undercuts the theory or the reasoning of the earlier Ninth Circuit precedent being challenged. *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003). In his

argument, Defendant ignores that the Supreme Court or *en banc* decision must be intervening. *See Def.'s Resp.* at 11, Dkt. 12. That means the clearly irreconcilable test is only applicable when it relies on a decision by a court of last resort that is issued *after* the prior case being challenged. *See, e.g.*, *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) ("A prior decision is effectively overruled if **intervening** higher authority has so undercut the theory or reasoning underlying the prior circuit precedent as to make the precedent clearly irreconcilable with the **intervening** authority." (internal quotation marks and citation omitted) (emphasis added)); *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1123 (9th Cir. 2002) ("we may overrule prior circuit authority without taking the case en banc when an **intervening** Supreme Court decision undermines an **existing precedent** of the Ninth Circuit, and both cases are closely on point." (internal quotation marks and citations omitted) (emphasis added)).

In *Miller*, the Ninth Circuit addressed when "a district court . . . is free to reexamine the holding of a prior panel in light of an inconsistent decision by a court of last resort on a closely related, but not identical issue." 335 F.3d at 899. The court held that "where the reasoning or theory of our **prior** circuit authority is clearly irreconcilable with the reasoning or theory of **intervening** higher authority, a three-judge panel should consider itself bound by the **later** and controlling authority, and should reject the **prior** circuit opinion as having been effectively overruled." *Id*. at 893 (emphasis added).

Defendant bases his clearly irreconcilable argument on *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), *Houchins v. KQED, Inc*., 438 U.S. 1 (1978), *Pell v. Procunier*, 417 U.S. 817 (1974), *Saxbe v. Washington Post Co*., 417 U.S. 843 (1974), and *Holden v. Minnesota*, 137 U.S. 483, 491 (1890). *See Def.'s Resp* at 17-18; Dkt. 12. All of these cases were decided well before—not after—the binding Ninth Circuit precedent the Media Groups rely on

in making their First Amendment right of access claims. The most recent decision of the group—

*Richmond Newspapers*—predates *CFAC* by more than two decades. Therefore, as a matter of

law, these cases cannot implicitly overrule *CFAC* and its progeny. They are not intervening. The

Ninth Circuit had these cases available to it at the time it made its decisions in *CFAC* and *Ryan*.

Thus, the clearly irreconcilable test is not applicable.

Even if the clearly irreconcilable test was somehow applicable, and again it is not, *CFAC*

and its progeny are not undermined by the non-intervening authority Defendant cites. "The

clearly irreconcilable requirement is a high standard." *Close*, 894 F.3d at 1073 (internal quotation

marks and citation omitted). "[I]t is not enough for there to be some tension between the

intervening higher authority and prior circuit precedent, or for the intervening higher authority to

cast doubt on the prior circuit precedent." *Id.* (internal quotation marks and citation omitted).

Indeed, "[a]s long as the Court may apply circuit precedent without conflicting with intervening

higher authority, the Court must do so." *United States v. Saba*, No. 1:22-cr-00248-AKB, 2023

WL 5333255, at *2 (D. Idaho Aug. 17, 2023) (citation omitted).

As Defendant acknowledges that, out of all the authority he relies on for his clearly

irreconcilable argument, only *Holden* involves executions. However, *Holden* does not undermine

*CFAC* or *Ryan*, nor does it stand for the broad propositions that Defendant claims it does.

*Holden*, a case that is more than 130 years old, involved a condemned prisoner's ex post facto

challenge to the Minnesota state statute then governing his execution. Although the challenged

statute in *Holden* did have provisions banning witnesses, the case did not involve any First

Amendment challenge to those provisions. *See* 137 U.S. at 491; *see also* Neil E. Nussbaum,

*"Film at Eleven . . ."-Does the Press Have the Right to Attend and Videotape Executions?*, 20

N.C. Cent. Law J. 121, 123–24 (1992) ("There were no media plaintiffs in *Holden* challenging

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
RESPONSE TO DEFENDANT'S MOTION TO DISMISS - 14
127530834.3 0012094-00006

the right of the state to limit their access to executions or their power to publish unrestricted accounts of executions. Nor did the condemned challenge the statutes as violative of his constitutional rights." (citation omitted)).

In fact, *CFAC* explicitly addresses *Holden*. In *CFAC*, much like here, the defendant argued that *Holden* foreclosed any recognition of a First Amendment right to view executions. *See* 299 F.3d at 875 n.3. The court then noted that the Ninth Circuit had already declined to adopt such a categorical interpretation of *Holden* in its prior decision. *Id*. (citing *Calderon*, 150 F.3d at 982). The court explained that "*Holden* was primarily concerned with ex post facto issues, did not expressly discuss the First Amendment and the Court's passing references to restrictions on the media are inconsistent with more modern Supreme Court jurisprudence[.]" *Id*. Therefore, the Ninth Circuit has already held that *Holden* does not foreclose the First Amendment right of access to executions described in *CFAC*, *Otter*, and *Ryan*. Stated differently, the Ninth Circuit has already decided that *CFAC* and its progeny can coexist with *Holden*. Simply put, *Holden* does not support Defendant's argument that the Media Groups' Complaint fails to state a claim on which relief can be granted or his argument that the Media Groups are not likely to succeed on the merits of that claim.

The remaining Supreme Court authority Defendant relies on also does not undermine or cast doubt on the decisions or reasoning in *CFAC* or *Ryan*. While some of the cited decisions do discuss a First Amendment right of access in the general prison setting, none of them address the relevant issue here—whether the public has a right of access to executions, or what that right of access requires. *See, e.g., Richmond Newspapers, Inc*, 448 U.S. 555 (addressing the "narrow question" of "whether the right of the public and press to attend criminal trials is guaranteed under the United States Constitution."); *Houchins*, 438 U.S. at 16 (holding that the media does

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS - 15

not have a special right of access to a county jail "different from or greater than that accorded the public[;]" however, here the media's right is coextensive with that of the public); *Pell*, 417 U.S. 817 (addressing whether the media has a right to unrestricted access to interview designated prisoners); *Saxbe*, 417 U.S. 843 (same).[6] Further, the Supreme Court's decisions in *Houchins*, *Pell*, and *Saxbe* emphasized that the media does not possess a greater right of access than the public in the prison setting. That is entirely consistent with the Ninth Circuit decisions in *CFAC*, *Otter*, and *Ryan* finding that the media's rights are explicitly derived from the rights of the general public, not some greater right reserved for the media.

In sum, because none of the Supreme Court cases Defendant relies on address the relevant issue decided in *CFAC*, *Otter*, and *Ryan*—and presented in this case—and because the underlying reasoning in these cases does not conflict with *CFAC*, *Otter,* and *Ryan*, Defendant could not show that *CFAC* and its progeny have been implicitly overruled even if the Supreme Court cases had been decided after and not before *CFAC*. Accordingly, this Court—and all district courts in the Ninth Circuit—remain bound by their holdings.

b.    The Media Groups' right of access encompasses the Medical Team Room.

Defendant next argues that *CFAC*, *Otter*, and *Ryan* do not support a First Amendment right of access to the Medical Team Room and that the "IDOC's policies comply with [*CFAC*] and *Ryan*." *Def.'s Resp.* at 8, Dkt. 12. Not so. As set out in the Media Groups' opening memorandum, *CFAC* and its progeny strongly support a First Amendment right of access to the Medical Team Room. Defendant's arguments to the contrary fail.

---

[6] Defendant also provides a string cite of out-of-circuit district court opinions and an unpublished Fourth Circuit decision. *See Def.'s MTD* at 7, Dkt. 7; *Def.'s Resp.* at 12, Dkt. 12. These opinions have no precedential value over Ninth Circuit authority.

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS - 16

    i.  *Calderon does not govern here.*

Defendant first attempts to narrow the Ninth Circuit's approach to the First Amendment right of access to executions by pointing to language in *California First Amend. Coal. v. Calderon*, 150 F.3d 976, 982 (9th Cir. 1998), an earlier decision in the *CFAC* litigation, that the right of access to executions is "severely limited." *Calderon*, however, does not do the heavy lifting Defendant claims it does.

In *Calderon,* the court stressed that it was "not holding that the public and the press do not have First Amendment rights to view executions." *Id*. In fact, the court assumed such a right likely did exist. *Id*. at 982. But it found that California's execution procedures at the time were not unconstitutional, in large part, because it did "not have substantial evidence" in the record, and therefore, it deferred to the prison officials and procedures in place. *Id*. at 983. Additionally, because *Calderon* did not address the issue, it never created any meaningful precedent on the scope of the First Amendment right of access to executions. *See CFAC*, 299 F.3d at 873 ("[In *Calderon*] we assumed without deciding that the public had a 'severely limited' First Amendment right to view executions" (citation omitted)); *see also Def.'s MTD Br.* at 11, Dkt. 11-1 (acknowledging that the *Holden* Court took the petitioner's argument at face value). It was not until *CFAC* that the Ninth Circuit first squarely addressed the relevant issue—whether there is a First Amendment right of access to executions. Thus, it is *CFAC* and its progeny—all decided after *Calderon*—that this Court should look to in assessing the scope of the public's (and thus, the press's) First Amendment right of access to executions.

    ii.  *CFAC and Ryan direct this Court to focus on whether the tasks in the Medical Team Room are inextricably intertwined with the execution and are part of the entire execution process.*

Defendant next attempts to narrow the reasoning of *CFAC* and *Ryan*. He claims that the "rights created by [*CFAC*] and *Ryan* are confined to seeing and hearing the condemned in the

execution chamber." *Def.'s MTD Br.* at 13, Dkt. 11-1. But Defendant's categorical and narrow reading of *CFAC* and *Ryan* is not supported by the reasoning or holding of those cases. In fact, the Court in *CFAC* expressly rejected it. In *CFAC*, the defendant argued that the public did not have a right to view the initial execution procedures because an execution is defined as "beginning when the lethal chemicals start to flow." 299 F.3d at 876. The court expressly rejected this argument. The court stated that "this definition" of when an execution begins was "simply of defendants' own making." *Id.*

In *CFAC*, the court instead adopted a broader approach, holding that "that the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Id.* at 877. In *Ryan,* the Ninth Circuit recognized this broader approach and explained "that the public has a qualified First Amendment right to view executions in their *entirety,*" including the ability to hear the sounds from the Execution Chamber. *Ryan*, 938 F.3d 1069, 1075 (citing *CFAC*, 299 F.3d at 875–77 (emphasis added)). The court explained that execution witnesses need to be able to observe and report on the entire process so that the public can determine whether lethal injections are fairly and humanely administered. *Id*. at 1076. Accordingly, the reasoning in *CFAC* and *Ryan* supports the Media Groups' claim here. The tasks performed in the Medical Team Room are part of or are inextricably intertwined with the process of putting the condemned inmate to death. They are part of the execution in its entirety.[7] *Plf.s' Mem*. at 11, Dkt. 2-1.

---

[7] IDOC understands that the right defined in *CFAC* and *Ryan* is not limited strictly to the Execution Chamber. Under the current SOP, the IDOC will provide audio and visual feed to the Execution Preparation Room, where a condemned individual will have IV lines inserted before being taken into the Execution Room. Defendant states that the IDOC updated its execution

This broad approach to the right of access is further reflected in the district court cases that have addressed this question. In *Los Angeles Times Commc'ns LLC v. Kernan*, the court explained that the "Ninth Circuit did not propound a rigid limit on the public's right of access beginning the moment the State brings an inmate into the Lethal Injection Room." 2018 WL 10419787, at *4 (denying defendant's motion to dismiss). The court further explained that "[t]reating the inmate's entry into the execution chamber as the definitive trigger of a First Amendment right of access is not consistent with the reasoning of *CFAC*, and ignores its concern for an informed public debate[.]" *Id.*

Additionally, in *Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d 859, 868 (D. Ariz. 2016), the district court expressly found that the logic of *CFAC* "applies with equal force to the administration (or subsequent administrations) of doses of the lethal injection drugs" even when those drugs were being administered in a separate chemical room. *Id.*

> iii. *Verbal alerts from the medical team that lethal drugs have been administered do not provide the required First Amendment access.*

Defendant argues that any First Amendment right of access to the Medical Team Room is satisfied by IDOC's execution procedures because IDOC makes "witnesses aware of the administration(s) of lethal drugs" through verbal alerts from the medical team. *See Def.'s Resp.* at 9, Dkt. 12. However, Defendant's unverified assertion of its implementation of tasks inextricably intertwined with an execution does not comply with *Guardian News* and does not satisfy the Media Groups' First Amendment rights. *See Doe v. Harris*, 772 F.3d 563, 580–81 (9th Cir. 2014) ("[T]he promise from the State that it will use the power appropriately is not sufficient: '[T]he First Amendment protects against the Government; it does not leave us at the

---

process to comply with *CFAC* and *Ryan* by placing cameras outside the Execution Room. *See Def.'s Resp.* at 9, Dkt. 12.

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS - 19

mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.'" (citation omitted)); *Spirit of Aloha Temple v. Cnty. of Maui*, 49 F.4th 1180, 1192 (9th Cir. 2022) ("We are not bound by officials' promises that they will enforce the guidelines responsibly.").

Moreover, *Guardian News* itself required access to view the activity in the chemical room. The Court there permanently enjoined the defendants from "conducting lethal injection executions without providing a means for witnesses to be aware of the administration(s) of lethal drugs, and invoking [the execution policy] as currently written to *close the viewing* of an execution[.]" 225 F. Supp. 3d at 870 (emphasis added). The Media Groups here ask this Court to recognize the same right of access recognized by the district court in Arizona.

> iv.  *Defendant does not dispute that the tasks in the medical room are not inextricably intertwined with the execution process.*

Tellingly, Defendant does not argue that the tasks performed in the Medical Team Room are not integrally intertwined with the execution process. Nor can he. The means of administering the lethal drugs occur in the Medical Team Room: preparing and labeling the syringes, drawing the lethal injection drugs into the prepared syringes, tracking the syringes to ensure they are not damaged or mixed up, and most importantly, administering the lethal injection drugs into the IV lines attached to the condemned person.

Additionally, access to the means and methods of execution is critically important to the open and informed discussion of whether capital punishment is being "fairly and humanely administered." *See CFAC*, 299 F.3d at 876. As the Ninth Circuit has explained, "[e]xecution witnesses need to be able to observe and report on *the entire process* so that the public can determine whether lethal injections are fairly and humanely administered." *Ryan*, 938 F.3d at 1076 (citation omitted) (emphasis added). If the IDOC is able to keep integral aspects of an

execution in a shroud of secrecy, the public's ability to have an informed discussion regarding capital punishment will be significantly undercut.

      c.    <u>There is a historical tradition of access to the means and methods of an execution, which occur in the Medical Team Room under the current SOP.</u>

Defendant claims that the historical right of access described in *CFAC* and *Ryan* does not extend to observing the Medical Team Room. *See Def.'s Resp.* at 11, Dkt. 12; *Def.'s MTD Br.* at 14, Dkt. 11-1. Ninth Circuit precedent and Idaho's past execution practices show otherwise. Witnesses to an execution have long been able to observe the manner and means by which an execution is implemented.

Defendant's argument that the historical right of access does not extend to the tasks in the Medical Team Room is premised on a faulty categorization of the Media Groups' request for access. Defendant claims that the Media Groups seek "ancillary details of an execution" and that the Media Groups' right of access "includes access to every conceivable matter related to executions[.]" *See Def.'s MTD Br.* at 16, Dkt. 11-1; *Def.'s Resp.* at 10, Dkt. 12. That simply is not the case.

The Media Groups here do not seek information about the specific lethal injection drugs used, their manufacturers, their expiration dates, or about the qualifications of certain execution team members. In fact, the Media Groups do not seek any "information" about the execution process at all. Instead, the Media Groups seek "visual and audio access to the Medical Team Room that is similar to the access already provided in the Execution Preparation Room or Execution Chamber." *Plf.s' PI Mtn.* at 2, Dkt. 2. In other words, the Media Groups, like the plaintiffs in *Guardian News*, seek to enforce their right of access to view what occurs in the

Medical Team Room, not a right to information about all of the items and individuals in the Medical Team Room.[8]

Based on his faulty premise that the Media Groups seek ancillary information about the execution process, Defendant argues that there is no historical tradition of witnesses observing analogous ancillary steps. He argues that there is "not a history of access to watching executioners clean and prepare their rifles for firing nor sharpen their blade for traditional methods." *Def.'s MTD Br*. at 14, Dkt. 11-1. These comparisons are too far removed from the execution to be analogous to the tasks the Media Groups seek access to here. Instead, access to the Medical Team Room is akin to the historical tradition of the public having access to the means and methods used to carry out an execution. In the context of a hanging, the actions taken in the Medical Team Room are more similar to observing the rope and gallows or the executioner placing the noose around a condemned individual's neck and ultimately engaging whatever device that will cause the condemned individual to drop to his death. In the context of a firing squad, the actions taken in the Medical Team Room are akin to the public being able to see a firing squad's elected firearm, the individuals as they ready their firearm and take aim and ultimately pulling the firearm's trigger.

Historical access to the means and methods of executions is well documented. The Ninth Circuit has explained that "[h]istorically, executions were open to all comers[,]" and "[e]xecutions were fully open events in the United States[.]" *CFAC*, 299 F.3d at 875. The court

---

[8] To further clarify, the Media Groups' request for audio and video access is not an attempt to evade *Ryan's* holding while still trying to obtain such information. Defendant is free to take whatever steps he deems necessary to keep this information confidential so long as it does not interfere with the Media Groups' First Amendment rights. That said, there are numerous low-cost alternatives that are more than sufficient to do so. Thus, there is no viable argument that maintaining the confidentiality of this information is a legitimate penological interest sufficient to justify restricting the Media Groups' access to the Medical Team Room.

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANT'S MOTION TO DISMISS - 22

further explained that "[t]he public and press historically have been allowed to watch the condemned inmate enter the execution place, be attached to the execution device and then die." *Id.* at 876. No part of this process was conducted remotely from a location witnesses could not observe. Because executions were generally open, the public was able to view the means and methods of execution. That is, the public has a history of being able to see the entirety of a hanging, including the gallows, the rope being used to hang an inmate, the device used to trigger the hanging, and the actions of the executioner as he effectuated capital punishment. *See Id.* ("witnesses were permitted to view hangings 'in their entirety, from the condemned's ascent up the gallows to the fall of the trap door.'" (citation omitted)); *see also* Nussbaum, 20 N.C. Cent. Law J. at 122–23 ("in the United States, convicts were hung in town centers so that hundreds (sometimes thousands) of people could watch the ritual that began with the arrival of the condemned person in the custody of the sheriff and ended with the corpse being carted off to an ignominious burial in some potter's field.") (internal quotations and citations omitted). Similarly, the public was able to view the guillotine, the blade as it dropped, and the executioner as an individual was beheaded. Indeed, the recent trend in attempting to hide the means and methods of execution in a chemical room seems to only have begun in the era of lethal injection, which is in direct contrast to the long history of open executions where those aspects of the execution were visible to the public.

Idaho's history of executions also shows that the public had a right to see the entire execution, including its means and methods. Many executions in Idaho occurred at the Old Idaho State Penitentiary in Boise. When executions were carried out by hanging in the gallows room of Bunk House #5, witnesses were able to see the rope attached to the ceiling and the lever mechanism that the executioner would pull to effectuate an execution. *See* Second Declaration of

Rebecca Boone in Support of Plaintiffs' Reply in Support of Motion for Preliminary Injunction and Response to Defendant's Motion to Dismiss. (Second Boone Decl.), ¶ 6 Ex. A. Similarly, when hangings were conducted outside, Idaho did not hide any of the fundamental aspects of the execution. *See id*, ¶ 8, Ex. B. Again, the executioner was not hidden behind closed doors, and there was no closed room from which the execution team initiated the hanging. Nor was the means of execution effectuated outside of the public's view. *Id*. Even other prisoners were able to observe all aspects of the execution. *Id.*

Through their Complaint and motion for a preliminary injunction, the Media Groups do not seek access to ancillary information related to an execution. They seek access to observe the integral tasks performed in the Medical Team Room at the time of the execution, including the activity in the Medical Team Room that initiates administration of the lethal drugs. Historically, these parts of the execution process were open to the public. This historical access supports the sufficiency of the Media Groups' First Amendment claim as pleaded and demonstrates their likelihood of success on the merits of that claim.

      d.    <u>Defendant has failed to satisfy the *Turner Test*.</u>

As set out in the Media Groups' opening memorandum, even if a right of access to the Medical Team Room exists, the government may restrict access if doing so is reasonably related to a legitimate penological interest and does not represent "an exaggerated response to those concerns." *CFAC*, 299 F.3d at 878 (quoting *Turner v. Safley*, 482 U.S. 78, 87 (1987) (internal quotation marks omitted)). It is the government's burden to justify its restriction. *Guardian News*, 225 F. Supp. 3d 866. Defendant has not done so here.

Defendant attempts to raise two legitimate penological interests for restricting access to the Medical Team Room. Both are insufficient to justify denying witnesses' access to observe

activity in the Medical Team Room. First, Defendant argues that maintaining the confidentiality

of the medical team members' identities justifies restricting access to the Medical Team Room.

However, Defendant does not provide any evidence that there is a risk that the medical team

members will be publicly identified or that there is a risk to their safety. Rather, Defendant's

conclusory statement is pure speculation. *Cf. CFAC*, 299 F.3d at 880 ("Based on the evidence in

the record, defendants' fear that execution team members will be publicly identified and

retaliated against is an overreaction, supported only by questionable speculation."). Moreover,

the Ninth Circuit has consistently rejected this argument, including when the State of Idaho made

it before. *See, e.g., Otter*, 682 F.3d at 825; *CFAC*, 299 F.3d at 884–85. The Ninth Circuit has

already explained that "an individual wearing a surgical cap, mask and gloves—which, when

worn together, cover the forehead, nose, cheeks, mouth and hands—cannot be identified with

any meaningful degree of specificity." *CFAC*, 299 F.3d at 884–85. And Ms. Boone confirmed

that in the Idaho executions she has witnessed, the medical team's attire and masks have

sufficiently obscured their identities. Boone Decl. ¶ 13, Dkt. 2-2.

Defendant's asserted interest in maintaining the confidentiality of the medical team

members' identities is further undermined by IDOC's current SOP, which allows witnesses to

see and hear the medical team while they are in the Execution Preparation Room. The Ninth

Circuit has already concluded that providing additional access to the medical team did not

increase the risk of exposing medical personnel's identities. *See, e.g.*, *Ryan*, 938 F.3d at 1077

("Thus, to the extent that execution team members could be identified by the sound of their

voices, witnesses can already hear their voices during the initial stages of the execution."). Like

in *Ryan*, providing access to the Medical Team Room does not create any additional risk not

already present by witnesses having access to the Execution Preparation Room. Because the

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
RESPONSE TO DEFENDANT'S MOTION TO DISMISS - 25
127530834.3 0012094-00006

current procedures in place are sufficient to protect the medical team members' identities in the
Execution Preparation Room, IDOC's attempt to limit access to the Medical Team Room based
on this justification is an exaggerated response.

Defendant's concerns are further mitigated by the statutory and procedural requirements
to maintain the anonymity of the medical team members and Ms. Boone's assertion that she has
not learned the identity of any medical team member at the executions she has witnessed. *See
IDOC SOP* at 31; Boone Decl. ¶ 13, Dkt. 2-2. Thus, Defendant's attempt to justify the IDOC's
restriction is nothing more than an exaggerated response.

Second, Defendant asserts a legitimate penological interest in prohibiting access to the
Medical Team Room because it allows the medical team to work "in the safest way possible
because they do not have to worry about their identities being uncovered and it allows them to
work without identity-protecting equipment." *Def.'s Resp.* at 13, Dkt. 12. Defendant, however,
has not provided any evidence that medical personnel are worried that their identities will be
uncovered. Defendant has also failed to produce any evidence whatsoever that working without
identity-protecting equipment is somehow safer than working with it. This unsupported objective
is insufficient to justify infringing on the public's First Amendment right of access. *Otter*, 682
F.3d at 825 ("This is pure speculation; the State has presented no evidence to support it.").

In a final attempt to justify its restriction on access to the Medical Team Room,
Defendant argues that descriptions from state officials regarding the events occurring in the
Medical Team Room are a sufficient "alternative means to know what happens in the Chemical
Room." *See Def.'s MTD Br.* at 17, Dkt. 11-1; *Def.'s Resp* at 12, Dkt. 12. The Ninth Circuit has
already rejected such an argument. In *CFAC*, the challenged California procedure eliminated
"independent, public eyewitness observation of several crucial steps of the execution process"

and forced the public to "rely on the same prison officials who [were] responsible for administering the execution to disclose and provide information about any difficulties with the procedure." 299 F.3d at 883. In finding that a prison official's description of an execution is insufficient to satisfy the First Amendment right of access, the court explained that "an informed public debate is the main purpose for granting a right of access to governmental proceedings. Prison officials simply do not have the same incentives to describe fully the potential shortcomings of lethal injection executions." *Id*. at 884. The court further explained that "a prison official's perception of the execution process may be vastly different—and markedly less critical—than that of the public." *Id*. Thus, in order to comply with the First Amendment, the public must have unbiased "first-hand knowledge of the events" that take place during an execution. *Id.* at 883. The fact that the medical team must record what happened is insufficient to make the SOP compliant with the First Amendment.

In sum, Defendant has not carried his burden to offer any penological interest to justify restricting the public's access to the Medical Team Room. Accordingly, the IDOC policies that restrict the Media Groups' First Amendment right to access the Medical Team Room are unconstitutional and must be enjoined.

## III.    The PLRA Has No Applicability to This Case.

In a final attempt to persuade the Court that the Media Groups do not have a First Amendment right of access to the Medical Team Room, Defendant argues that the PLRA bars the Media Groups' claim. Defendant asserts that the PLRA precludes court involvement in the prison system "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the federal right, and is the least intrusive means necessary

to correct the violation of the federal right." *Def.'s MTD Br.* at 20, Dkt. 11-1 (quoting 18 U.S.C. § 3626). This is an incomplete and inapplicable statement of law.

The PLRA is only applicable to individuals who are prisoners at the time they file their lawsuit. *See, e.g., Olivas v. Nev. ex rel. Dep't of Corr.*, 856 F.3d 1281, 1284 (9th Cir. 2017) (holding that a former prisoner who had been released from custody before he filed suit was not a "prisoner" under the PLRA and thus was not subject to the screening procedures established by the PLRA); *Talamantes v. Leyva*, 575 F.3d 1021, 1024 (9th Cir. 2009) (holding that "that only those individuals who are prisoners … at the time they file suit must comply with the [PLRA's] exhaustion requirements" (citation omitted)); *Page v. Torrey*, 201 F.3d 1136, 1139 (9th Cir. 2000) (holding that an individual who was not a "prisoner" at the time he was civilly committed was not subject to the PLRA's financial reporting requirements for filing an in forma pauperus application for his § 1983 civil rights action). Indeed, even the cases Defendant cites show the PLRA applies only in actions pursued by prisoners. *See, e.g.*, *Armstrong v. Newsom*, 58 F.4th 1283, 1288 (9th Cir. 2023) (the lawsuit was brought by a class of California prisoners); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 767 (9th Cir. 2019) (involving a transgender prisoner in the custody of the IDOC); *Balla v. Idaho State Bd. of Corr.*, No. 1:81-CV-1165-BLW, 2020 WL 2812564, at *1 (D. Idaho May 30, 2020) (involving a class of Idaho state prisoners regarding various conditions of the prison system).

Defendant has not provided any authority for the proposition that the PLRA applies when a non-prisoner brings constitutional claims against the state official who is the head of a state prison system. Simply put, the PLRA has no relevance or applicability to this case.

IV.     **The Remaining Preliminary Injunction Factors Weigh in the Media Groups' Favor.**

As set forth above and in the Media Groups' opening memorandum, the Media Groups are likely to succeed on the merits of their First Amendment right of access claim. The remaining preliminary injunction factors also weigh in the Media Groups' favor. Defendant argues that the Media Groups "cannot establish irreparable harm because IDOC provides witnesses with whatever the Constitution requires." *Def.'s Resp.* at 19, Dkt. 12. That argument simply begs the question. If the Court finds that the Media Groups have a First Amendment right of access to the Medical Team Room, then IDOC's current SOP and policies denying that access cause irreparable harm. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (internal quotation marks and citation omitted). Accordingly, the Court should find that this factor weighs in favor of granting the Media Groups' preliminary injunction. *See Otter*, 682 F.3d at 826.

Defendant argues that the balance of equities and the public interest weigh in Defendant's favor because Idaho has an interest in seeing that its law and policy on executions are carried out. Defendant's argument once again misunderstands the Media Groups' request. The Media Groups are not seeking to enjoin the "IDOC from carrying out any execution until this entire case can be resolved." *Def.'s Resp.* at 20, Dkt. 12. The Media Groups seek only to protect their First Amendment right to access the entirety of an execution, including the parts that are integrally intertwined with the process. If this Court issues a preliminary injunction, the IDOC is free to carry out any execution it wishes so long as it complies with the Court's order. Moreover, because the Media Groups raise serious First Amendment questions, "the balance of hardships tips sharply in [their] favor[,]" *Fellowship of Christian Athletes v. San Jose Unified Sch. Bd.*, 82

F.4th 664, 695 (9th Cir. 2023) (internal quotation marks and citation omitted), and there is

"significant public interest in upholding First Amendment principles." *Otter*, 682 F.3d at 826

(citation omitted).

## CONCLUSION

For the reasons set forth herein and in the Media Groups' opening memorandum, the

Court should deny Defendant's motion to dismiss and enter a preliminary injunction enjoining

Defendant from restricting access to the Medical Team Room leading up to, during, and

immediately after any future executions of condemned individuals.

DATED: January 10, 2025                STOEL RIVES LLP


                                       /s/ Wendy J. Olson
                                       Wendy J. Olson
                                       Anders Pedersen

                                       *Attorneys for Plaintiffs the Associated Press,*
                                       *The Idaho Statesman, East Idaho News*

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
RESPONSE TO DEFENDANT'S MOTION TO DISMISS - 30