## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

THE ASSOCIATED PRESS; THE
MCCLATCHY COMPANY, LLC, dba
The Idaho Statesman; EAST-IDAHO-
NEWS.COM, LLC, dba East Idaho
News,

Plaintiffs,

v.

JOSH TEWALT, in his official capacity
as the Director of the Idaho Department
of Correction,

Defendant.

Case No. 1:24-cv-00587-DKG

**ORDER RE: DEFENDANT'S
MOTION TO DISMISS (DKT. 11)**

## INTRODUCTION

Before the Court is Defendant's Motion to Dismiss Plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1] (Dkt. 11). The motion is fully briefed and at issue. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Court will decide the motion based on the record. Dist. Idaho Civ. Rule 7.1(d). For the reasons that

---

[1] The parties have consented to proceed before a United States Magistrate Judge in this matter pursuant to 28 U.S.C. § 636(c)(1) and Local Civil Rule 72.1(a)(1). (Dkt. 18).

follow, the Court will deny Defendant's motion to dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs here consist of several media groups, namely, The Associated Press, The Idaho Statesman, and East Idaho News. Defendant is Josh Tewalt, the Director of the Idaho Department of Correction ("IDOC"), being sued in his official capacity. Plaintiffs filed their complaint pursuant to 42 U.S.C. § 1983, alleging First Amendment violations stemming from the procedures and protocols used by Defendant and IDOC during executions by lethal injection, specifically the prohibition on audio and visual witness access to the Medical Team Room. (Dkt. 1).

Under IDOC's current execution protocol, the execution of a condemned person begins by securing the individual to a medical gurney. (Dkt. 11-1 at 57); IDOC Execution Chemicals Preparation and Administration ("*IDOC ECPA*"), at 5. The individual is then escorted to the Execution Preparation Room, where the medical team will establish peripheral or central line venous access and affix EKG leads onto the condemned person. *Id*. A live, closed-circuit video and audio feed is available to the witness rooms for the entirety of the time the condemned person is in the Execution Preparation Room. *Id*; *see also* Boone Decl. ¶ 34.

Once the medical team has established IV access, the condemned person is then escorted on the medical gurney to the Execution Chamber. *IDOC ECPA*, at 5. The medical team leader will then attach the EKG leads to the monitor and attach the IV lines to established IV access catheter sites. *Id*. No lethal injection drugs are administered by the medical team while in the Execution Chamber. *Id*. Rather, there is a small opening in

the wall where the IV lines pass into the Medical Team Room. Boone Decl. ¶¶ 21-22. The medical team members exit the Execution Chamber and monitor the condemned individual via closed-circuit audio and video feed from the Medical Team Room while the Idaho Maximum Security Institution Warden remains in the Execution Chamber. *IDOC ECPA*, at 6.

The medical team conducts various tasks while inside the Medical Team Room, including preparing and labeling syringes that will be used to contain the lethal injection drugs, drawing the lethal injection drugs into the prepared syringes, tracking the syringes, and monitoring the condemned person and their vital signs through the closed-circuit feed and the EKG monitor. *Id*. at 1, 5-6. The medical team members are then responsible for administering the lethal injection drugs from the prepared syringes into the IV lines attached to the condemned person. *Id*. at 6-9. The medical team members remain in the Medical Team Room throughout the administration of the lethal injection drugs. *Id*.

Under IDOC's current execution procedures, witnesses have audio and visual access to the Execution Preparation Room and the Execution Chamber for the duration of the execution. Boone Decl. ¶¶ 35-47. Plaintiffs are seeking general audio and visual access to the Medical Team Room leading up to, during, and immediately after any future executions. (Dkt. 1 at 13).

Plaintiffs filed a motion seeking to enjoin Defendant's procedure of restricting access to the Medical Team Room, arguing that such a restriction is a violation of their First Amendment right to access to integral aspects of the execution process. (Dkt. 2-1).

Defendant filed the motion to dismiss currently before the Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Dkt. 11-1).[2]

## STANDARD OF LAW

### 1. Motion to Dismiss Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. A lack of jurisdiction is presumed unless the party asserting jurisdiction establishes that it exists. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994). Thus, the plaintiff bears the burden of proof on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *Sopcak v. Northern Mountain Helicopter Serv.*, 52 F.3d 817, 818 (9th Cir. 1995).

"Rule 12(b)(1) jurisdictional attacks can be either facial or factual."[3] *Id.* "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In contrast, a factual attack "disputes the truth of the

---

[2] Defendant filed an objection to Rebecca Boone's second declaration included with Plaintiffs' combined preliminary injunction reply and motion to dismiss response. (Dkt. 20). The Court did not consider Ms. Boone's second declaration in deciding Defendant's motion to dismiss before the Court. *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015) (generally, the Court "may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion").

[3] In Defendant's memorandum in support of the motion to dismiss, he states that "[t]he Court can consider materials beyond the four corners of the complaint to determine if it has jurisdiction." (Dkt. 11-1 at 3) (citing *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). *Warren* noted that "[a] jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings [i.e. a facial challenge] or by presenting extrinsic evidence [i.e. a factual challenge]." 328 F.3d at 1139. As such, by alleging that the Court can consider materials beyond the complaint, Defendant appears to make a factual attack in his motion to dismiss. However, in Defendant's objection to the declaration included in Plaintiffs' combined preliminary injunction reply and motion to dismiss response, he states that Defendant's motion to dismiss was based on a Rule 12(b)(6) facial attack. (Dkt. 20 at 2).

allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.*; *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (in assessing standing, the court may consider "the complaint and any other particularized allegations of fact in affidavits or in amendments to the complaint").

### 2. Motion to Dismiss Rule 12(b)(6)

Motions made under Rule 12(b)(6) test the legal sufficiency of the allegations underlying the claims made in a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When assessing the sufficiency of a complaint, all well-pleaded factual allegations are taken as true and construed in the light most favorable to the nonmoving party, *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018), and all reasonable inferences are to be drawn in favor of that party as well. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). To overcome a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### DISCUSSION

Defendant moves to dismiss Plaintiffs claim for lack of subject matter jurisdiction and for failure to state a plausible claim for relief. (Dkt. 11). Defendant contends that Plaintiffs lack standing, their claim presents a non-justiciable political question and is

unripe, they do not possess the First Amendment right they assert is violated here, and that the Prison Litigation Reform Act precludes their desired relief. (Dkt. 11-1 at 2).

### A.    Justiciability

#### 1.    Whether Plaintiffs' Claim is Barred by the Political Question Doctrine.

Defendant argues that "Supreme Court precedent forecloses the justiciability of Plaintiffs' claim for being a political question." (Dkt. 11-1 at 3) (citing *Holden v. State of Minnesota*, 137 U.S. 483 (1980)). Plaintiffs contend that Defendant misunderstands *Holden* and relies on cases that do not address First Amendment claims, as Plaintiffs claim does here. (Dkt. 16 at 17). Plaintiffs also argue that the Ninth Circuit and district courts within this circuit have previously addressed the issue before this Court without interference from the political question doctrine. *Id*.

The political question doctrine arises out of Article III's "case or controversy" requirement and has its roots in separation of powers concerns. *Baker v. Carr*, 369 U.S. 186, 210 (1962). The political question doctrine is a jurisdictional restriction on "a court's power under Article III to hear a case" involving "political decisions that are by their nature committed to the political branches to the exclusion of the judiciary." *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 980-81 (9th Cir. 2007) (internal quotation marks omitted). In *Baker*, the Supreme Court found six criteria to be considered in determining whether a case is a non-justiciable political question:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial

discretion; or the impossibility of a court's undertaking independent
resolution without expressing lack of the respect due coordinate branches of
government; or an unusual need for unquestioning adherence to a political
decision already made; or the potentiality of embarrassment from
multifarious pronouncements by various departments on one question.

369 U.S. at 217.

Defendant argues the Supreme Court in *Holden* found that determining when,

where, and how an execution shall be carried out, determining who, if anyone, can

witness the execution, and regulating the character of witnesses, are purely legislative

tasks. (Dkt. 11-1 at 4) (citing *Holden*, 137 U.S. at 291). However, the Ninth Circuit

declined to adopt such an interpretation in *Cal. First Amend. Coalition v. Calderon*, 150

F.3d 976, 982-83 (9th Cir. 1998), and then reiterated in *Cal. First. Amend. Coalition v.*

*Woodford ("CFAC")*, that "*Holden* was primarily concerned with *ex post facto* issues,

did not expressly discuss the First Amendment, and the [Supreme] Court's passing

references to restrictions on the media are inconsistent with more modern Supreme Court

jurisprudence." 299 F.3d 868, 875 n.3 (9th Cir. 2002).

Unlike the cases relied upon by Defendant, the question before the Court here is

whether IDOC's current policy restricting access to the Medical Team Room violates

Plaintiffs' First Amendment rights. The Court is not being asked to make a policy

determination regarding the specifics of Defendant's execution procedures, but simply

whether Plaintiffs have a right of access to the Medical Team Room under the First

Amendment. As Defendant acknowledges in his brief, the determination of whether a

policy violates the Constitution is for the Court to decide. (Dkt. 11-1 at 4 n.1). The Ninth

Circuit has addressed the right of access to executions under the First Amendment before

and has found the issue to be justiciable and not precluded by the political question doctrine. *See, e.g.*, *First Amendment Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069 (9th Cir. 2019); *AP v. Otter*, 682 F.3d 821 (9th Cir. 2012); *CFAC*, 299 F.3d at 875 n.3; *Calderon*, 150 F.3d at 982. Accordingly, the Court finds that Plaintiffs' claim does not present a political question precluding the Court's review.

> 2.    *Whether Plaintiffs satisfy the injury in fact element of standing and have a constitutionally ripe claim.*

Defendant next claims that Plaintiffs lack standing because their claim is speculative and hypothetical, as there is not currently an execution scheduled and Plaintiffs have not been selected or approved as designated witnesses should an execution be scheduled. (Dkt. 11-1 at 19). Standing ensures a plaintiff has a "personal stake in the outcome of the controversy" by requiring that the plaintiff establish: 1) an injury in fact that is concrete and particularized, and actual or imminent; 2) the injury is fairly traceable to the challenged conduct of the defendant; and 3) the injury would likely be redressed by a favorable decision. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (An injury in fact is "an invasion of a legally protected interest…."). Here, Defendant alleges that Plaintiffs have not suffered an injury in fact but do not challenge the causation or redressability elements of constitutional standing. (Dkt. 11-1 at 19).

Defendant similarly contends that Plaintiffs claim is unripe for the same reasons that Plaintiffs lack standing. (Dkt. 11-1 at 6). The ripeness doctrine is designed to "prevent the courts, through avoidance of premature adjudication, from entangling

themselves in abstract disagreements." *Poland v. Stewart*, 117 F.3d 1094, 1104 (9th Cir. 1997) (citation omitted). Constitutional ripeness requires that the case "present issues that are definite and concrete" and "is often treated under the rubric of standing because ripeness coincides squarely with standing's injury in fact prong." *Safer Chems. v. United States EPA*, 943 F.3d 397, 411 (9th Cir. 2019) (citation omitted).

Although Defendant makes separate arguments relating to the injury in fact element of standing and constitutional ripeness, the Court will analyze the issues together as the inquiry is ultimately the same. *See Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1143 (2001); *see also Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003) ("[T]he constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry."). Whether the First Amendment issue is analyzed under the doctrines of standing or ripeness, the question here is whether Plaintiffs face a realistic danger of direct injury as a result of Defendant's enforcement of their current execution procedures, or whether their alleged injury is too hypothetical or speculative to support jurisdiction. *Thomas,* 220 F.3d at 1139.  Further, the Ninth Circuit has found that the requirements of ripeness and standing are applied less stringently in the context of First Amendment Claims. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173-74 (9th Cir. 2022) (citing *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010).

Plaintiffs here are three media organizations. (Dkt. 1). The standing inquiry is the same for individuals and organizations, directing the Court to evaluate the three aforementioned requirements to ensure a plaintiff has "'alleged such a personal stake in

the outcome of the controversy as to warrant…invocation of federal-court jurisdiction.'"
*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) (quoting
*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)). Where "at least one
plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 143 S.Ct. 2355, 2365
(2023) (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc*., 547 U.S. 47, 53 n. 2
(2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's
case-or-controversy requirement.")); *see also Isaacson v. Mayes*, 84 F.4th 1089, 1095 n.
3 (9th Cir. 2023).

Initially, Defendant argues Plaintiffs' claim is speculative and hypothetical
because all media representatives must still apply to be selected as a witness, the drawing
to be selected is random, and IDOC ultimately retains the ability to deny all media
representatives, including the Associated Press ("AP"), from attending an execution.
(Dkt. 11-1 at 19). Under IDOC's current execution procedures, up to four news media
representatives are permitted to witness an execution. (Dkt. 11-1 at 33); *see IDOC
Execution Procedures* at 11. Any news media representative desiring to be a witness must
submit an application and undergo a criminal background check. *Id*. The policy states
that the selected media representatives will be one witness from the AP and three other
media representatives picked in a random drawing.[4] *Id*. The drawing to select the three

---

[4] "One media representative witness will be randomly selected from each of the following
groups: media organizations that focus on and primarily cover the region in which the county of
conviction is located, print and internet news media organizations that focus on and primarily cover and
deliver local news to communities in Idaho, and broadcast news media organizations that focus on and
primarily cover and deliver local news to communities in Idaho." *IDOC Execution Procedures* at 11.

**MEMORANDUM DECISION ORDER - 10**

other media representatives occurs seven days before the scheduled execution. *Id*. Media representatives selected as witnesses must agree to return to the on-site media center following an execution and share information and observations with other news media representatives who were not witnesses to the execution. *Id*.

Generally, members of the press have standing to bring a First Amendment challenge based on governmental restrictions on information they allege is needed to do their work. *See Calderon*, 150 F.3d at 980 (where a coalition of print and broadcast journalists had associational standing to challenge a constitutional ban on observing lethal injections; injury in fact arose from past news stories and plans for future reporting on the issue). Rebecca Boone, an AP correspondent, submitted a declaration stating that she has served as the designated AP media witness for two completed executions in 2011 and 2012 and the attempted execution of Mr. Thomas Creech on February 28, 2024. Boone Decl. ¶ 17. Ms. Boone also expects to be the designated AP media witness should Mr. Creech's execution be rescheduled. *Id*. at ¶ 8. *Lujan v. Defs. Of Wildlife,* 504 U.S. 555, 561 (1992) (finding that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'").

Past practice demonstrates that Ms. Boone or another AP correspondent will be admitted as a media witness to the next execution. *See* Boone Decl. ¶ 17. A correspondent from the AP, under IDOC's current execution procedures, will be selected as witness should a death warrant be issued, and therefore the AP's injury is not

hypothetical nor speculative. Further, regardless of which specific media organizations have representatives selected to witness the execution, all Plaintiffs have reported on executions in the past and intend to report on them in the future. *See* Cripe Decl. ¶ 4; Sunderland Delc. ¶ 6. IDOC's current procedures also require that any non-witness media representatives in the media center are provided information and observations from the witness representatives. *IDOC Execution Procedures* at 11.  It is not speculative that, at the least, the AP Plaintiff intends to apply to be a media representative to witness an execution should one be scheduled, nor is it speculative that IDOC's policy prohibits witness access to the Medical Team Room.

Additionally, although Defendant alleges, he retains the ability to deny all media representatives from witnessing the execution, current IDOC execution policy specifically provides that four media witnesses will be admitted, and one of the four media witnesses will be from the AP. *IDOC Execution Procedure* at 11; *See Pizzuto v. Tewalt*, 997 F.3d 893, 902 (9th Cir. 2021) (citing *Whitaker v. Collier*, 862 F.3d 490, 493 (5th Cir. 2017) (the mere possibility that protocol or procedure may change is a concern that applies to every government policy or law, and such is not enough to make Plaintiffs' claim unripe).

Further, Idaho has demonstrated it intends to continue to issue writs of execution and carry out executions of condemned individuals, including Thomas Creech and Gerald Pizzuto.[5] (Dkt. 2-1 at 7). Defendant argues that because Creech and Pizzuto, though

---

[5] Idaho attempted to execute Mr. Creech on February 13, 2024. *See* Boone Decl. ¶ 7. During that attempt, the execution team members tried eight times to place a viable IV line in Mr. Creech's arms and (Continued)

previously scheduled to be executed, both have stays of executions entered by this Court, Plaintiffs claim remains hypothetical. (Dkt. 11-1 at 6); *see Creech v. Valley*, 1:24-cv-00485, Dkt. 20; *Pizzuto v. Tewalt*, 1:23-cv-00081-BLW, Dkt. 31, p.3.

Defendant's argument that Plaintiffs' claim is not cognizable because there is not currently an execution scheduled or a death warrant issued is unavailing. The Ninth Circuit has rejected the bright line rule that a plaintiff's claim will only become ripe once post-conviction proceedings have concluded, allowing the state to issue a death warrant. *Pizzuto v. Tewalt*, 997 F.3d 893, 899-900 (9th Cir. 2021). Such a rule requires plaintiffs to "frequently be litigating their claims within the small window of time after their death warrants are signed and before their execution dates (which, in Idaho, is thirty days)." *Id.* at 900 (finding "where plaintiffs raise eleventh-hour challenges to their executions, courts have routinely denied stays of execution because the plaintiffs did not raise their claims earlier."); *see Gomez v. U.S. Dist. Ct. for N. Dist. of Cal.*, 503 U.S. 653, 653-54 (1992) (per curiam); *Cooper v. Rimmer*, 379 F.3d 1029, 1032 n.2 (9th Cir. 2004) (per curiam); *McKenzie v. Day*, 57 F.3d 1461, 1468 (9th Cir. 1995). The Ninth Circuit found the plaintiffs' constitutional arguments in *Pizzuto* to be ripe although no death warrants were

---

legs over multiple hours. *Id.* ¶ 32. Eventually, the execution team determined that they could not successfully set an IV line, and Mr. Creech's execution was halted. *Id.* Idaho issued a second death warrant for Mr. Creech, scheduling his execution for November 13, 2024. *Id.* ¶ 8. A week before the second scheduled execution, this Court stayed his execution, ordered briefing, and that matter remains pending. *Creech v. Valley*, 1:24-cv-00485, Dkt. 20. Idaho has also issued multiple death warrants for Mr. Pizzuto since May 2021, but his execution is currently stayed until the Ninth Circuit resolves an appeal involving a discovery dispute. *See Pizzuto v. Tewalt*, No. 1:21-cv-00359-BLW, 2024 WL 3089291, at *4 (D. Idaho June 21, 2024). Additionally, there are seven other condemned individuals on Idaho's Death Row. *See* https://www.idoc.idaho.gov/content/prisons/death-row (last visited Feb. 24, 2024).

issued and both plaintiffs were involved in on-going post-conviction litigation. 997 F.3d at 899-900.

By Defendant's argument, Plaintiffs would only have standing after not only the issuance of a death warrant, but also after completion of the random drawing for the media representative witnesses. *See IDOC Execution Procedure*, at 11 ("Approximately seven days before the scheduled execution, the PIO will conduct the drawing for three media representative witnesses."). Thus, Plaintiffs would be required to litigate their constitutional claim within the seven days between the witness drawing and the date of execution, when such "eleventh hour" challenges to execution procedures have been previously denied. *See Pizzuto*, 997 F.3d at 900. Applying such a rule would result in review of Plaintiffs' claim being largely unworkable. *See also Creech v. Richardson*, 2024 U.S. Dist. LEXIS 7122, at *21 (D. Idaho Jan. 12, 2024) (declining to find an Eighth Amendment death penalty challenge only ripe after an execution is scheduled, as such would be "contrary to a significant number of authorities addressing challenges to death sentences long before the scheduling of an execution.").

Although the *Pizzuto* plaintiffs are distinct to the case here in that they themselves were the condemned individuals, the underlying considerations in evaluating standing and ripeness in the absence of a death warrant apply similarly here. 997 F.3d at 899-900. IDOC's execution protocol has been identified and is expected to be put into practice should an execution be scheduled, meaning the Court can readily determine now whether such protocols violate Plaintiffs' First Amendment right. Additionally, withholding judicial consideration until the issuance of a death warrant and selection of media

witnesses, as Defendant suggests, would impose hardship on both the parties and this

Court to litigate this issue on an unnecessarily condensed timeline. Determining whether

Defendant's refusal to provide such access violates Plaintiffs' First Amendment Rights is

capable of being resolved now. *See id*. at 901 ("A court simply needs to examine the law

to determine if plaintiffs' alleged rights exist and, if so, find the facts necessary, if any, to

determine if those rights have been violated."). Defendant has offered no indication that

the current protocol precluding witness access to the Medical Team Room will not be the

protocol governing future scheduled executions, preventing the Court from deciding the

issue presently before it.

　　　Additionally, it is unclear how Defendant will suffer hardship if the Court decides

Plaintiffs' claim now, rather than waiting for a writ of execution to be issued and the

witness selection to occur. Assuming Plaintiffs' claims have some merit, allowing the

case to proceed will provide Defendant the opportunity to address any constitutional

deficiencies in IDOC's execution procedure. Taking Plaintiffs' allegations as true, there

is no uncertainty as to how Defendant's execution procedures will currently apply to

witnesses viewing an execution. *See* Boone Decl. ¶¶ 35-47; *IDOC ECPA*; *Pakdel v. City

and Cnty*. of S.F., Cal., 594 U.S. 474, 478 (2021). Defendant has established the witness

protocol in the instance of an execution, so the Court has the ability to review such

protocol to evaluate whether it violates Plaintiffs' First Amendment Rights. As such,

Plaintiffs' claim is ripe and capable of resolution now.

　　　Therefore, as Plaintiffs' claimed injuries are neither hypothetical nor speculative,

Plaintiffs have demonstrated that the injury-in-fact element is sufficiently met. The Court

finds that Plaintiffs have standing to proceed in this case and their claim is ripe for review. *Twitter v. Paxton*, 56 F.4th 1170, 1173-74 (9th Cir. 2022) (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010) (Courts "appl[y] the requirements of ripeness and standing less stringently in the context of First Amendment claims.").

**B.    First Amendment Right of Access to Executions**

  *1.    Whether Plaintiffs have a First Amendment Right of Access to Executions.*

Defendant argues that Plaintiffs' claim should be dismissed because the First Amendment does not provide a right of access to executions. (Dkt. 11-1 at 7). Defendant contends that this Court is not bound by Ninth Circuit case law explicitly finding a right of access to executions under the First Amendment because such holdings are inconsistent with Supreme Court precedent. *Id*. at 6-7.

The Ninth Circuit has held that "where intervening Supreme Court authority is clearly irreconcilable with Ninth Circuit authority, district courts should consider themselves bound by the intervening higher authority and reject prior Ninth Circuit authority as having been effectively overruled." *United States v. Saba*, 2023 U.S. Dist. LEXIS 147257, at *4-5 (D. Idaho Aug. 17, 2023) (citing *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2002) (en banc) (internal quotations omitted). However, the Supreme Court decisions cited to by Defendant in support here are not intervening as to overrule Ninth Circuit authority finding a First Amendment right of access to executions. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Houchins v. KQED, Inc*., 438 U.S. 1 (1978); *Pell v. Procunier*, 417 U.S. 817 (1974); *Saxbe v. Washington Post*

*Co.*, 417 U.S. 843 (1974); *Holden v. Minnesota*, 137 U.S. 483, 491 (1890). The cases

Defendant argues are irreconcilable with Ninth Circuit precedent were decided a

significant period of time prior to the Ninth Circuit cases Plaintiffs rely on for finding

such a First Amendment right of access, and as such, are not considered intervening.

Additionally, *California First Amendment Coalition v. Woodford ("CFAC")* and

its progeny are not irreconcilable with the Supreme Court authority Defendant cites. 299

F.3d at 875 n.3. The "clearly irreconcilable" standard is high, meaning that "[i]t is not

enough for there to be some tension between the intervening higher authority and prior

circuit precedent or for the intervening higher authority to cast doubt on the prior circuit

precedent." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012). Even ignoring the fact

that the authority used by Defendant for support is not intervening, the Ninth Circuit

previously addressed that *Holden* did not foreclose the court's recognition of a First

Amendment right of access to executions, as *Holden* largely addressed *ex post facto*

issues, not the First Amendment, and any passing references to the media were deemed

inconsistent with more modern Supreme Court jurisprudence. *CFAC*, 299 F.3d at 875

n.3.

Defendant's cited authorities do not foreclose on the Ninth Circuit's ability to find

that the First Amendment includes a right of access to executions. *See Richmond*

*Newspapers, Inc*, 448 U.S. at 580 (finding the right of public access to criminal trials);

*Houchins*, 438 U.S. at 16 (finding that the media have no special right of access to a

county jail, different from or greater than that accorded to the general public); *Pell*, 417

U.S. at 834 (finding the media have no constitutional access to prisons or inmates beyond

that afforded to the general public); *Saxbe*, 417 U.S. at 849 (finding a prison visitation policy that provides the media and the public with the same visitation rights to be constitutional). The Supreme Court authority Defendant relies upon is neither intervening nor irreconcilable with the Ninth Circuit precedent cited to by Plaintiffs. As such, Ninth Circuit caselaw providing for a First Amendment right of access to executions is binding upon this Court.

>    2.    *Whether Plaintiffs' First Amendment Right of Access to Executions Includes General Visual and Audio Access to the Medical Team Room.*

The Court will now provide a brief overview of the Ninth Circuit authority Plaintiffs rely on here. The Ninth Circuit found a First Amendment right of access to executions in *CFAC*. 299 F.3d at 875. Such a finding was rooted in the well-settled First Amendment right providing the public – and the press – a qualified right of access to governmental proceedings. *Id*. at 873-74. "[A]lthough the right of access is not enumerated in the First Amendment, it is encompassed within the Amendment as a right that is 'nonetheless necessary to the enjoyment of other First Amendment rights.'" *Id*. at 874 (citing *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982).

*CFAC's* dispute concerned the public's ability to view the "initial execution procedures" rather than only the execution itself (once the lethal injection chemicals start to flow). 299 F.3d at 876. The Ninth Circuit evaluated the requested access using the two-prong test in *Press Enter. Co v. Superior Court*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*"), asking 1) "whether the place and process have historically been open to the press and public[]" and 2) "whether public access plays a significant positive role in

the functioning of the particular process in question." *CFAC*, 299 F.3d at 875 (quoting *Id*.). The court found that '[h]istorically, executions were open to all comers," finding there is a tradition in the United States of at least limited public access to executions. 299 F.3d at 875. That only select members of the public attend, like the press, did not erode the public nature of executions, because these official witnesses act as representatives for the public at large. *Id*; *Cf. Richmond Newspapers v. Virginia*, 448 U.S. 555, 573 (1980) (noting that people now acquire information about trials chiefly through the media rather than first hand, and validating the media's claim that it functions as a "surrogate[]for the public").

Discussing varying execution methods, the court found the public has "historically been allowed to watch the condemned inmate enter the execution place, be attached to the execution device, and then die"; and that historical tradition supports the First Amendment right to view the condemned as the guards escort him into the chamber, strap him to the gurney, and insert the IV lines. *CFAC*, 299 F.3d at 876. The Court also found public access to executions played a significant role in the proper functioning of capital punishment, heightening public respect for the judicial process, and fosters a "sense of catharsis" by being "permitted to see justice done. *Id*. at 876-77.  Finding there was both a historical tradition and a functional importance of access to executions, the court held the "public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Id*. at 877.

**MEMORANDUM DECISION ORDER - 19**

Nearly a decade after *CFAC*, media plaintiffs sought a preliminary injunction against the State of Idaho due to IDOC's then policy allowing witness access to executions beginning with the reading of the death warrant and ending with the pronouncement of death but precluded access to the initial procedures in which the inmate enters the execution chambers and has IV lines inserted into his or her body. *AP v. Otter*, 682 F.3d 821, 823 (9th Cir. 2012). The State argued that there were legitimate penological objectives that overrode the access to executions in their entirety, including preserving the condemned prisoner's privacy and dignity, respecting the sensibilities of the condemned person's family, respecting the sensibilities of fellow death row inmates, and protecting anonymity of the members of the medical team. *Id*. The Ninth Circuit determined the preliminary injunction should have been granted at the district court level, finding the plaintiffs were likely to succeed on the merits because the public had a "right to witness all phases of [the] execution," including the portions that Idaho was shielding from view. *Id*. at 824. The court also found the State's policy represented an exaggerated response to the legitimate penological objectives, instructing "the State to allow witnesses to observe [] the entire execution, from the moment [the condemned person] enters the execution chamber through, to and including, the time [he or she] is declared dead." *Id*. at 825-27.

Then, in *First Amendment Coal. of Ariz., Inc. v. Ryan*, the Ninth Circuit evaluated whether Arizona's execution policy was likely to violate the plaintiffs' First Amendment rights by restricting the ability of execution witnesses to hear the sounds of the entire execution process. 983 F.3d 1069, 1072 (9th Cir. 2019). The plaintiffs in *Ryan* opposed

the State's procedure of turning off the overhead microphone once the IV lines were inserted, meaning witnesses were unable hear sounds from the execution room, except for brief moments when execution team members would turn on the microphone to give updates as to the condemned's level of consciousness. *Id*. at 1073. The plaintiffs argued that limiting access to the sounds of the execution process deprived the public of information necessary to have an informed debate about capital punishment in Arizona. *Id*. at 1074. The court found the right of access described in *CFAC* encompassed the right to hear the sounds of executions in their entirety. *Id*. at 1075. The court reiterated that a deferential standard of review is appropriate in this context because executions take place inside prisons, and corrections officials must have broad discretion to carry out the complex task of prison administration. *Id*. at 1076 (citing *CFAC*, 299 at 877-79). Ultimately, the court found the plaintiffs had plausibly alleged a legally cognizable theory and that there was no valid, rational connection between Arizona's execution policy and cognizable government interests. *Id*. at 1077 (citing *Turner v. Safley*, 482 U.S. 78, 87 (1987).

Here, Defendant argues that IDOC's current policies satisfy the required access found in *CFAC* and later Ninth Circuit cases. (Dkt. 11-1 at 13-14). Alternatively, Plaintiffs contend that the actions taken in the Medical Team Room, including the injection of lethal drugs into IV lines connected to the condemned person, are part of the initial procedures mentioned in *CFAC*, and inextricably intertwined with the execution process. (Dkt. 16 at 24-25). The Ninth Circuit has not provided an exhaustive list of applicable initial procedures of an execution, nor expounded on the implications of the

public being unable to view the injection of drugs into IV lines connected to the condemned person. *See L.A. Times Communs. LLC*, 2018 U.S. Dist. LEXIS 222359, at *10-11 (finding that "no case has provided an exhaustive list of 'initial execution procedures'. . . and the Ninth Circuit rejected attempts [in *CFAC*] to define when an execution begins as 'simply of defendants' own making.").

As it is clear Plaintiffs have a First Amendment right to access executions, "including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death," the Court must consider whether Plaintiffs state a plausible claim that Defendant's policy of precluding access to the Medical Team Room violates their First Amendment right. *CFAC*, 299 at 877. To determine whether there is a First Amendment right of access to a proceeding, the Ninth Circuit looks to two complimentary considerations, whether the proceeding has historically been open to the public, and whether public access has a "significant positive role" in the proceeding. *CFAC*, 266 F.3d at 875 (citing *Press-Enterprise II*, 487 U.S. 1, 8-9 (1986). If the Court finds Plaintiffs have alleged a plausible claim that there is a right of access to the Medical Team Room, such access can only be limited when the prohibition is "reasonably related to legitimate penological objectives" that are not an "exaggerated response to those concerns." *Id*. at 878 (quoting *Turner*, 482 U.S. at 87.).

Defendant argues the holding in *CFAC* was limited to seeing the condemned person "as he enters the execution chamber, is forcibly restrained and fitted with the apparatus of death." 299 F.3d at 877. Defendant argues public access to the Medical Team Room and its members before, during, and after an execution, goes beyond the

right allowed under *CFAC* because it does not satisfy the requirements under *Press Enterprise II*, that it be historically open to the public and that such access plays a significant positive role in the proceeding. (Dkt. 11-1 at 14).

Alternatively, Plaintiffs cite to the same holding in *CFAC*, arguing that access to the Medical Team Room is part of the "initial procedures that are inextricably intertwined with the process of putting the condemned inmate to death." (Dkt. 16 at 25); 299 F.3d at 877. Plaintiffs contend that the court in *CFAC* adopted a broader approach to the public's right to view executions, and that Defendant's reading of the "right to view executions from the moment the condemned is escorted into the execution chamber" is categorically narrow in that it restricts access to anything beyond viewing the inmate as they enter the execution chamber and are subsequently put to death. (Dkt. 16 at 25).

Neither party has presented binding authority supporting that visual and audio access to the Medical Team Room is either provided for under the First Amendment or has been found to go beyond *CFAC's* holding. However, two district courts within this circuit have evaluated identical or similar access and found that chemical preparation or administration is included in the public's right to view the entirety of the execution proceeding. *See Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d 859, 870 (D. Ariz. Dec. 21, 2016); *L.A. Times Communs. LLC*, 2018 U.S. Dist. LEXIS 222359 at *3.

Media plaintiffs in *Guardian News* sought to assert their right to view the totality of the execution. 225 F. Supp. 3d at 866. Similar to the Plaintiffs' here, the *Guardian News* plaintiffs were unable to see the medical team administering the lethal injection drugs, and at no point had audio or visual access to what was happening outside the

execution chamber. *Id*. at 867. The district court found the same logic in *CFAC* applied to the administration of lethal injection drugs as being part of the plaintiffs' right to view the entirety of the execution. *Id*. at 868. The court applied the *Turner* factors to determine whether there was a close fit between the restriction and the state's interest in security of those involved in the execution. *Id*. Ultimately, the defendant's argument that physical and logistical difficulties prohibited granting such access, because the administration of the drugs occurred in a separate room and restricting such access protected the anonymity of the medical team, was found to be an exaggerated response that failed to overcome the plaintiffs' First Amendment right of access. *Id*. at 869-70. As such, the court enjoined the defendant from conducting executions without providing a means for witnesses to be aware of the administration of lethal injection drugs. *Id*.

Similarly, in *L.A. Times Commns. LLC*, the media plaintiffs sought access to observe the preparation and administration of the lethal injection drugs, which occurred outside the execution chamber. 2018 U.S. Dist. LEXIS 222359 at *7. Agreeing with the plaintiffs that *CFAC* supports a more open and flexible interpretation of the right of access to executions, the court found that the plaintiffs had met their burden by stating a plausible claim that preparing and administering the lethal injection drugs is inextricably intertwined with the execution process. *Id* at *11-12. Though it was the State's burden to propose a legitimate penological interest to restrict such access, at the pleading stage with only the complaint before it, the court denied the defendant's motion to dismiss. *Id*. at *19.

To maintain a First Amendment claim against Defendant, Plaintiffs must sufficiently allege that they are being deprived of a constitutional right. Here, Plaintiffs assert in their complaint that Defendant precludes access to the Medical Team Room, in which fundamental aspects of the execution process occur. (Dkt. 1 at 12). Actions occurring in the Medical Team Room include, but are not limited to, preparing and labeling syringes that will contain the lethal injection drugs, drawing the lethal injection drugs into the prepared syringes, tracking the syringes, monitoring the condemned person through a closed-circuit feed and an EKG monitor, and ultimately administering the lethal injection drugs into the IV lines connected to the condemned person. *Id*. Plaintiffs contend that the public right of access to witness executions in their entirety encompasses the actions taken in the Medical Team Room. *Id*. As detailed in *CFAC*, Plaintiffs cite to the historical tradition of public executions in the United States, and that even when execution forums and methods evolved, the public's access to executions is preserved by the media assuming the role of surrogates for the interests of the public. (Dkt 1 at 10-11). Additionally, Plaintiffs allege that the right of access to executions allows for independent public scrutiny in determining whether executions are, or can be, fairly and humanely administered. *Id*. (citing *CFAC*, 299 F.3d at 876). Plaintiffs assert that the actions taken in the Medical Team Room are fundamental parts of the execution process and IDOC's prohibition on witness access to those aspects violates the First Amendment. (Dkt. 1 at 12). Ultimately, Plaintiffs argue the public right of access to witness executions in their entirety encompasses the actions taken in the Medical Team Room.

At the motion to dismiss stage, Plaintiffs can satisfy their pleading standard under *CFAC's* First Amendment right of access to view an execution, including those "initial procedures that are inextricably intertwined with the process of putting the condemned inmate to death." Plaintiffs have sufficiently stated a plausible claim that the actions taking place in the Medical Team Room are inextricably intertwined with the entirety of the execution process. *CFAC*, 299 F.3d at 877. While there is currently no binding precedent explicitly providing general audio and visual access to the Medical Team Room, that does not preclude a plausible claim from being made that such a right exists.

Further, as illustrated above, Defendant may still preclude access to the Medical Team Room if there are legitimate penological interests reasonably related to the regulations barring such access. *Turner*, 482 U.S. at 87 (citing *Pell*, 417 U.S. at 827). Should Defendant's current policy of limiting such access represent an exaggerated response to the penological interests, it will be deemed insufficient to justify the intrusion into Plaintiffs' First Amendment Rights.[6] Courts have recognized some legitimate penological interests including "deterrence of future crime, protection of society by quarantining criminal offenders, rehabilitation of those offenders, and preservation of internal security." *CFAC*, 299 F.3d at 878 (citing *Pell*, 417 U.S. at 822-23). It was noted

---

[6] In determining whether such a restriction on the exercise of rights is reasonable or exaggerated in light of the penological interests, the following four factors are relevant: 1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; 2) whether there are alternative means of exercising the right that remain open to prison inmates, 3) what impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally, and 4) whether there exist ready alternatives. . . that fully accommodate[] the prisoner's rights at de minimis cost to valid penological interests." *CFAC*, 299 F.3d at 878 (quoting *Turner*, 428 U.S. at 89-91).

in *CFAC* that prison regulations "centrally concerned with restricting the rights of outsiders rather than prisoners," are not reasonably related to a legitimate penological interests, such as security or rehabilitation, and will likely fail to satisfy the deferential analysis under *Turner*. 299 F.3d at 878 n.4. Defendant here has the burden to propose a legitimate penological interest. *See L.A. Times Communs. LLC*, 2018 U.S. Dist. 222359, at *19. Defendant acknowledges that at the motion to dismiss phase of the litigation, he is limited in his scope of argument. (Dkt. 11-1 at 17); *Moonlight Mt. Recovery, Inc. v. McCoy*, 2024 U.S. Dist LEXIS 158827, at *6 (D. Idaho Sep. 3, 2024) ("When considering a Rule 12(b)(6) motion to dismiss, the Court may not consider material beyond the complaint.").

Defendant does allege, however, that because IDOC's current procedure requires documentation of the administration of lethal injection drugs during an execution, and IDOC's team verbally notifies witnesses when drugs are being administered, there are alternative means to allow witnesses to exercise their right of access. (Dkt. 11-1 at 17) (citing *Turner*, 482 U.S. at 89-91). However, the right of access to executions under the First Amendment includes the right to both audio and visual access to the entirety of the execution, including the initial procedures, per *CFAC* and *Ryan*. Defendant's contention that Plaintiffs can view documentation after the execution is completed, detailing the injection process, and are informed of when the injections are occurring, does not alter the Court's finding that Plaintiffs have alleged a plausible violation of their First Amendment right of access to the Medical Team Room.

### C.    Prison Litigation Reform Act

Finally, Defendant argues that the Prison Litigation Reform Act ("PLRA") precludes court involvement in the prison system "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the federal right, and is the least intrusive means necessary to correct the violation of the federal right." (Dkt. 11-1 at 20) (quoting 18 U.S.C. § 3626). Defendant defines this as the "needs-narrowness-intrusiveness" test. (Dkt. 11-1 at 20).  Plaintiffs contend that the PLRA has no applicability to this case because it only applies to individuals who are prisoners at the time they file their lawsuit. (Dkt. 16 at 35).

The PLRA imposes significant limitations on court intervention in matters traditionally within the discretion of the Executive Branch and its prisons. It establishes standards for entry and termination of prospective civil actions challenging prison conditions. *See Miller v. French*, 530 U.S. 327, 333 (2000). Defendant is correct in that the "needs-narrowness-intrusiveness" test applies to the federal court's involvement in granting relief regarding prison conditions. 18 U.S.C. § 3626(a)(1)(A). Defendant is incorrect, however, that the PLRA applies to Plaintiffs' claim here.

As Plaintiffs point out, they are not prisoners within the meaning of the PLRA. *See* 18 U.S.C. § 3626(g)(3) (defining "prisoner" as "any person subject to incarceration, detention, or admission to any facility who is accused of, convicted of, sentenced for. . . violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."). The Ninth Circuit has interpreted the same definition of prisoner as it relates to other provisions of the PLRA and found that to fall within the

definition of "prisoner", the individual in question must be currently detained as a result of accusation, conviction, or sentence for a criminal offense. *Page v. Torrey*, 201 F.3d 1136, 1139-40 (9th Cir. 2000) (finding that "only individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offenses are 'prisoners' within the definition of [the PLRA].");

*Talamantes v. Leyva*, 575 F.3d 1021, 1024 (9th Cir. 2009) (finding that because the plaintiff had been released from custody before he filed suit, he did not have to comply with the exhaustion requirements of the PLRA); *Olivas v. Nev. ex rel. Dep't of Corr.*, 856 F.3d 1281, 1284 (9th Cir. 2017) (finding that because the plaintiff was released from custody a month before filing his complaint, the screening requirements under the PLRA did not apply to his claims). Although the specific section of the PLRA relating to prospective relief states that it applies to "any civil action," Defendant provides no support for his contention that while the rest of the PLRA seemingly only applies to claims brought by "prisoners," this section does not. Although the Court here does not find that section 3626 of the PLRA applies to non-prisoner litigants, even if it did, the PLRA would still not apply to Plaintiffs' claims here as explained below.

Plaintiffs' claims also do not concern "prison conditions" implicating the section of the PLRA invoked by Defendant. For the PLRA to apply to claims of prospective relief, the claims must concern "the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2). Plaintiffs here are not challenging conditions of confinement, nor any action by officials effecting the lives of persons in confinement. Instead, Plaintiffs are pursuing a First

Amendment claim specific to Defendant's witness procedures for viewing certain aspects of an execution. The First Amendment right Plaintiffs allege is violated by Defendant precluding them from accessing the Medical Team Room does not concern prison conditions nor effect the lives of those imprisoned. As such, there is no reason that the "needs-narrowness-intrusiveness" test would apply here to Plaintiffs' claims because they do not invoke 18 U.S.C. § 3626 of the PLRA.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is denied. The Court finds Plaintiffs have standing to pursue their claim and such claim is ripe for review. Further, Plaintiffs complaint plausibly states a claim for a First Amendment right of access to the Medical Team Room should an execution be scheduled.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss Plaintiffs' Complaint (Dkt. 11) is **DENIED**.

DATED: March 6, 2025

Honorable Debora K. Grasham
United States Magistrate Judge