## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE ASSOCIATED PRESS; THE MCCLATCHY COMPANY, LLC, dba The Idaho Statesman; EAST-IDAHO-NEWS.COM, LLC, dba East Idaho News, | Case No. 1:24-cv-00587-DKG |
| Plaintiffs, | **ORDER RE: PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DKT. 2)** |
| v. | |
| JOSH TEWALT, in his official capacity as the Director of the Idaho Department of Correction, | |
| Defendant. | |

## INTRODUCTION

Before the Court is Plaintiffs' Motion for Preliminary Injunction, or in the alternative, a Temporary Restraining Order, pursuant to Federal Rule of Civil Procedure 65. (Dkt. 2). The motion is fully briefed and at issue. The parties have consented to proceed before a United States Magistrate Judge in this matter pursuant to 28 U.S.C. § 636(c)(1) and Local Civil Rule 72.1(a)(1). (Dkt. 18). The Court held oral argument on April 8, 2025, and took the matter under advisement. For the reasons that follow, the Court will grant Plaintiffs' Motion for Preliminary Injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs here consist of several media groups, namely, The Associated Press, The Idaho Statesman, and East Idaho News. Defendant is Josh Tewalt, the Director of the Idaho Department of Correction ("IDOC"), being sued in his official capacity. Plaintiffs filed a motion for preliminary injunction, seeking to enjoin Defendant's practice of restricting witness access to the Medical Team Room as part of IDOC's lethal injection execution procedure. (Dkt. 2-1).

Under IDOC's current execution protocol, the execution of a condemned person begins by securing the individual to a medical gurney. (Dkt. 11-1 at 57); IDOC Execution Chemicals Preparation and Administration ("*IDOC ECPA*"), at 5. The individual is then escorted to the Execution Preparation Room, where the medical team will establish peripheral or central line venous access and affix EKG leads onto the condemned person. *Id*. A live, closed-circuit audio and video feed is available to the witnesses for the entirety of the time the condemned person is in the Execution Preparation Room. *Id*; *see also* Boone Decl. ¶ 34.

Once the medical team has established IV access, the condemned person is then escorted on the medical gurney to the Execution Chamber. *IDOC ECPA*, at 5. Witnesses have direct audio and visual access through a window into the Execution Chamber. The medical team leader attaches the EKG leads to the monitor and attaches the IV lines to established IV access catheter sites. *Id*. No lethal injection drugs are administered by the medical team while in the Execution Chamber. *Id*. Rather, there is a small opening in the wall where the IV lines pass into the Medical Team Room. Boone Decl. ¶¶ 21-22. Once

the EKG leads and IV lines are established, the medical team members exit the Execution Chamber and thereafter monitor the condemned individual from the Medical Team Room via closed-circuit audio and video feed while the Idaho Maximum Security Institution Warden remains in the Execution Chamber. *IDOC ECPA*, at 6.

The medical team conducts various tasks while inside the Medical Team Room, including preparing and labeling syringes that will be used to contain the lethal injection drugs, drawing the lethal injection drugs into the prepared syringes, tracking the syringes, and monitoring the condemned person and their vital signs through the closed-circuit feed and the EKG monitor. *Id*. at 1, 5-6. The medical team members are then responsible for administering the lethal injection drugs from the prepared syringes into the IV lines attached to the condemned person. *Id*. at 6-9. The medical team members remain in the Medical Team Room throughout the administration of the lethal injection drugs. *Id*.

Under IDOC's current execution procedures, witnesses have audio and visual access to the Execution Preparation Room and the Execution Chamber for the duration of the execution, but not to the Medical Team Room. Boone Decl. ¶¶ 35-47. Witnesses are verbally notified by the Warden when the medical team has begun the lethal injection process. (Dkt. 12 at 17). Plaintiffs are seeking general audio and visual access to the Medical Team Room leading up to, during, and immediately after any future executions. (Dkt. 1 at 13).

On March 6, 2025, this Court denied Defendant's motion to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6). (Dkt. 21). The Court found Plaintiffs had standing to pursue their claim, which was ripe for review and

not precluded by the political question doctrine or the Prison Litigation Reform Act. *Id.* The Court also found Plaintiffs had met the pleading standard and sufficiently alleged a violation of their First Amendment right of access to executions. *Id.*

## STANDARD OF LAW

Temporary restraining orders and preliminary injunctions generally serve the same purpose of "preserv[ing] the status quo ante litem pending a determination of the action on the merits." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980); Fed. R. Civ. P. 65. "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997)).

"A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest." *Hecox v. Little*, 479 F.Supp.3d 930, 971 (D. Idaho 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)). When the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

## DISCUSSION

Plaintiffs argue that audio and video access to the Medical Team Room is part of the "initial procedures that are inextricably intertwined with the process of putting the

condemned inmate to death." *California First Amendment Coalition v. Woodford*, 299 F.3d 868, 877 (9th Cir. 2002) ("*CFAC*"). Plaintiffs further contend that Defendant's reading of the "right to view executions from the moment the condemned is escorted into the execution chamber" is categorically narrow and conflicts with the Ninth Circuit's broad approach to the public's right to view executions, by restricting access to anything beyond viewing the inmate as they enter the execution chamber and are subsequently put to death. (Dkt. 16 at 25). Plaintiffs assert that viewing the method and manner used to execute a person has been historically open to the public and viewing the entirety of an execution plays a significant positive role in the public's understanding of modern execution procedures.

Defendant argues the holding in *CFAC* was limited to observing the condemned person "as he enters the execution chamber, is forcibly restrained and fitted with the apparatus of death." 299 F.3d at 877. Defendant argues that public access to the Medical Team Room and its members before, during, and after an execution, goes beyond the right permitted under *CFAC* and that it does not satisfy the requirements, under *Press Enterprise II*, that the proceeding be historically open to the public and that such access plays a significant positive role in the proceeding. (Dkt. 11-1 at 14). Further, even if the Court found Plaintiffs to have such a right of access, Defendant maintains that restricting witness access from the Medical Team Room is reasonably related to legitimate penological objectives including the safety and confidentiality of the medical team and maintaining the current structural logistics of F block, which houses IDOC's execution

chamber. (Dkt. 12) (citing *Turner v. Safley*, 482 U.S. 78, 89-90, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987)).

Here, the Court will first evaluate whether Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment claim by considering whether they have a right of access to witness the actions occurring within the Medical Team Room. If there is a right of access, the Court will then evaluate whether Defendant's current restriction on that access is reasonably related to a legitimate penological objective, before moving on to the remaining preliminary injunction requirements.

### A.     Likelihood of Success on the Merits of the First Amendment Claim

Beginning in the 1980s, the Supreme Court recognized that "the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees [of freedom of speech and the press]." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980). Though this "right of access" was initially recognized in the context of criminal trials, the Supreme Court described it in language that has been applied to other government proceedings. *See, e.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604-05, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982) (describing the right of access as "protect[ing] the free discussion of governmental affairs" and "ensur[ing] that this constitutionally protected discussion of governmental affairs is an informed one").

Thus, "the Supreme Court has long recognized a qualified right of access for the press and public to observe government activities." *Leigh v. Salazar*, 677 F.3d 892, 898

(9th Cir. 2012). By reporting about the government, the media act as "surrogates for the public." *Richmond Newspapers*, 448 U.S. at 573 (Burger, C.J., announcing judgment); *see also Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations.").

The Ninth Circuit first held that a First Amendment right of access applied to executions in *CFAC*. 299 F.3d at 875. There, the Court held "that the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, including those 'initial procedures' that are inextricably intertwined with the process of putting the condemned inmate to death." *Id*. at 877. The Court's holding was rooted in the well-settled First Amendment right providing the public — and the press — a qualified right of access to governmental proceedings. *Id.* at 873-74. Finding that "although the right of access is not enumerated in the First Amendment; it is encompassed within the Amendment as a right that is 'nonetheless necessary to the enjoyment of other First Amendment rights.'" *Id.* at 874 (citing *Globe Newspaper Co.,* 457 U.S. at 604. Ten years later, in *Associated Press v. Otter*, the Ninth Circuit held that the public had a "right to witness <u>all phases</u> of [the] execution," including the portions that [the State] was shielding from view (e.g. the condemned individual entering the execution chamber and the insertion of the IV lines into his body). 628 F.3d 821, 823-24 (9th Cir. 2012) (emphasis added). Accordingly, the Court

instructed "the State to allow witnesses to observe [] the entire execution, from the moment [the condemned person] enters the execution chamber through, to and including, the time [he or she] is declared dead." *Id.* at 825-27. More recently, in *First Amendment Coal. of Ariz., Inc. v. Ryan*, the Ninth Circuit held that the plaintiffs' First Amendment rights were violated by the State's restriction on the ability of execution witnesses to hear the sounds of the entire execution process. 938 F.3d 1069, 1072, 1075 (9th Cir. 2019) ("The First Amendment right of access to governmental proceedings encompasses a right to hear the sounds of executions in their entirety.").

Here, Plaintiffs argue that the right to view executions "in their entirety" as specified in *Ryan*, including all procedures that are "inextricably intertwined with the process" of the execution as found in *CFAC*, includes access to the Medical Team Room where the lethal injection drugs are prepared and administered. (Dkt. 2-1 at 16); *Ryan*, 938 F.3d at 1075; *CFAC*, 299 F.3d at 877. Plaintiffs assert that the tasks occurring in the Medical Team Room are inextricably intertwined with the process, because without the actions taken of preparing and administering the lethal injection drugs, the execution would not occur. (Dkt. 2-1 at 11-12).

Defendant responds that the right of access found in *Ryan* is not as broad as Plaintiffs argue. Instead, they note that the Ninth Circuit has held that the public does not have the right to examine executions in minute detail and they are not entitled to every piece of information that is inextricably intertwined with executions. (Dkt. 12 at 8) (citing *Ryan*, 938 F.3d at 1079-80). To that end, at the hearing, Defendant characterized the actions taken in the Medical Team Room as a "minute detail" of the execution. *Id*.

Defendant maintains that IDOC's current execution policies comply with *CFAC* and *Ryan* because witnesses will have audio and visual access to the condemned person in the Execution Preparation Room and the Execution Chamber, and witnesses will be verbally notified when the drugs are being administered by the medical team members.  (Dkt. 12 at 10).

The applicable Ninth Circuit cases of *CFAC*, *Otter*, and *Ryan* provide for a broad interpretation of the type of execution access the public has a right to view, consistent with the ever-changing practices and procedures states employ to carry out capital punishment. The defendants in *CFAC* attempted to define the beginning of an execution as when the lethal chemicals begin to flow, reasoning that the public does not have a right to view the "initial execution procedures." 299 F.3d at 876. The Ninth Circuit ultimately rejected that narrow definition, finding it to be "simply of [the] defendant's own making." *Id*. Although the holdings in prior Ninth Circuit cases did not explicitly include access to the preparation and administration of lethal injection drugs occurring in a location other than the Execution Chamber, they also did not foreclose the possibility that the preparation and administration of lethal injection drugs is inextricably intertwined with the process of conducting an execution. *See LA Times Communs. LLC v. Kernan*, 2018 U.S. Dist. LEXIS 222359, at *10-11 (N. D. Cal. Aug. 17, 2018) (finding that no cases in the Ninth Circuit have "opined on the right of access to the [actions taken in the Medical Team Room] sought here," while on the other hand, "no case has provided an exhaustive list of 'initial execution procedures' the public has a right to observe . . .") (internal citation omitted).

**MEMORANDUM DECISION ORDER - 9**

Because the Ninth Circuit has made it clear that Plaintiffs have a First Amendment right to audio and visual access of executions, the Court must consider whether Defendant's policy of precluding witness access to the actions taken within the Medical Team Room violates that First Amendment right. *CFAC*, 299 F.3d at 877. Courts must look to two complementary considerations to answer that question: (1) whether the proceeding has "historically been open" to the public; and (2) whether public access plays a "significant positive role" in the proceeding. *Id.* at 875 (citing *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)) ("*Press-Enterprise II*"). Even if there is a right of access to a proceeding, access can still be limited when concealing the proceeding is "reasonably related to legitimate penological objectives" and not an "exaggerated response to those concerns." *Id.* at 878 (quoting *Turner*, 482 U.S. at 87). "*Press-Enterprise II* balances the vital public interest in preserving the media's ability to monitor government activities against the government's need to impose restrictions if necessary for safety or other legitimate reasons." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012). "Under this framework, a court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Id.* "[C]ourts have a duty to conduct a thorough and searching review of any attempt to restrict public access." *Id.*

       1.    *The method and means of conducting an execution have historically been open to the public.*

The *Press-Enterprise II* test first asks the Court to consider whether the proceeding has been historically open to the public. Plaintiffs attest that the historical

tradition of public access to executions has been well documented in Ninth Circuit case law, and such tradition includes access to view the methods and means of conducting an execution. (Dkt. 16 at 28). Defendant argued during the hearing and asserts in his briefing that there is neither a historical right of access to executions in Idaho, nor a historical right of access to the Medical Team Room. (Dkt. 12 at 11).

Initially, the Court finds there is ample support within the Ninth Circuit and the District of Idaho demonstrating a historical tradition of at least limited public access to executions. The historical tradition highlighted by the court in *CFAC* applied to access more broadly, and did not solely focus on the history of executions within the state at issue in that case. 299 F.3d at 875-76; *see* John Laurence, *A History of Capital Punishment* 177-178, 179-80 (1960) (explaining that "[i]n England, from 1196 to 1783, the city of Tyburn hosted up to 50,000 public executions; the Old Bailey, opposite Newgate, was the site of public executions from 1783 to 1868; Tyburn and Newgate both drew "large and disorderly" crowds, and in 1807 a crowd as large as 40,000 congregated at Newgate.); *see also* David D. Cooper, *The Lesson of the Scaffold* 1-26 (1974)."). Executions were at times also fully open events in the United States. *Id.* (citing *See* John D. Bessler, *Televised Executions and the Constitution*: *Recognizing a First Amendment Right of Access to State Executions*, 45 Fed. Comm. L.J. 355, 359-64 (1993); Neil E. Nussbaum, *"Film at Eleven ..." - Does the Press Have a Right to Attend and Videotape Executions?*, 20 N.C. Cent. L.J. 121, 122-23 (1992); Roderick C. Patrick, *Hiding Death*, 18 New Eng. J. on Crim. & Civ. Confinement 117, 118 (1992)). When executions were moved out of the public forum and into prisons, states implemented procedures ensuring

executions would remain open to some public scrutiny. *CFAC*, 299 F.3d at 875-76 (finding that "when public executions were first abolished in America, the press was still allowed to attend") (citing Louis P. Massur, *Rites of Execution* 114-16 (Oxford University Press 1989); Bessler, 45 Fed. Comm. L.J. at 362-64; *Holden v. State of Minnesota*, 137 U.S. 483, 486 (1980).

Further, the District of Idaho previously evaluated the historical tradition of access to executions in *Associated Press v. Otter*. 2012 U.S. Dist. LEXIS 203450, at *13 (D. Idaho June 5, 2012), *rev'd and remanded*, 682 F.3d 821, 823 (9th Cir. 2012).[1] This Court in *Otter* acknowledged that the State of Idaho has a historical tradition of allowing the public to witness the process of putting a condemned inmate to death. *Otter*, 2012 U.S. Dist. LEXIS 203450, at *13. The Court noted that the applicable state statute prior to 1901 provided for a limited number of witnesses to be present during an execution, but the statute after 1901 stated executions were to be "closed from public view within the walls of the state penitentiary." *Id*. However, the Court found undisputed support in newspaper accounts of past executions and specific language used in IDOC's own execution procedures, that at least some portion of the public has historically been able to view executions occurring in Idaho. *Id*.

---

[1] Before the district court, the State of Idaho in *Otter* argued that the historical tradition argument in *CFAC* was premised on the history of executions in California, and therefore not applicable to executions in Idaho, which this court squarely rejected. 2012 U.S. Dist. LEXIS 203450, at *13. Although the district court's decision was reversed and remanded by the Ninth Circuit after concluding that the lower court abused its discretion by finding the media plaintiffs had not met their burden for a preliminary injunction, the district court's evaluation of the historical access of executions in Idaho was not addressed before the Ninth Circuit and is nonetheless instructive here. *See Otter*, 2012 U.S. Dist. LEXIS 203450, at *13, *rev'd and remanded*, 682 F.3d 821 (9th Cir. 2012).

Attached to Plaintiffs' reply brief was the second declaration of Rebecca Boone, the AP news correspondent in Idaho, which included additional information in response to Defendant's argument that the tradition and history of executions in Idaho does not include a right of access to the actions taken within Medical Team Room.[2] (Dkt. 16-1 at 2). The declaration stated that Ms. Boone had visited the Old Idaho Penitentiary, including the Gallows Room in Bunk House No. 5, where Idaho executed Raymond Snowden on October 18, 1957. (Dkt. 16-1 at 2); *see Old Idaho Penetentiary FAQ: Idaho State Historical Society*, https://history.idaho.gov/old-pen-faq/ (last visited April 10, 2025). Ms. Boone included a photograph she took of the Gallows Room standing outside of the execution witness window. (Dkt. 16-1); Exh. A. Ms. Boone pointed out that the lever the executioner would pull to effectuate a condemned individual's hanging, and the mechanism used to attach the noose to the ceiling are clearly visible from the execution witness window. *Id*. Ms. Boone also included a photograph she took of a historical photograph of the gallows constructed at the northeast corner of the prison, called the "Rose Garden", where Idaho executed six condemned individuals. *Id*.; Exh. B.

---

[2] Defendant filed an objection to Ms. Boone's second declaration, arguing Federal Rule of Civil Procedure 6(c)(2) provides that "[a]ny affidavit supporting a motion must be served with the motion." (Dkt. 20); Fed. R. Civ. P. 6(c)(2). While it is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers, the court may, in its discretion, consider evidence submitted in a reply brief "that is responsive to arguments raised in the non-moving party's brief in opposition." *Ejonga v. Strange*, 2023 U.S. Dist. LEXIS 121041, 2023 WL 4457142, at *1 (W.D. Wash. Jul.191 F. supp. 2d 111 11, 2023); *United States ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. Jul. 27, 2000) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894-95, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)). Here, the declaration in question responds to arguments raised in Defendant's response brief and is made "in support of" Plaintiffs' reply brief. (Dkt. 16, 16-1). Considering Defendant presented new information in opposition to Ms. Boone's second declaration during the hearing, which was not included in the briefing, the Court will consider both the second declaration, and the arguments made during oral argument by Defendant on this motion.

Alternatively, Defendant, citing to Kathy Deinhardt Hill's *Hanged – A History of Idaho's Executions*, noted during the hearing that prior to statehood, executions within the territory of Idaho were public and run by county sheriffs, but once capital punishment was being conducted by the State and the Board of Prisons in 1899, it was no longer a public spectacle. Deinhardt Hill, Kathy, *Hanged – A History of Idaho's Executions* 3 (2010). While Defendant is correct that some executions occurring in early statehood were explicitly closed to the public, most occurred with multiple witnesses, including reporters. *See id*. at 26, 35, 93, 235 (describing the execution of William Henry Hicks "Fred" Bond in 1906, where "a small crowd gathered" to witness the execution, the execution of Fred Seward in 1909, where a crowd of fifty people had gathered, including reporters[3], the execution of Noah Arnold in 1924 which included a "small group of reporters", and the execution of Raymond Snowden in 1957, where there was said to be "ten people in the observation room."). Although Defendant attempts to demonstrate that not every execution in Idaho's history has allowed witnesses, the overwhelming majority of evidence supports Plaintiffs' assertion that media representatives were generally witnesses to the State's executions. *See generally* Betsy Z. Russell, *News media have witnessed all but one Idaho state execution since 1901*, THE SPOKESMAN-REVIEW, (Jun. 4, 2012) https://www.spokesman.com/blogs/boise/2012/jun/ 04/news-media-have-witnessed-all-one-idaho-state-execution/.

---

[3] For example, the *Idaho Daily Statesman* on May 7, 1909, published a picture of a formal invitation the newspaper had received from the state prison warden, for its reporter to cover the execution of Fred Seward. (Idaho Daily Statesman, May 7, 1909).

**MEMORANDUM DECISION ORDER - 14**

Moreover, Defendant's argument that there is no specific historical tradition of access to the Medical Team Room misinterprets the first *Press-Enterprise II* factor as it has been previously analyzed by the Ninth Circuit. (Dkt. 12 at 11-12). The analysis is not whether witnesses have specifically been allowed access to the preparation and administration of lethal injection drugs occurring in the Medical Team Room, because execution methods have evolved over time and death by lethal injection is only now the current means of enacting capital punishment. *See Bucklew v. Precythe*, 587 U.S. 119, 134, 139 S. Ct. 1112, 1125, 203 L. Ed. 2d 521, 535 (2019) (where the Supreme Court analyzed the progression from one method of execution to another "as soon as an arguably more humane method like lethal injection [became] available."); *see also Glossip v. Gross*, 576 U.S. 863, 977, 135 S. Ct. 2726, 2797, 192 L. Ed. 2d 761, 840 (2015) (Sotomayor, J., dissenting) (remarking "lethal injection represents just the latest iteration of the States' centuries-long search for 'neat and non-disfiguring homicidal methods'") (quoting Craig Brandon, *The Electric Chair: An Unnatural American History* 39 (1999)).

Instead, the question for this Court is whether there is a historical tradition of access to the method and means used when conducting an execution. As with the historical openness of executions, the method used to enact capital punishment has similarly been part of the access that the public is entitled to under the First Amendment. Se*e Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d 859, 879 (D. Ariz. Dec. 16, 2016) (finding "[t]he public and the press enjoy a qualified First Amendment right of

access to view executions in their entirety, including each administration of the means of achieving death . . .").

Defendant's argument that there is no historical tradition of access to the Medical Team Room is analogous to the defendant's argument in *Ryan*, where the state's execution policy was to turn off the microphone in the chamber during an execution. 938 F.3d at 1076. The defendant there argued that the plaintiffs were seeking an amplified sound broadcast from the execution room, which was not available in the historical tradition of access to executions. *Id*. The Ninth Circuit found the defendant was mischaracterizing the nature of the plaintiffs' request, because they were not asking for amplified audio, but rather that they be able to hear the sounds as if they were viewing the execution directly rather than through a soundproof window, and it was ultimately the state's choice to have witnesses view the events through a window requiring amplified sound technology. *Id*. Similarly here, Plaintiffs request audio and visual access to the Medical Team Room for the purpose of observing the preparation and administration of the lethal injection drugs, as if the means for enacting capital punishment were not occurring in a separate room beyond their view. As demonstrated above, there is ample support for this Court's finding that the ability to see and hear executions in their entirety, including the preparation and administration of the means of achieving death, has a historical tradition of being open to the public.

Further, witness access to the preparation and administration of the lethal injection drugs also conforms with Ninth Circuit holdings that the public has "historically [] been allowed to watch the condemned inmate enter the execution place, be attached to the

execution device and then die." *CFAC*, 299 F.3d at 876. IDOC's current execution procedure allows witnesses to have audio and visual access to the condemned person beginning in the Execution Preparation Room, where the IV lines are inserted by the medical team. (Dkt. 2-2 at 6); *IDOC ECPA*, at 5. It is only after IV access is established in the Execution Preparation Room that the medical team, now inside the Medical Team Room, will draw the lethal injection chemicals into the corresponding syringes and administer the drugs into the IV lines attached to the condemned person in the Execution Chamber. *IDOC ECPA*, at 1 ("Primary chemical set A will be drawn after (IV) access is established and before the execution process commences."). This order of procedures provides support for Plaintiffs' assertion that the preparation and administration of the lethal injection drugs is part of access to the entirety of the execution that Plaintiffs have a right to observe. The preparation and administration of the lethal injection drugs is an essential intermediate step occurring between portions of the execution that witnesses already have access to under IDOC's procedures. Thus, allowing witnesses to have access to the medical team's preparation and administration of the drugs will not extend the amount of time witnesses spend in the witness room or require any change in procedure by the medical team members.

Defendant correctly notes that the Ninth Circuit in *Ryan* did not establish "a First Amendment right to examine executions in minute detail, such that witnesses could see the drug labels and the nametags of execution team members." 938 F.3d at 1079 (finding that other courts have reached similar conclusions that the right of access does not extend to every piece of information relating to a governmental proceeding open to the public);

*see Phillips v. DeWine*, 841 F.3d 405, 417-20 (6th Cir. 2016) (holding that the public does not have a First Amendment right of access to information regarding the identities of execution team members or the identities of entities that transport, manufacture, compound, or supply lethal-injection drugs); *Zink v. Lombardi*, 783 F.3d 1089, 1111-13 (8th Cir. 2015) (holding that the public does not have a First Amendment right to know the identities of the entities that supply and compound lethal injection drugs); *Wellons v. Commissioner*, 754 F.3d 1260, 1266-67 (11th Cir. 2014) (holding the public does not have a right to know the qualifications of execution team members or the source of lethal injection drugs). But that is not the type of access Plaintiffs seek here. Plaintiffs are not seeking audio and visual access to information that courts within this circuit have found to be minute details of an execution, such as viewing team member nametags and drug labels. (Dkt. 16 at 11); *see Ryan*, 938 F.3d at 1079. They are seeking access to the preparation and administration of the lethal drugs as they are injected into the condemned individual.

The Court disagrees with Defendant that the preparation and administration of the lethal injection drugs, the method which brings about an execution, is a "minute detail" of the execution process. Indeed, the Court struggles to think of a more vital step of the execution process than the actions taken by the medical team while in the Medical Team Room, because without such actions, the execution would not occur. *See CFAC*, 299 F.3d at 877.

Ultimately, the Court finds that a historical tradition of audio and visual access to the means and methods used in enacting capital punishment is well documented.

Plaintiffs here are likely to succeed on the first *Press-Enterprise II* element – as access to the means and methods of conducting an execution, specifically here the preparation and administration of lethal injection drugs, is not ancillary information, but rather part of the process that is inextricably intertwined with the execution and has been historically open to the public.

2.    *Public access to the means and methods used to carry out an execution plays a significant positive role in the proceeding.*

Next, the Court evaluates whether public access, made possible by media witnesses to an execution, plays a significant positive role in the proper functioning of capital punishment. *CFAC*, 299 F.3d at 876. "To determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable information about the 'initial procedures', which are invasive, possibly painful and may give rise to serious complications." *Id*; *Globe Newspaper*, 457 U.S. at 606; *see also Richmond Newspapers*, 448 U.S. at 572 ("People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."). "An informed public debate is critical in determining whether execution by lethal injection comports with 'the evolving standards of decency which mark the progress of a maturing society.'" *CFAC*, 299 F.3d at 879 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958)). Further, "public access … fosters an appearance of fairness, thereby heightening public respect for the judicial process." *Globe Newspaper*, 457 U.S. at 606; *accord Richmond Newspapers*, 448 U.S. at 572. Ultimately, the public must have reliable information about the method of executing

a condemned person in order to judge the propriety of the particular means used to carry out capital punishment.

Furthermore, as technology and society's perception evolve, viewing the means of enacting capital punishment may impact the public's view of acceptable methods of executions or prompt implementation of alternative methods. *See California First Amendment Coalition v. Woodford*, 2000 U.S. Dist. LEXIS 22189, at *25-26 (N. D. Cal. Jul. 26, 2000); *see, e.g. California First Amendment Coalition v Calderon*, 150 F.3d 976, 978 (9th Cir 1998) ("Eyewitness media reports of the first lethal gas executions sparked public debate over this form of execution and the death penalty itself."). As such, the Court finds that public access to the means and manner used to conduct an execution plays a significant positive role in the proper functioning of capital punishment.

Accordingly, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits of a First Amendment right of audio and visual access to the preparation and administration of the lethal injection drugs in the Medical Team Room.

> 3.    *Defendant's restriction on witness access to the preparation and administration of lethal injection drugs is not reasonably related to the legitimate penological interests proposed.*

As noted above, notwithstanding a First Amendment right of access, Defendant may still close a proceeding from public view if the restriction is reasonably related to a legitimate penological interest. *Turner*, 482 U.S. at 87. In reviewing a challenge to a prison regulation that "burdens fundamental rights," the Court asks whether the regulation "is 'reasonably related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns." *Id.* (quoting *Pell v. Procunier*,

417 U.S. 817, 827, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)). "The 'legitimate policies and goals of the corrections system' are deterrence of future crime, protection of society by quarantining criminal offenders, rehabilitation of those offenders, and preservation of internal security." *CFAC*, 299 F.3d at 878 (citing *Pell*, 417 U.S. at 827).

When determining whether a restriction on access is a reasonable or exaggerated response in light of those penological interests, four factors are relevant: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" and (4) whether there exist "ready alternatives … that fully accommodate[]the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 89-91. However, where the regulation promulgated by prison officials is centrally concerned with restricting the rights of outsiders rather than prisoners and does not require case-by-case discretion, a "closer fit" is required between Defendant's restriction on witness access and the legitimate penological interest. *CFAC*, 299 F.3d at 879.

Here, Defendant offers two legitimate penological interests that witness restriction on access to the Medical Team Room serves. Defendant's primary basis for restricting access is ensuring the safety and anonymity of the medical team members. (Dkt. 12 at 13). Defendant also makes a passing argument that because the area where IDOC executions occur is not designed for direct access from the Medical Team Room into the

witness rooms, providing such access would require renovations to equip the rooms with additional cameras and microphones. *Id*. at 12-13.

In cases such as this, the Ninth Circuit has repeatedly stressed the need for state officials to present evidence supporting their arguments that public access to aspects of executions will cause problems. For instance, in *CFAC,* the court emphasized that the state "must at a minimum supply some evidence that such potential problems are real, not imagined." 299 F.3d at 882. In *Otter*, the court chastised Idaho officials for presenting arguments based on "pure speculation" with "no evidence to support" them. 682 F.3d at 825. The Defendant's presentation of legitimate penological interests in this case suffers from the same flaw.

At the outset, the Court agrees with Defendant that ensuring the safety and security of prison staff, including members of the medical team, is a valid penological interest. Further, it is apparent that such an interest is also a significant concern to the State, as Idaho Code § 19-2716A provides that the identities of the on-site physician and members of the medical team, among others, shall remain confidential. I.C. § 19-2716A. However, the question here is whether Defendant's blanket prohibition of access to the Medical Team Room represents an exaggerated response to that legitimate concern. *CFAC*, 299 F.3d at 880.

Defendant alleges that prohibiting access to the Medical Team Room allows the medical team members to work without donning identity-protecting equipment, like surgical garb, which allows them to work in the safest way possible. (Dkt. 12 at 13) (The "current system allows the medical team to work in the safest way possible because they

do not have to worry about their identities being uncovered and it allows them to work without identity protecting equipment."). Again, protecting the identities of medical team members is a valid, penological interest. However, Defendant has provided no evidence here, beyond speculation, that there is an elevated concern that IDOC's medical team, while in the Medical Team Room, will be identified by witnesses during an execution. During the hearing, Defendant explained that medical team members are already visible to witnesses while they are in the Execution Preparation Room preparing the condemned person for the execution. Nonetheless, Defendant contends that if witnesses also have access to the medical team members while they are in Medical Team Room, it will increase the possibility that witnesses will discover team members' identities, because in the aggregate, more identifying information is available. No evidence is offered to support this argument.

Further, Defendant does not provide an explanation as to how the medical team members, working without wearing identity protecting equipment or not worrying about their anonymity, would create a safer environment for medical team members or prison staff. It appears counterintuitive to the Court for Defendant to contend that medical professionals would be safer when not wearing surgical gear as they prepare and administer lethal injection chemicals. While gloves, masks, head coverings, and surgical gowns are worn to protect medical team members' identities during an execution, the equipment has a dual purpose of keeping team members safe while handling the lethal injection drugs and other medical equipment.

Likewise, any argument that wearing identity protecting surgical garb has a negative effect on the medical team's ability to perform their duties is unsupported, because team members already wear identity protecting equipment while working in the Execution Preparation Room and the Execution Chamber, when witnesses have audio and visual access to both of those areas. The purpose of medical team members entering the Execution Preparation Room and the Execution Chamber wearing identity-protecting equipment is to retain their anonymity, and Defendant offers no argument that such equipment has been insufficient to protect their identity during previous executions. Even assuming that a medical team member was identified by a witness, the notion of disclosure of their identity or retaliation against the team member is also based only on Defendant's speculation.

As such, Defendant has failed to link the penological interest in safety and anonymity of the medical team to the action of restricting witness access from the entirety of the Medical Team Room. Defendant offers a legitimate penological interest here, but the categorical restriction on witness access to the preparation and administration of the lethal injection drugs represents an exaggerated response to that interest.

Defendant's second proffered penological interest provides even less evidentiary support, as Defendant argues that allowing access to the Medical Team Room would be a logistical difficulty because currently there is no direct audio or visual access from the Medical Team Room to the witness rooms. (Dkt. 12 at 12-13) (stating that "not requiring renovations reduces taxpayer expenses because IDOC is not required to renovate F block

to equip it with additional cameras and microphones."). During the hearing, Defendant confirmed that closed-circuit audio and video feeds are already used to stream from the Execution Preparation Room into the witness rooms and from the Execution Chamber into the Medical Team Room. Defendant did not provide an estimated cost for the placement of a closed-circuit audio and visual feed from the Medical Team Room to the witness rooms, beyond stating that a contractor would need to be hired. Defendant's assertion that requiring IDOC to provide such access will take an undisclosed amount of time and an undisclosed number of resources is not a sufficient justification for precluding access as provided for under the First Amendment. Without more specific argument or evidence from Defendant to the contrary, the Court cannot conclude that the installation of an additional closed-circuit audio and video feed allowing witnesses to see the preparation and administration of the lethal injection drugs into the IV lines connected to the condemned individual in the Medical Team Room, would cause an undue burden on Defendant.

Ultimately, the Court finds that Defendant's current limitation on witness access to the preparation and administration of the lethal injection drugs is not "reasonably related to legitimate penological objectives" but rather "represents an exaggerated response to those concerns." *Turner*, 482 U.S. at 87 (internal quotation marks omitted). The Court will briefly consider the remaining *Turner* factors, although Defendant's failure to satisfy the first factor is dispositive. *See Morrison v. Hall*, 261 F.3d 896, 904 (9th Cir. 2001) (holding that once the first *Turner* factor is resolved in either the plaintiff's or defendant's favor, other factors need not be considered).

The second *Turner* factor concerns alternatives means of exercising the right. Defendant argues that if there is a First Amendment right of access to the actions occurring within the Medical Team Room, that right is satisfied by the provision of a verbal notification to witnesses at the time the drugs are administered and documentation to be presumably released by IDOC after an execution, detailing the administration of the drugs and any deviations from protocol. (Dkt. 12 at 17). The Defendant's proffered alternative means are not adequate alternatives to witnessing the preparation and administration of the lethal injection drugs. Eliminating independent, eyewitness observation of the preparation and administration of the drugs would force the public to rely on the same prison officials who are responsible for administering the execution to disclose and provide information about any difficulties of the procedure. *See CFAC*, 299 F.3d at 883; *Ryan*, 938 F.3d at 1077 ("Reports of executions by the same prison officials who carry them out are not adequate substitutes."). An informed public debate is the main impetus behind granting a First Amendment right of access to governmental proceedings.

While this Court believes Defendant would provide accurate and adequate notification and documentation to witnesses, a promise from those conducting an execution, that it will do so responsibly, does not satisfy Plaintiffs' First Amendment right of access. *See Doe v. Harris*, 772 F.3d 563, 580-81 (9th Cir. 2014) (finding "[t]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.") (citing *United States v. Stevens*, 559 U.S. 460, 480, 130 S. Ct. 1577, 176 L Ed. 2d 435 (2010)). The court in *CFAC* found it critical

for the public to be reliably informed about the method of conducting execution by lethal injection, and stated that "[p]rison officials simply do not have the same incentives to describe fully the potential shortcomings of lethal injection executions." 299 F.3d at 884 (noting that "a prison official's perception of the execution process may be vastly different – and markedly less critical – than that of the public."). The First Amendment right of access to executions cannot be obfuscated by the State's promise to follow its own protocol and act responsibly.

The third *Turner* factor addresses the impact that accommodation would have on guards, other inmates, and the allocation of prison resources. 482 U.S. at 90. The Court recognizes and appreciates Defendant's concern that Plaintiffs' request for "general audio and visual access to the Medical Team Room, leading up to, during, and immediately after an execution" is overly broad and could include portions of the execution process that the Court has not explicitly found to be part of Plaintiffs' First Amendment right of access. The Court's grant of Plaintiffs' preliminary injunction here does not provide for the entirety of access Plaintiffs seek, but instead allows for limited audio and visual access to the actual preparation and administration of the lethal injection drugs in the Medical Team Room. Defendant is not required to provide access to the Medical Team Room in its entirety. People and procedures that are not directly involved with the preparation and administration of the drugs may stay out of view of the closed-circuit feed, allowing Defendant to maintain its current IDOC execution procedures. Additionally, the Court acknowledges that the installation of another closed-circuit audio and video feed beyond those already in use, will have a monetary expense for labor and

equipment, but Defendant has provided no specific information as to what that would be. Beyond those addressed above, the Court is unaware of any additional negative impacts to staff or other inmates that would occur by allowing witness access to the preparation and administration of the lethal injection drugs.

The fourth *Turner* factor also weighs against the reasonableness of the current witness restriction, because there already exists a ready, low-cost alternative that would accommodate the public's First Amendment right of access and address the Defendant's concerns. *See CFAC*, 299 F.3d at 884-85. Identity protecting surgical gear already in use by medical team members during other aspects of the execution is a ready alternative to restricting all witness access to the Medical Team Room and would fully accommodate Defendant's concerns about maintaining the anonymity of medical team members. This is particularly true because IDOC's procedures instruct that "[a]t no time will the [medical team] personnel be addressed by name or asked anything that would require a verbal response." *IDOC Execution Procedures*, at 31; (Dkt. 11-1 at 53).

As such, the *Turner* factors weigh against finding Defendant's current witness restriction of the Medical Team Room is reasonably related to their legitimate interest in the safety of the medical team members and the continued functionality of F block, and instead demonstrates that the total prohibition on access to the preparation and administration of the lethal injection drugs in the Medical Team Room represents an exaggerated response. Accordingly, the Court finds Plaintiffs have demonstrated a historical tradition of access to the means and method of conducting an execution, such access plays a significant positive role in the proceeding, and Defendant's restriction on

such access is an exaggerated response to legitimate penological interests. Thus, Plaintiffs have shown a likelihood of success on the merits of their First Amendment claim.

### B.    Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1979). Irreparable harm is relatively easy to establish in the context of the First Amendment because the party seeking an injunction need only demonstrate the existence of a colorable First Amendment Claim. *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005). Plaintiffs have met that burden here.

The court held in *Otter* that "the First Amendment protects the right to witness executions in their entirety." 682 F.3d at 825. As discussed above, Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment claim to see and hear the preparation and administration of the lethal injection drugs in the Medical Team Room, as that aspect is inextricably intertwined with the execution process. Plaintiffs will be harmed by the denial of their right to observe future executions in their entirety, including visual and audio access to the Medical Team Room for the purpose of witnessing the preparation and administration of the lethal injection drugs. Therefore, Plaintiffs will suffer irreparable injury in the absence of a preliminary injunction.

### C.    Balance of Equities and Public Interest

Defendant contends that the people of Idaho have sentenced various people to death, and by seeking an injunction, Plaintiffs attempt to preclude IDOC's ability to carry

out its lawful functions. (Dkt. 12 at 20). Defendant argues the Court's grant of the preliminary injunction here would be against the public's interest in punishing the guilty because it would unduly delay executions. *Id.*

When the government is a party, the balance of equities and the public interest factors merge. *Drakes Bay Oyster Co.*, 747 F.3d at 1092. Notably, "it is always in the public interest to prevent the violation of a party's constitutional rights." *See e.g., Padilla v. Immigration & Customs Enforcement*, 953 F.3d 1134, 1147-48 (9th Cir. 2020) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The Ninth Circuit has generally found that this factor weighs in favor of the public under these circumstances and other courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles. *Id.* (determining the "balance of equities and public interest favors [the] plaintiffs"); *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002).

Defendant's argument that granting Plaintiffs' injunction will impede Defendant's ability to carry out its function of enacting the death penalty is a serious charge, but unavailing here. Enjoining Defendant from carrying out lethal injection executions without providing witnesses audio and visual access to the preparation and administration of the lethal injection drugs is unlikely to have the far-reaching effect of preventing IDOC from executing a condemned person should a death warrant be issued. As Defendant acknowledges, there are no pending death warrants issued, so that requiring the addition of a closed-circuit audio and visual feed from the Medical Team Room into the witness rooms will not disrupt any currently scheduled execution. Further, although

Defendant mentions the potential difficulties of allowing access due to the logistics of F block, Defendant is not required to reconfigure F block in its entirety but can use less intrusive means to provide such access. Presumably, this could be accomplished through the placement of a closed-circuit audio and visual feed from the Medical Team Room into the witness rooms, since this technology is already in use to provide access from the Execution Preparation Room into the witness rooms, and from the Execution Chamber into the Medical Team Room.

Defendant has offered no evidence that the Court's grant of a preliminary injunction would make it impossible for the State to carry out an execution should a death warrant be issued. Again, as of the entry of this order, the Court is not aware of any scheduled execution that would be delayed due to the holding here. Even if a death warrant were issued tomorrow, Defendant would generally have a thirty-day window to update witness access to comply with the Court's order. *See Pizzuto v. Tewalt*, 997 F.3d 893, 899-900 (9th Cir. 2021) (an execution in Idaho must take place no more than thirty days after the issuance of a death warrant) (citing I.C. § 19-2716). Although an execution date could be set fewer than thirty days from the issuance of a death warrant, IDOC's own execution procedure provides for activities commencing in preparation for an execution to begin thirty days prior to an execution. (Dkt. 11-1 at 41); *IDOC Execution Procedures* at 19. Mere speculation without further evidence that such access would be unfeasible for IDOC to complete prior to a scheduled execution is not a sufficient justification for restricting Plaintiffs' First Amendment right of access. For the reasons explained above, the entry of a preliminary injunction here promotes the public interest.

*See Otter*, 682 F.3d at 826 (quoting *Sammartano* 303 F.3d at 974 ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles.").

## CONCLUSION

While it is true that this case concerns Idaho's lethal injection execution procedures, it equally concerns the public's First Amendment right of access to the State's administration of the most severe penalty enforced by our State. The Supreme Court has found that capital punishment categorically differs from other penalties, requiring increased transparency in its implementation. *See Gregg v. Georgia*, 428 U.S. 153, 188, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality opinion). As such, restriction on the public's right of access to a government proceeding carries greater consequences in the context of capital punishment.

It is clear that the performance of capital punishment in the United States has historically been open to the public. The Court finds that the means and methods of an execution were also open and obvious, allowing the public to witness not only the execution itself, but the cause and effect of the execution method used. The Court here does not make a policy judgment regarding if, when, and how the death penalty should be imposed. Rather, it attempts to safeguard the constitutional right belonging to the public under the First Amendment of access to executions conducted by the State, so that such policy decisions can be well-informed.

This Court finds it difficult to identify any aspect of an execution by lethal injection that is more "inextricably intertwined" with the execution than the actual

preparation and administration of the lethal injection drugs into the IV lines connected to the condemned individual. Plaintiffs here, as surrogates for the public at large, enjoy a qualified right of access to witness both audibly and visually, the entirety of an execution, including the preparation and administration of the means of achieving death. *See Guardian News*, 225 F. Supp. 3d at 879. Defendant provided argument as to the legitimate penological interests necessitating a complete restriction of witness access to the Medical Team Room but failed to present evidence demonstrating that such restriction was reasonably related to the concerns and not an exaggerated response.

At this preliminary stage, the preparation and administration of the lethal injection drugs that occurs within the Medical Team Room, is an aspect of the execution that Plaintiffs have demonstrated a right to witness under the First Amendment. To be clear, under IDOC's current lethal injection execution procedure, the Court's grant of Plaintiffs' injunction requires audio and visual witness access to those medical team members that perform all tasks associated with the preparation and administration of the lethal injection drugs in the Medical Team Room. *IDOC ECPA*, at 1-2 (witness access would remain the same under any of the four methods of lethal injection described in IDOC's execution procedures); *See City and County of San Franscisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (finding injunctions must be "narrowly tailored to remedy the specific harm shown.") (internal quotation omitted).

## ORDER

THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (Dkt. 2) is **GRANTED** insofar as Defendant must provide execution witnesses with audio and visual access to the preparation and administration of the lethal injection drugs.

DATED: April 29, 2025

Honorable Debora K. Grasham
United States Magistrate Judge